# EXHIBIT B-2

C.    In the event any Lessor-permitted building or other improvement not belonging to the Lessor on the Premises is damaged or destroyed by fire, storm, or other casualty, the Lessee shall within thirty days after such happening, remove all debris and rubbish resulting therefrom; and if Lessee fails to do so, the Lessor may enter the premises and remove such debris and rubbish, and the Lessee agrees to reimburse the Lessor, within thirty days after bill rendered, for all expenses incurred in such cleanup.

D.    In the Lessee's occupancy and use of the Premises the Lessee, at Lessee's expense, shall conform and comply with all applicable laws, ordinances and public regulations now or hereafter in effect, and hold harmless the Lessor from any failure so to do and from any fines, penalties, forfeitures or judgments resulting from Lessee's failure to conform and comply with all such laws, ordinances and public regulations.

E.    It is further agreed that no gunpowder, gasoline, dynamite or other explosive, flammable or hazardous materials shall be stored or kept upon the Premises. Nothing herein contained, however, shall prevent the storage of those hazardous commodities, if any, specified in Article I of the Lease Agreement, nor the storage of oil or gasoline where same are used by the Lessee for fuel in the business carried on by the Lessee on the Premises, and are stored in quantities reasonable for such purposes: PROVIDED, however, that in all such excepted cases, the Lessee shall not store such commodities within fifty (50) feet from the center line of any main street and shall strictly comply with all federal, state and municipal laws and regulations relating to the storage of such commodities.

## Section 7.   HAZARDOUS SUBSTANCES AND WASTES

A.    Lessee shall comply with all federal, state, and local environmental laws and regulations in its use of the Premises, including the Resource Conservation and Recovery Act, as amended (RCRA), and the Comprehensive Environmental Response Compensation and Liability Act, as amended (CERCLA). Lessee shall not treat, store or dispose of hazardous wastes on the Premises, as defined in RCRA, without first obtaining the Lessor's written permission. If such permission is granted, the Lessee shall obtain any necessary permits and identification numbers and provide the Lessor the identification numbers and copies of the permits.  Lessee shall also assume all responsibility for and costs associated with any closure and/or post-closure care required. In addition, Lessee shall not install any underground storage tanks as defined in RCRA without first obtaining the Lessor's written permission. If such written permission is granted, Lessee shall obtain any necessary permits, notify the proper authorities, and provide the Lessor with copies of such permits and notifications. Furthermore, Lessee shall assume all responsibility for and shall indemnify and defend Lessor against any and all costs and claims associated with a release or leak of any tank contents.

B.    Lessee shall Use its best efforts and safety practices to prevent the release of all and hazardous substances as defined in CERCLA on the Premises. Notwithstanding, Lessee assumes all responsibility for the investigation and cleanup of any such release and shall indemnify and defend the Lessor, its officers, agents and employees, for all costs, including environmental consultant and attorney fees, and claims resulting from or associated with any such release. This provision shall continue in full force and effect regardless of whether this Lease is terminated pursuant to any other provision, or the Premises are abandoned and vacated by the Lessee.

## Section 8.   UTILITIES.

A.    The Lessee shall arrange, secure, and be responsible for all water, gas, heat, electricity, power, sewer, telephone, and any and all other utilities and services supplied and/or furnished to the Premises in connection with the use of the Premises by the Lessee as herein provided, together with any and all taxes and/or assessments applicable thereto.

B.    It is agreed that all utilities and services outlined above should be separately metered to the Lessee. In the event such utilities and services are not separately metered to Lessee, Lessee shall pay a reasonable proportion of the cost of such utilities and services, to be determined by the Lessor, of all charges jointly metered with other portions of the Lessor's property.

C.    It is understood and agreed that none of the above utilities or services may be installed or permitted upon the Premises without first securing the written consent and approval of the Lessor for such installations and services.

## Section 9.   LIENS.

The Lessee shall pay, when due and before any lien shall attach to the Premises, if the same may lawfully be asserted, all charges for water, gas, light, and power furnished; and for rental or use of sewer facilities serving the Premises, and fully pay for all materials joined or affixed to the Premises, pay for all taxes and assessments,  and pay in full all persons who perform labor upon the Premises, and shall not permit or suffer any mechanic's or materialman's or other lien of any kind or nature to be created, threatened, or enforced against Lessor or against any portion or all of the Premises for any work done or materials furnished thereon at the instance or request or on behalf of the Lessee; and the Lessee agrees to indemnify, hold harmless, and defend, the Lessor and Lessor's property against and from any and all liens, claims, demands, costs, and expenses of whatsoever nature in any way connected with or growing out of such done, labor performed, or materials or other things furnished.

## Section 10.    LESSOR'S PRIOR CONSENT REQUIRED FOR BUILDINGS, IMPROVEMENTS, STRUCTURES, DEVICES, TRACKAGE; LESSEE NOT TO IMPAIR CLEARANCES.

A    Detailed plans for all buildings, platforms loading or unloading devices, structures and all alterations, improvements and/or additions thereto, which the Lessee shall desire to make upon the Premises or adjacent property, shall be presented to Lessor for Lessor's consent prior to installation upon the Premises. If the Lessor shall give its consent, the consent shall be deemed conditioned upon Lessee acquiring a permit to do such work from appropriate governmental agencies, and the furnishing of a copy thereof to Lessor prior to the

commencement of the work and the compliance by Lessee prior to the commencement of the work and the compliance by Lessee of all conditions of said permit in a prompt and expeditious manner.

B.       All buildings, platforms, loading or unloading devices, structures, structures and/or material or obstruction of any kind erected, maintained, placed, piled, stacked, or maintained upon the Premises after the commencement of this Lease and any alterations, improvements and/or additions thereto or to buildings, platforms, loading or unloading devices or structures located on the premises prior to the commencement of this Lease shall be constructed, operated, maintained, repaired, renewed, modified and/or reconstructed by the Lessee in strict conformity with applicable federal, state, county, and local laws and regulations and with any and all covenants and conditions that encumber and run with the land which comprises the Premises in whole or in part.

C.       The Lessor consents to Lessee's use of buildings, platforms, loading or unloading devices, structures and/or material or obstructions of any kind located upon the Premises which are in place at the time the Lessee takes possession of the Premises, or which were constructed, placed, piled, stored, stacked, or maintained upon the Premises with the express consent of the Lessor under the terms of a previous lease between Lessor's predecessor in interest and such predecessor's prior tenants, even though not in conformity with Lessor's Clearance Standards applicable at the time.

D.       Nothing herein or applicable to the Premises by any agreement relieve Lessee from the obligation to fully comply with the requirements of any federal, state, county, or municipal law or regulation.

E.       The Lessee shall not locate or permit the location or erection of any poles upon the Premises, nor any, beams, pipes, wires, structure or other obstruction over or under any portion of the Premises without the prior written consent of the Lessor. Lessor shall consider requests of the Lessee to impair clearances which are necessitated by the operational requirements of the Lessee, but Lessor shall not be obligated to consent to any impairment. Any necessary permission to impair clearances to which the Lessor has consented must be secured by the Lessee at its own expense, in advance of any impairment, and Lessee shall comply promptly and strictly with all requirements or orders issued by appropriate state or other public authority relating to such impairments.

F.       Lessee assumes the risk of and shall indemnify, hold harmless, and defend the Lessor, its officers, agents, and employees, against and from all injury to or death of persons, or loss of or damage to property of the parties hereto and their employees and agents and to the person or property of any other person or corporation resulting from the Lessee's noncompliance with the provisions of this Section 10 or resulting directly or indirectly from any impairment of any clearances described in this Section 10, whether the Lessor had notice thereof or consented thereto, or whether authorized by applicable state or other public authority pursuant hereto, or existing without compliance with the provisions of this Section 10.

G.       Any knowledge on the part of the Lessor of a violation of the clearance requirements of this Lease, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve the Lessee of its obligation to indemnify and defend the Lessor, its officers, agents, and employees, for losses and claims resulting from such violation. However, the terms of this Section 10 shall not apply to losses resulting from impairments or facilities created or constructed by this Lessor that will not benefit the Lessee.

## Section 11: ASSUMPTION OF RISK; INDEMNITY.

A.       This Lessee accepts the Premises in its present condition and hereby assumes the risk of any injury to and death of persons and damage to or destruction of property resulting from the condition of or any defects anywhere in or upon the Premises, regardless of whether such condition or defects are known or unknown, apparent or latent, and regardless of whether such condition or defects exist at the commencement of this Lease or at some later time.

B.       The occupation of and activities upon the Premises by the Lessee will expose the Lessor's property, operations and facilities to additional hazards; and as one of the material considerations for this Lease, the Lessee agrees to assume the risk of and to indemnify and hold harmless the Lessor as follows:

      1.       The Lessee assumes the risk of and shall indemnify and hold harmless the Lessor, and its affiliates, their officers, agents and employees, against and from any and all liability, loss, damage, claims, demands, costs and expenses of whatsoever nature, including court costs and attorney fees, arising from or growing out of any injury to or death of persons whomsoever or loss of or damage to property whatsoever. The right of Lessor to be indemnified shall accrue when such injury, death, loss, or damage occurs from any cause and is associated in whole or in part with, incidental to, or caused by the occupation or use of the Premises, or any activity upon the Premises by the Lessee, its employees or agents, or by any person on or near the Premises by reason of any relation (contractual or otherwise) with the Lessee, its officers, employees or agents, or caused by Lessee's breach of this Lease. Except as provided in subparagraph 2 below, the Lessee shall not indemnify the Lessor when any such injury, death, loss, or damage is caused by the sole, direct negligence of the Lessor, its officers employees or agents.

      2.       The Lessee assumes all risk of and agrees to indemnify and hold harmless the Lessor from and against all demands, liability, claims and actions asserted by any person, including an insurer, arising out of or by reason of loss, damage or destruction of or to any and all improvements or other property on the Premises or in proximity to the Premises if used in connection with or incidental to the occupation of the Premises by the Lessee, and any and all incidental loss or injury to the business of the Lessee, (1) where occasioned by fire or other casualty regardless of whether caused or contributed to by operations of the Lessor or any negligence of the Lessor, its officers, agents or employees; or (2) where occasioned by water to the Premises or to property located herein belonging to or in the custody or control of the Lessee, including buildings and contents, regardless of whether such damage is caused or contributed to by the position, location, construction, or condition of any structure of Lessor or any unimproved portion of the Premises.

## Section 12. TERMINATION ON DEFAULT.

A.       It is further agreed that the breach of any covenant, stipulation or condition herein contained to be kept and performed by the Lessee, shall, at the option of the Lessor, forthwith work a termination of this Lease, and all rights of the Lessee hereunder; provided,

however, that the Lessee shall not be deemed in default under this Lease unless the Lessor has furnished written notice to the Lessee of Lessor's default, and the Lessee has failed to begin to cure that default within seventy-two (72) hours after receipt of Lessor's default notice or after commencing an attempt to cure, Lessee has failed to proceed diligently with its cure efforts

B.      After a default by the Lessee, the Lessor may at once re-enter upon the Premises and repossess itself thereof and remove all persons therefrom or may resort to an action of forcible/unlawful entry and detainer, or any other action to recover the same. A waiver by the Lessor of the breach by the Lessee of any covenant or condition of this Lease shall not impair the right of the Lessor to avail itself of any other or subsequent breach thereof.

## Section 13.    TERMINATION ON NOTICE.

A.      This Lease may be terminated, with or without cause, by written notice given by either the Lessor to the Lessee, or by the Lessee to the Lessor, whichever the case may be, on any date in such notice stated, which effective termination date, however, shall not be less than thirty (30) days following the date on which such notice is given.

B.      Upon such termination and vacation of the Premises by the Lessee, the Lessor shall refund to the Lessee, on a pro rata basis, any unearned rental paid in advance.

## Section 14. NOTICE.

A. Any notice, demand, request, consent, approval or communication that either party hereto desires or is required to give to the other party under this Lease shall be in writing. Notice shall be deemed to have been given to the Lessee by serving the Lessee personally (serving the person executing the Lease), or by mailing the same, postage prepaid, to the Lessee at the Premises or the last address known to the Lessor. Notice may be given to the Lessor by mailing the same, postage prepaid, to Safe Storage Management Company, 1818-D Mount Diablo Boulevard, Second Floor, Walnut Creek, California 94596 Attn: J.V. Worsley.

B.      Postal notices shall be by certified mail, return receipt requested, and such notice shall be deemed given on the date deposited with the United States Postal Service.

## Section 15. CONSENT.

Wherever the consent, approval, judgment or determination of Lessor is required or permitted under this Lease, Lessor shall exercise good faith and reasonable business judgment in granting or withholding such consent or approval or in making such judgment or determination, and shall not unreasonably withhold or delay its consent, approval, judgment or determination.

## Section 16. SURRENDER; ABANDONMENT; VACATION OF PREMISES; REMOVAL OF LESSEE'S PROPERTY.

A.      The Lessee agrees   that upon the expiration, abandonment of the Premises by Lessee, or sooner termination of this Lease, the Lessee will peaceably and quietly surrender possession of the Premises to the Lessor, or the Lessor's successors and assigns, without Lessor giving any notice to quit or demand for possession.   Lessee's non-use of the Premises for the purposes described in Article 1 of the Lease (to which this Exhibit B is attached) continuing for thirty (30) days shall be sufficient and conclusive evidence of such abandonment. No later than the expiration or termination date of this Lease, the Lessee shall (a) remove from the Premises, at the expense of the Lessee, all structures, property and other materials not affixed to the Premises and not belonging to the Lessor; and (b) restore the surface of the ground to as good a condition as the same was in before such legally removed structures were erected, including, without limiting the generality of the foregoing, the removal of foundations of such structures, the filling in of all excavations and pits and the removal of all debris and rubbish, all of which shall be performed at Lessee's expense.   If the Lessee should fail to perform such removal the Lessor may perform the work and the Lessee shall reimburse the Lessor for the cost thereof within thirty (30) days after the bill therefore is rendered.

B.      In the case of the Lessee's failure to remove such non-affixed structures and other property, the same, at the option of the Lessor, shall upon the expiration of thirty (30) days after the termination of this Lease, become and thereafter remain the property of the Lessor, and if within one (1) year after the expiration of such thirty-day period the Lessor elects to and does remove, or cause to be removed said structure and other property from the Premises and the market value thereof or of the material therefrom removed does not equal the cost of such removal plus the cost of restoring the surface of the ground as aforesaid, then the Lessee shall reimburse the Lessor for the deficit within thirty (30) days after bill rendered.

## Section 17. PROTECTION OF FIBER OPTICS.

A.      Fiber optic cable systems may be buried on the Lessor's property. Lessee shall telephone the Lessor at (925) 988-0804 to determine if fiber optic cable is buried anywhere on the Premises.   If it is, Lessee will telephone the telecommunications companies involved, arrange for a cable locator, and make arrangements for the relocation or other protection of the fiber optic cable prior to beginning any work on the Premises.

B.      In addition to the liability terms described elsewhere in this Lease, the Lessee shall indemnify and hold the Lessor harmless against and from all cost, liability, and expense whatsoever (including, without limitation, attorney fees and court costs and expenses) arising out of or in any way contributed to by any act or omission of the Lessee, its contractor, agents and/or employees, that causes or in any way or degree contributed to (a) any damage to or destruction of any telecommunications system by the Lessee, and/or its contractor, agents

and/or employees, on Lessor's property; (b) any injury to or death of any person employed by or on behalf of any telecommunications company, and/or its contractor, agents and/or employees, on Lessor's property, and/or its contractor, agents and/or employees on Lessor's property; and/or (c) any claim or cause of action for alleged loss of profits or revenue by, or loss of service by a customer or user of, such telecommunications company or companies.

## Section 18. LESSEE NOT TO SUBLET OR ASSIGN.

The Lessee agrees not to let and not to sublet the Premises, in whole or in part, or to assign this Lease without the consent in writing of the Lessor, and it is agreed that any transfer or assignment of this Lease, whether voluntarily, by operation of law or otherwise, without such consent in writing, shall be absolutely void and, at the option of the Lessor, shall terminate this Lease.

## Section 19. SUCCESSORS AND ASSIGNS.

Subject to the provisions of Section 18 hereof, this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns;

## Section 20. INSURANCE

A.    LIABILITY INSURANCE: During the Lease Term, Lessee shall maintain, at Lessee's own expense, a policy of comprehensive public liability, insuring Lessor and any holder of a first mortgage or deed of trust on the Premises designated by Lessor against liability for personal injury or property damage arising out of the ownership, use, occupancy, or maintenance of the Premises, the sidewalks and thoroughfares adjacent to the Premises, and the business or businesses operated by Lessee and any tenants of Lessee in the Premises. The initial amount of such insurance shall be an amount not less than $1,000,000.00 combined single liability limit per occurrence, and shall be subject to periodic increase based upon inflation, increased liability awards, lender requirements, and other similarly relevant factors affecting insurance coverages generally. The policy shall contain (a) a cross-liability endorsement; (b) a provision such coverage is primary and non-contributing with any policy carried by Lessor (which shall be excess insurance); and (c) a provision that no cancellation or reduction in coverage shall be effective until thirty (30) days after written notice to Lessor and such lender. The policy shall be issued by an insurer licensed in California and reasonably approved by Lessor. Not in limitation of its applicability, the policy shall insure Lessee's performance of the indemnity provisions of Section 11, of this Exhibit B, above. However, the amount of this policy applied to such indemnity provisions shall not relieve Lessee's liability nor relieve Lessee of any obligation hereunder. Prior to the commencement of this Lease the Lessee shall deliver a certificate to Lessor sufficiently evidencing such insurance. Lessee shall deliver a binder or renewal of such insurance at least twenty (20) days prior to expiration of such insurance then in force. Lessee shall maintain such other liability insurance as will protect the interests and business of Lessee.

B.    FIRE AND EXTENDED COVERAGE: During the Lease Term Lessee shall maintain at Lessee's expense, insurance covering loss or damage to the Premises (excluding Lessee's personal property), in the full amount of its replacement value, insuring against all perils included within the classification of fire, extended coverage.

## Section 21. CONDEMNATION.

If, as reasonably determined by Lessor, the Premises cannot be used by Lessee because of condemnation or sale in lieu of condemnation, then this Lease shall automatically terminate. Lessor shall be entitled to the entire award or proceeds for any total or partial condemnation, in sale in lieu thereof, including, without limitation, any award or proceeds for the value of the leasehold estate created by this Lease. Notwithstanding the foregoing, Lessee shall have the right to pursue recovery from the condemning authority of such compensation as may be separately awarded to Lessee for Lessee's relocation expenses, the taking of Lessee's personal property and fixtures, and the interruption of or damage to Lessee's business.

## Section 22 ATTORNEY'S FEES

If either party retains an attorney to enforce this Lease (including, without limitation, the indemnity provisions of this Lease), the prevailing party shall be entitled to reasonable attorney's fees.

## Section 23. ENTIRE AGREEMENT

This Lease is the entire agreement between the parties respecting the Premises and supercedes all other oral or written agreements between the parties pertaining to this transaction. Except for the unilateral redetermination of rent as provided in Article 3 of the Lease to which this Exhibit B is attached, this Lease may be amended only by written instrument signed by both parties

END

Schedule —
(Attachment) A



SAFE STORAGE CUSTOMER MAP
2783 EAST 12TH STREET
OAKLAND, CA. 94601      PH. 510.536.0616

# EXHIBIT 4

Case: 12-46534   Doc# 341-3   Filed: 07/26/13   Entered: 07/26/13 11:45:15   Page 7 of 34

*email sent 4/30*

## LEASE OF IMPROVED INDUSTRIAL / COMMERCIAL PROPERTY: 2783 EAST 12ᵀᴴ STREET, OAKLAND, CALIFORNIA

This Agreement (the "Lease") is made and entered into this 1st day of January, 2008 by and between Pacific Thomas Corporation, a California corporation (PTC) (hereinafter "Lessor"), and Pacific Trading Ventures, a California corporation (PTV) (c/o its duly authorized representative, Safe Storage Management Company, 1818-D Mt. Diablo Blvd, Second Floor, Walnut Creek, California 94596 (hereinafter the "Lessee").

### THE ABOVE PARTIES MUTUALLY AGREE AS FOLLOWS:

### Article 1. PREMISES; LOCATION; USE.

A. The Lessor, for and in consideration of the rental to be paid and the covenants and conditions to be performed by the Lessee as hereinafter provided, does hereby lease and let unto the Lessee, for the period and subject to the terms and conditions herein stated, that portion of the Morse Building located at 2783 East 12ᵗʰ Street, (the "Premises"), City of Oakland, Alameda County, California, shown on the plat, or described in the description, either or both portrayed in the document marked Schedule A attached hereto and incorporated fully into this Lease. The Premises shall be comprised of approximately 1,500 square feet at such location of Lessor. The Premises leased under this Lease may be used by the Lessee to conduct during commercially reasonable business hours a self-storage operation complying with California laws concerning such enterprises and for all related purposes. In the conduct of this self-storage operation Lessee shall have access and ingress and egress to the Premises described in the attached plat Respecting use of the Premises, Lessor may make routine inspections of the Premises on a periodic basis not more frequent than monthly.

B. The grant of right herein made to the Lessee is subject to each and all of the terms, provisions, conditions, limitations and covenants set forth herein and in the attached Exhibit B, which document is acknowledged to have been, understood, and agreed to, and as such is thereby incorporated by this reference into this Lease.

### Article 2. TERM.

A. The term of this Lease shall be **FIVE YEARS**, unless sooner terminated as provided within this Lease, governed by the laws of California respecting such periodic tenancies, and commencing as of January 1, 2005.  — *2010*

B. So long as Lessee is not in default, this Lease shall renew itself automatically from the term stated above without further documentation until terminated and cancelled according to the terms and conditions provided herein, including, without limitation, the service upon Lessee of a thirty-day notice terminating this Lease, with or without cause. Each monthly renewal term will be upon the same terms and conditions set forth herein, including, without limitation, the Lessor's right to reevaluate and change the rental for the Premises upon giving Lessee thirty-days' notice of such change.

### Article 3. RENT; CHANGE IN RENT.

The Lessee covenants, and agrees to pay to the Lessor, as rental for the use of the Premises during each monthly leasehold term rental of **Two Thousand Five Hundred and no/100 Dollars ($2500.00)** per month, payable in advance for each and every month. The above agreed rental of $2500.00 will be due and owing February 1, 2005 and for each ensuing month to which this Lease pertains.

B.   At any time in the month-to-month tenancy, Lessor may re-evaluate the rental base upon which the above monthly rental is computed and change the Lessee's rent.  In the event the Lessor determines that the rental paid is no longer representative of a fair market rental, the Lessor may adjust the rental up or down and shall advise the Lessee by written notice of such change.  Such written notice shall be served upon Lessee at least thirty (30) days prior to the effective date of the next month in which the change is to first take place.

## Article 4.    SPECIAL PROVISIONS

A.   The parties agree that all provisions set forth in Sections 6, 7 and 11 of Exhibit B shall particularly and specifically apply with respect to any appliances maintained or used by the Lessee on the premises (which activity of Lessee shall first require the prior written consent of Lessor).  The parties further agree that the insurance required of Lessee under Exhibit B Section 20 shall be with specific reference to, but not limited to,  full liability coverage with respect to such permitted appliance in an amount not less than $1,000,000.00 , assuring Lessor of such insurance and coverage by delivering additional insured endorsements (naming Lessor as an added insured) and certificates of insurance evidencing the existence and amounts of such insurance with loss payable clauses as required by this Lease.

B.   To assure that Lessee faithfully performs all obligations required hereunder and that the Premises are left in a "broom-clean" condition at the end of the Lease, Lessee shall deposit on execution of this document $             .00 as a security deposit unless a security deposit of this amount was paid commencing with Lessee's Lease running from July 1, 2004, in which case such security deposit shall transfer over to this Lease commencing January 1, 2005.   Lessor may use, apply, or retain all or any portion of such security deposit to compensate Lessor for any default by Lessee which results in loss or damage to Lessor.  If Lessor makes such an application or use of the security deposit, Lessee shall immediately deposit with Lessor an amount sufficient to restore the security deposit to its level at the commencement of the Lease, per this Section 4 (B).  Similarly, if the monthly rent shall increase at any time, pursuant to the provisions of  this Lease, Lessee shall also deposit sums sufficient to bring the amount of the security deposit equal to the monthly rent amount then in effect.  Any unused portion of the security deposit shall be returned to Lessee upon the termination of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written above.

LESSOR:

Pacific Thomas Corporation, a California corporation

By

_____
Its Duly Authorized Representative

By

_____
Its Duly Authorized Representative

LESSEE:

_____
Jill V. Worsley, its Duly Authorized Representative

BERK 02022

EXHIBIT B: Leasehold Standard Terms and Conditions

## Section 1. IMPROVEMENTS.

It is agreed that no improvements placed upon the Premises by the Lessee shall become a part of the Premises realty.

## Section 2. PRIOR RIGHTS.

A. This Lease is made without covenant of title or to give possession or for quiet enjoyment.

B. This Lease is made subject to all outstanding superior rights, including, but not limited to, underground facilities, rights-of-way for highways and for power, fiber optics and other communication lines and facilities, and the right of the Lessor to renew such outstanding rights, to renew the term thereof and to grant such new or additional rights, licenses or easements unto others as the Lessor in its sole discretion shall deem necessary, convenient or appropriate. In the Lessee's use and occupancy of the Premises, the Lessee shall not disturb, damage or interfere with any such facilities of either the Lessor or any nonparties to this Lease.

## Section 3. PAYMENT OF RENTAL; UNPAID RENTAL.

A. All rental shall be paid in lawful money of the United States of America at the offices of Lessor's duly authorized representative and manager, Safe Storage Management Company, 1818-D Mt. Diablo Boulevard, Second Floor, Walnut Creek, California 94569, or at such other place(s) as the Lessor shall designate in writing from time to time.

B. In the event that the rental herein specified to be paid has not been received by the Lessor within ten (10) days after the date that such rental payment is due, a finance charge of $25.00 for each unpaid and delinquent rental payment shall be assessed against the Lessee, and interest, at the maximum legal rate then applicable, shall be assessed against the unpaid rental and shall accrue until such rental payments are current and all interest payments and finance charges have been paid.

## Section 4. TAXES AND ASSESSMENTS.

A. The Lessee further agrees to pay, before the same shall become delinquent, all taxes levied during the life of this Lease upon the Premises and upon any buildings and improvements thereon allowed by Lessor, or to reimburse the Lessor, either directly or as an amount included in Lessee's rental payment for sums paid by the Lessor for such taxes.

B. If, during the life of this Lease, any street or other improvement shall be made, whether consisting of new construction, maintenance, repairs, renewals, or reconstruction, and the whole or any portion of the cost of which is assessed against or is fairly assignable to the Premises on a prorated basis, the Lessee agrees to pay in addition to the other payments herein provided for the entire amount so assessed against or assignable to the Premises.

## Section 5. WATER RIGHTS.

This Lease does not grant, convey or transfer any right to the use of water under any water right owned or claimed by the Lessor which may be appurtenant to or otherwise associated with the Premises. All right, title, and interest in and to such water is expressly reserved unto the Lessor, its successors and assigns, and the right to use same or any part thereof may be obtained only after the prior written consent of the Lessor is first secured.

## Section 6. CARE AND USE OF PREMISES.

A. In the Lessee's use and occupancy of the Premises, the Lessee will observe and exercise reasonable care and caution against damage or destruction to the Premises by fire or otherwise. The Lessee shall not do, suffer or permit anything upon or about the Premises which will or may increase the fire hazard thereon. The Lessee shall not commit or suffer waste thereof or injury thereto and shall not use or permit the use of the Premises for any unlawful purpose nor create or maintain thereon any nuisance or any offensive object, matter or thing. The Lessee, at Lessee's expense, will at all times keep the Premises in a safe, neat, clean and presentable condition including all sidewalks and public ways located on or leading to the Premises. The Lessee, at Lessee's expense, shall also keep all walkways appurtenant to any railroad track(s) or to public rights-of-way free and clear from debris, snow, ice and any other substance which would or might create a hazard thereon.

B. The Lessee shall not install, maintain or permit any sign or advertisement upon the Premises, except signs relating to the Lessee's business; provided such signs are properly installed and maintained by the Lessee and present a neat appearance. The Lessor reserves the right to place and maintain at prominent places on the Premises, signs advertising the name and business of Lessor or the representative of Lessor maintaining the Premises.

C. In the event any Lessor-permitted building or other improvement not belonging to the Lessor on the Premises is damaged or destroyed by fire, storm, or other casualty, the Lessee shall within thirty days after such happening, remove all debris and rubbish resulting therefrom; and if Lessee fails to do so, the Lessor may enter the premises and remove such debris and rubbish, and the Lessee agrees to reimburse the Lessor, within thirty days after bill rendered, for all expenses incurred in such cleanup.

BERK 02023

D.    In the Lessee's occupancy and use of the Premises the Lessee, at Lessee's expense, shall conform and comply with all applicable laws, ordinances and public regulations now or hereafter in effect, and hold harmless the Lessor from any failure so to do and from any fines, penalties, forfeitures or judgments resulting from Lessee's failure to conform and comply with all such laws, ordinances and public regulations.

E.    It is further agreed that no gunpowder, gasoline, dynamite or other explosive, flammables or hazardous materials shall be stored or kept upon the Premises. Nothing herein contained, however, shall prevent the storage of those hazardous commodities, if any, specified in Article I of the Lease Agreement, nor the storage of oil or gasoline where same are used by the Lessee for fuel in the business carried on by the Lessee on the Premises, and are stored in quantities reasonable for such purposes; PROVIDED, however, that in all such excepted cases, the Lessee shall not store such commodities within fifty (50) feet from the center line of any main street and shall strictly comply with all federal, state and municipal laws and regulations relating to the storage of such commodities.

## Section 7.  HAZARDOUS SUBSTANCES AND WASTES

A.    Lessee shall comply with all federal, state, and local environmental laws and regulations in its use of the Premises, including the Resource Conservation and Recovery Act, as amended (RCRA), and the Comprehensive Environmental Response Compensation and Liability Act, as amended (CERCLA). Lessee shall not treat, store or dispose of hazardous wastes on the Premises, as defined in RCRA, without first obtaining the Lessor's written permission. If such permission is granted, the Lessee shall obtain any necessary permits and identification numbers and provide the Lessor the identification numbers and copies of the permits.  Lessee shall also assume all responsibility for and costs associated with any closure and/or post-closure care required. In addition, Lessee shall not install any underground storage tanks as defined in RCRA without first obtaining the Lessor's written permission. If such written permission is granted, Lessee shall obtain any necessary permits, notify the proper authorities, and provide the Lessor with copies of such permits and notifications. Furthermore, Lessee shall assume all responsibility for and shall indemnify and defend Lessor against any and all costs and claims associated with a release or leak of any tank contents.

B.    Lessee shall Use its best efforts and safety practices  to prevent the release of oil and hazardous substances as defined in CERCLA on the Premises. Notwithstanding, Lessee assumes all responsibility for the investigation and cleanup of any such release and shall indemnify and defend the Lessor, its officers, agents and employees, for all costs, including environmental consultant and attorney fees, and claims resulting from or associated with any such release. This provision  shall continue in full  force and effect regardless of whether this Lease is terminated pursuant to any other provision, or the Premises are abandoned and vacated by the Lessee.

## Section 8.  UTILITIES.

A.    The Lessee shall arrange, secure, and be responsible for all water, gas, heat electricity, power, sewer, telephone, and any and all other utilities and services supplied  and/or furnished to the Premises in connection with the use of the Premises by the Lessee as herein provided, together with any and all taxes and/or assessments applicable thereto.

B.    It is agreed that all utilities and services outlined above-should be separately metered to the Lessee. In the event such utilities and services are not separately metered to Lessee, Lessee shall pay a reasonable proportion of the cost of such utilities and services, to be determined by the Lessor, of all charges jointly metered with other portions of the Lessor's property.

C.    It is understood and agreed that none of the above utilities or services may be installed or permitted upon the Premises without first securing the written consent and approval of the Lessor for such installations and services.

## Section 9.  LIENS.

The Lessee shall pay, when due and before any lien shall attach to the Premises, if the same may lawfully be asserted, all charges for water, gas, light, and power furnished; and for rental or use of sewer facilities serving the Premises, and fully pay for all materials joined or affixed to the Premises, pay for all taxes and assessments,  and pay in full all persons who perform labor  upon the Premises, and shall not permit or suffer any mechanic's or materialman's or other lien of any kind or nature  to be created, threatened, or enforced against Lessor or against  any portion or all of  the Premises for any work done or materials furnished thereon at the instance or request or on behalf of the Lessee; and the Lessee agrees to indemnify, hold harmless, and defend, the Lessor and Lessor's property against and from any and all liens, claims, demands, costs, and expenses of whatsoever nature in any way connected with or growing out of such done, labor performed, or materials or other things furnished.

## Section 10.    LESSOR'S PRIOR CONSENT REQUIRED FOR BUILDINGS, IMPROVEMENTS, STRUCTURES, DEVICES, TRACKAGE; LESSEE NOT TO IMPAIR CLEARANCES.

A.    Detailed plans for all buildings, platforms loading or unloading devices, structures and all alterations, improvements and/or additions thereto, which the Lessee shall desire to make upon the Premises or adjacent property  shall be presented to Lessor for Lessor's consent prior to installation upon the Premises. If the Lessor shall give its consent, the consent shall be deemed conditioned upon Lessee acquiring a permit to do such work from appropriate governmental agencies, and  the furnishing of a copy  thereof to Lessor prior to the commencement of the work and the compliance by Lessee prior to the commencement of the work and the compliance by Lessee of all conditions of said permit in a prompt and expeditious manner.

B.    All buildings, platforms, loading or unloading devices, structures, and/or material or obstruction of any kind erected, maintained, placed, piled, stacked, or maintained upon the Premises after the commencement of this Lease and any alterations, improvements and/or additions thereto or to buildings, platforms, loading or  unloading devices or  structures located on the premises prior to the commencement

of this Lease shall be constructed, operated, maintained, repaired, renewed, modified and/or reconstructed by the Lessee in strict conformity with applicable federal, state, county, and local laws and regulations and with any and all covenants and conditions that encumber and run with the land which comprises the Premises in whole or in part.

C.     The Lessor consents to Lessee's use of buildings, platforms, loading or unloading devices, structures and/or material or obstructions of any kind located upon the Premises which are in place at the time the Lessee takes possession of the Premises, or which were constructed , placed, piled, stored, stacked, or maintained upon the Premises with the express consent of the Lessor under the terms of a previous lease between Lessor's predecessor in interest and such predecessor's prior tenants, even though not in conformity with Lessor's Clearance Standards applicable at the time .

D.     Nothing herein or applicable to the Premises by any agreement  relieve Lessee from the obligation to fully comply with the requirements of any federal, state, county, or municipal law or regulation.

E.     The Lessee shall not locate or permit the location or erection of any poles upon the Premises, nor any, breams, pipes, wires, structure or other obstruction over or under any portion of the Premises  without the prior written consent of the Lessor Lessor shall consider requests of the Lessee to impair clearances which are necessitated by the operational requirements of the Lessee, but Lessor shall not be obligated to consent to any impairment. Any necessary permission to impair clearances to which the Lessor has consented must be secured by the Lessee at its own expense, in advance of any impairment; and Lessee shall comply promptly and strictly with all requirements or orders issued by appropriate state or other public authority relating to such impairments.

F.     Lessee assumes the risk of and shall indemnify, hold harmless, and defend the Lessor, its officers, agents, and employees, against and from all injury to or death of persons, or loss of or damage to property of the parties hereto and their employees and agents and to the person or property of any other person or corpora tion resulting from the Lessee's noncompliance with the provisions of this Section 10 or resulting directly or indirectly from any impairment of any  clearances described in this Section 10, whether the Lessor had notice thereof or consented thereto, or whether authorized by applicable state or other public authority pursuant hereto, or existing without compliance with the provisions of this Section 10.

G.     Any  knowledge on the part of the Lessor of a violation of the clearance requirements of this Lease, whether such knowledge is actual or implied, shall not constitute a waiver and shall not relieve the Lessee of its obligation to indemnify and defend the Lessor, its officers, agents, and employees, for losses and claims resulting from such violation. However, the terms of this Section 10 shall not apply to losses resulting from impairments or facilities created or constructed by the Lessor that will not benefit the Lessee.

## Section 11.   ASSUMPTION.OF RISK; INDEMNITY.

A.     The Lessee accepts the Premises in its present condition and hereby assumes the risk of any injury to and death of persons and damage to or destruction of property  resulting from the condition of or any defects anywhere in or upon the Premises,  regardless of whether such condition or defects a re known or unknown,  apparent or latent, and regardless of whether such condition or defects exist at the commencement of this Lease or at some later time.

B.     The occupation of and activities upon the Premises by the Lessee will expose the Lessor's property, operations and facilities to additional hazards; and as one of the material considerations for this Lease, the Lessee agrees to assume the risk of and to indemnify and hold harmless the Lessor as follows:

1.     The Lessee assumes the risk of and shall indemnify and hold harmless the Lessor, and its affiliates, their officers, agents and employees, against and from any and all liability, loss, damage,  claims, demands, costs and expenses of whatsoever nature, including court costs and attorney fees, arising from or growing out of any injury to or death of persons whomsoever or loss of or damage to property  whatsoever. The right of Lessor  to be indemnified  shall  accrue when such injury,  death, loss,  or damage occurs from any cause and is associated in whole or in part with, incidental to, or caused by the occupation or use of the Premises, or any activity upon the Premises by the Lessee, its employees or agents, or by any person on or near the Premises by reason of any relation (contractual or otherwise) with the Lessee, its officers, employees or agents, or caused by Lessee's breach of this Lease.  Except as provided in subparagraph 2 below, the Lessee shall not indemnify the Lessor when any such injury, · death, loss, or damage is caused by the sole, direct negligence of the Lessor, its officers employees or agents.

2.     The Lessee assumes all risk of and agrees to indemnify and ho ld harmless the Lessor from and against all demands, liability, claims and actions asserted by any  person, including an insurer, arising out of or by reason of loss, damage or destruction of or to any and all  improvements or other property  on the Premises or in proximity to the Premises if used in connection with or incidental to the occupation of the Premises by the Lessee, and any and all incidental loss or  injury to the business of the Lessee, (1)  where occasioned by fire  or other casualty regardless of. whether caused or contributed to by operations of the Lessor or any negligence of the Lessor, its officers, agents or employees; or (2)  where occasioned by water to the Premises or to property located hereon belonging to or in the custody or control of the Lessee, including buildings and contents,  regardless of whether such damage is caused or contributed to by the position, location, construction, or condition of any structure of Lessor or any unimproved portion of the Premises.

## Section 12.   TERMINATION ON DEFAULT.

A.     It is further agreed that the breach of any covenant, stipulation or condition herein contained to be kept and performed by the Lessee, shall, at the option of the Lessor, forthwith work a termination of this Lease, and all rights of the Lessee hereunder; provided, however, that the Lessee shall not be deemed in default under  this Lease unless the Lessor has furnished written notice to the Lessee of Lessee's default, and the Lessee has failed to begin to cure that default within seventy-two (72) hours after receipt of Lessor's default notice or after commencing an attempt to cure, Lessee has failed to proceed diligently with its cure efforts.

B.     After a default by the Lessee, the Lessor may at once re-enter upon the Premises and repossess itself thereof and remove all persons therefrom  or may resort to an action of forcible/unlawful entry and detainer, or any other action to recover the same.  A waiver by


Case: 12-46534   Doc# 341-3   Filed: 07/26/13   Entered: 07/26/13 14:45:15   Page 12 of 34

the Lessor of the breach by the Lessee of any covenant or condition of this Lease shall not impair the right of the Lessor to avail itself of any other or subsequent breach thereof.

## Section 13. TERMINATION ON NOTICE.

A.      This Lease may be terminated, with or without cause, by written notice given by either the Lessor to the Lessee, or by the Lessee to the Lessor, whichever the case may be, on any date in such notice stated, which effective termination date, however, shall not be less than thirty (30) days following the date on which such notice is given.

B.      Upon such termination and vacation of the Premises by the Lessee, the Lessor shall refund to the Lessee, on a pro rata basis, any unearned rental paid in advance.

## Section 14. NOTICE.

A. Any notice, demand, request, consent, approval or communication that either party hereto desires or is required to give to the other party under this Lease shall l be in writing. Notice shall be deemed to have been given to the Lessee by serving the Lessee personally (serving the person executing this Lease), or by mailing the same, postage prepaid, to the Lessee at the Premises or the last address known to the Lessor. Notice may be given to the Lessor by mailing the same, postage prepaid, to Safe Storage Management Company, 1818-D Mount Diablo Boulevard, Second Floor, Walnut Creek, California 94596 Attn: J.V. Worsley.

B.      Postal notices shall be by certified mail, return receipt requested, and such notice shall be deemed given on the date deposited with the United States Postal Service.

## Section 15. CONSENT.

Wherever the consent, approval, judgment or determination of Lessor is required or permitted under this Lease, Lessor shall exercise good faith and reasonable business judgment in granting or withholding such consent or approval or in making such judgment or determination and shall not unreasonably withhold or delay its consent, approval, judgment or determination.

## Section 16. SURRENDER; ABANDONMENT; VACATION OF PREMISES; REMOVAL OF LESSEE'S PROPERTY.

A.      The Lessee agrees . that upon the expiration, abandonment of the Premises by Lessee, or sooner termination of this Lease, the Lessee will peaceably and quietly surrender possession of the Premises to the Lessor, or the Lessor's successors and assigns, without Lessor giving any notice to quit or demand for possession. Lessee's non-use of the Premises for the purposes described in Article 1 of the Lease (to which this Exhibit B is attached) continuing for thirty (30) days shall be sufficient and conclusive evidence of such abandonment. No later than the expiration or termination date of this Lease, the Lessee shall (a) remove from the Premises, at the expense of the Lessee, all structures, property and other materials not affixed to the Premises and not belonging to the Lessor; and (b) restore the surface of the ground to as good a condition as the same was in before such legally removed structures were erected, including, without limiting the generality of the foregoing, the removal of foundations of such structures, the filling in of all excavations and pits and the removal of all debris and rubbish, all of which shall be performed at Lessee's expense. If the Lessee should fail to perform such removal the Lessor may perform the work and the Lessee shall reimburse the Lessor for the cost thereof within thirty (30) days after the bill therefore is rendered.

B.      In the case of the Lessee's failure to remove such non-affixed structures and other property, the same, at the option of the Lessor, shall upon the expiration of thirty (30) days after the termination of this Lease, become and thereafter remain the property of the Lessor; and if within one (1) year after the expiration of such thirty-day period the Lessor elects to and does remove, or, cause to be removed said structure and other property from the Premises and the market value thereof or of the material therefrom removed does not equal the cost of such removal plus the cost of restoring the surface of the ground as aforesaid, then the Lessee shall reimburse the Lessor for the deficit within thirty (30) days after bill rendered.

## Section 17. PROTECTION OF FIBER OPTICS.

A.      Fiber optic cable systems may be buried on the Lessor's property. Lessee shall telephone the Lessor at (925) 988-0804 to determine if fiber optic cable is buried anywhere on the Premises. If it is, Lessee will telephone the telecommunications companies involved, arrange for a cable locator, and make arrangements for the relocation or other protection of the fiber optic cable prior to beginning any work on the Premises.

B.      In addition to the liability terms described elsewhere in this Lease, the Lessee shall indemnify and hold the Lessor harmless against and from all cost, liability and expense whatsoever (including, without limitation, attorney fees and court costs and expenses) arising out of or in any way connected to or arising by any act or omission of the Lessee, its contractor, agents and/or employees, that causes or in any way or degree contributed to (a) any damage to or destruction of any telecommunications system by the Lessee, and/or its contractor, agents and/or employees, on Lessor's property; (b) any injury to or death of any person employed by or on behalf of any telecommunications company, and/or its contractor, agents and/or employees, on Lessor's property, and/or its contractor, agents and/or employees on Lessor's property; and/or (c) any claim or cause of action for alleged loss of profits or revenue by, or loss of service by a customer or user of, such telecommunications company or companies.



Section 18. LESSEE NOT TO SUBLET OR ASSIGN.

The Lessee agrees not to let and not to sublet the Premises, in whole or in part, or to assign this Lease without the consent in writing of the Lessor, and it is agreed that any transfer or assignment of this Lease, whether voluntarily, by operation of law or otherwise, without such consent in writing, shall be absolutely void and, at the option of the Lessor, shall terminate this Lease.

Section 19. SUCCESSORS AND ASSIGNS.

Subject to the provisions of Section 18 hereof, this Lease shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 20.  INSURANCE

A.        LIABILITY INSURANCE: During the Lease Term, Lessee shall maintain, at Lessee's own expense, a policy of comprehensive public liability, insuring Lessor and any holder of a first mortgage or deed of trust on the Premises designated by Lessor against liability for personal injury or property damage arising out of the ownership, use, occupancy, or maintenance of the Premises, the sidewalks and thoroughfares adjacent to the Premises, and the business or businesses operated by Lessee and any tenants of Lessee in the Premises. The initial amount of such insurance shall be an amount not less than  $1,000,000.00 combined single liability limit per occurrence, and shall be subject to periodic increase based upon inflation, increased liability awards, lender requirements, and other similarly relevant factors affecting insurance coverages generally.  The policy shall contain (a) a cross-liability endorsement; (b)  a provision such coverage is primary and non-contributing with any policy carried by Lessor (which shall be excess insurance); and (c) a provision that no cancellation or reduction in coverage shall be effective until thirty (30) days after written notice to Lessor and such lender.  The policy shall be issued by an insurer licensed in California and reasonably approved by Lessor.  Not in limitation of its applicability, the policy shall insure Lessee's performance of the indemnity provisions of Section 11, of this Exhibit B, above.   However, the amount of the policy applied to such indemnity provisions shall not relieve Lessee's liability nor relieve Lessee of any obligation hereunder.  Prior to the commencement of this Lease the Lessee shall deliver a certificate to Lessor sufficiently evidencing such insurance.  Lessee shall deliver a binder or renewal of such insurance at least twenty (20) days prior to expiration of  such insurance then in force.  Lessee shall maintain such other liability insurance as will protect the interests and business of Lessee.

B.        FIRE AND EXTENDED COVERAGE:  During the Lease Term Lessee shall maintain at Lessee's  expense, insurance covering loss or damage to the Premises (excluding Lessee's personal property), in the full amount of its replacement value, insuring against all perils included within the classification of fire,  extended coverage.

Section 21. CONDEMNATION.

If, as reasonably determined by Lessor, the Premises cannot be used by Lessee because of condemnation or sale in lieu of condemnation, then this Lease shall automatically terminate.  Lessor shall be entitled to the entire award or proceeds for any total or partial condemnation in sale in lieu thereof, including, without limitation, any award  or proceeds for the value of the leasehold estate created by this Lease. Notwithstanding the foregoing, Lessee shall have the right to pursue recovery from the condemning authority of such compensation as may be separately awarded to Lessee for Lessee's relocation expenses, the taking of Lessee's personal property and fixtures, and the interruption of or damage to Lessee's business.

Section  22  ATTORNEY'S FEES

If either party retains an attorney to enforce this Lease (including, without limitation, the indemnity provisions of this Lease), the prevailing party shall be entitled to reasonable attorney's fees.

Section 23. ENTIRE AGREEMENT

This Lease is the entire agreement between the parties respecting the Premises and supercedes all other oral or written agreements between the parties pertaining to this transaction. Except for the unilateral redetermination of  rent as provided in Article 3 of the Lease to which this Exhibit B is attached,  this Lease may be amended only by written instrument signed by both parties.

END

B.    At any time in the month-to-month tenancy, Lessor may re-evaluate the rental base upon which the above monthly rental is computed and change the Lessee's rent.  In the event the Lessor determines that the rental paid is no longer representative of a fair market rental, the Lessor may adjust the rental up or down and shall advise the Lessee by written notice of such change. Such written notice shall be served upon Lessee at least thirty (30) days prior to the effective date of the next month in which the change is to first take place.

## Article 4.    SPECIAL PROVISIONS

A.    The parties agree that all provisions set forth in Sections 6, 7 and 11 of Exhibit B shall particularly and specifically apply with respect to any appliances maintained or used by the Lessee on the premises (which activity of Lessee shall first require the prior written consent of Lessor). The parties further agree that the insurance required of Lessee under Exhibit B Section 20 shall be with specific reference to, but not limited to, full liability coverage with respect to such permitted appliance in an amount not less than $1,000,000.00, assuring Lessor of such insurance and coverage by delivering additional insured endorsements (naming Lessor as an added insured) and certificates of insurance evidencing the existence and amounts of such insurance with loss payable clauses as required by this Lease.

B.    To assure that Lessee faithfully performs all obligations required hereunder and that the Premises are left in a "broom-clean" condition at the end of the Lease, Lessee shall deposit on execution of this Lease $ 2,500.00 as a security deposit unless a security deposit of this amount was paid commencing with Lessee's Lease running from July 1, 2004, in which case such security deposit shall transfer over to this Lease commencing January 1, 2005. Lessor may use, apply, or retain all or any portion of such security deposit to compensate Lessor for any default by Lessee which results in loss or damage to Lessor. If Lessor makes such an application or use of the security deposit, Lessee shall immediately deposit with Lessor an amount sufficient to restore the security deposit to its level at the commencement of the Lease, per this Section 4 (B).  Similarly, if the monthly rent shall increase at any time, pursuant to the provisions of this Lease, Lessee shall also deposit sums sufficient to bring the amount of the security deposit equal to the monthly rent amount then in effect.  Any unused portion of the security deposit shall be returned to Lessee upon the termination of this Lease.

IN WITNESS WHEREOF, the parties hereto have executed this Lease as of the day and year first written above.

LESSOR:

Pacific Thomas Corporation, a California corporation

By _____
         Its Duly Authorized Representative

By _____
         Its Duly Authorized Representative

LESSEE:

_____
Jill V. Worsley, its Duly Authorized Representative

BERK 02028

# EXHIBIT 5



**SAFE STORAGE**
**MANAGEMENT COMPANY**

January 1, 2010

Pacific Thomas Capital, as landlord and Pacific Trading Ventures, dba Safe Storage Management Company, as lessee, entered into a lease agreement on or about January 1, 2005. The lease agreement (attached as Exhibit A) was for a five year period. Subject to each and every term and condition contained in such January 5, 2005 lease agreement, the parties wish to extend such original lease agreement for an additional five-year term.

All other provisions within the original lease agreement shall remain as stated, excepting, of course, the (a) expiration date which is being extended as provided herein, and (b) that thereafter, the lease agreement shall be cancellable only upon either party giving to the other six (6) months written notice of termination.

Duly represented by Jill Worsley, Pacific Trading Ventures, dba Safe Storage Management company

_[signature] Jill Worsley_                                            01/01/10

_Yes-agreed_

_[signature]_

1818 Mt. Diablo Blvd. Suite D
Walnut Creek, CA 94596

Tel: (925) 988-0804   Fax: (925) 988-0897

Case: 12-46534   Doc# 341-3   Filed: 07/26/13   Entered: 07/26/13 11:45:19   Page 17
of 34                                                                    BERK 02029

# EXHIBIT 6

Case: 12-04079   Doc #131   Filed: 04/10/13   Entered: 04/10/13 17:45:15   Page 18 of 34

# AMENDMENT and MODIFICATION TO LEASE

This Amendment and Modification to Lease (this "Amendment and Modification") is made as of August 1, 2012 by and between Pacific Thomas Corporation ("Lessor") and Pacific Trading Ventures doing business as Safe Storage Management Company ("Lessee").

## RECITALS

A.    Lessor and Lessee are parties to that commercial Lease of Improved Industrial / Commercial Property dated January 01, 2005 and extended by that lease extension dated January 1, 2010 (collectively, the "Lease") providing for the leasing of certain premises primarily located at 2783 East 12th Street, 1113-1115 29th Avenue and 2615 East 12th Street, Oakland, California (the "Premises").

B.    The parties now desire to further amend and modify the Lease to shift additional lease payment responsibility to Lessee in exchange for Lessor granting necessary tenant improvements for Lessee to continue operations of the self storage operation. In particular, Article 3B of the original Lease allows for the following:

*"In the event the Lessor determines that the rental paid is no longer representative of a fair market rental, the Lessor may adjust the rent based on a fair market valuation."*

Any capitalized terms used but not defined herein shall have the meanings attributed to them in the Lease.

C.    All other provisions within the original lease agreement shall remain as stated, excepting that if any conflicting language occurs between the Exhibit B: Leasehold Standard Terms and Conditions and the primary Lease documents, or any subsequent amendments, the language contained within the primary Lease documents shall control and be binding upon all parties.

NOW, THEREFORE, in consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Lessor and Lessee agree as follows:

1.    Amendment and modification to Articles 3A and 3B. RENT; CHANGE IN RENT. The following paragraph will replace the original Articles 3A and 3B:

A. The Lessee covenants, and agrees to pay to the Lessor, as rental for the use of the Premises during leasehold term rental of   SEVENTY THOUSAND and No/100 ( $70,000.00) per month, payable on the 1st and 15th for each and every month, and payable in 50% partial commitments, but never less than the total due amount for each month. The above agreed rental of $70,000 will be due August 1st ($35,000 payment due) and August 15th($35,000 payment due). Lessee shall continue to be responsible for the operating costs, excepting property taxes, insurance and deferred maintenance,

which shall be the obligation of the Lessor(Landlord expense). In the event the Lessor determines that the rental paid is no longer representative of a fair market rental, the Lessor may adjust the rent based on a fair market valuation. Such written notice shall be served upon Lessee at least one-hundred eighty (180) days prior to effective date.

2.   <u>Granting Tenant Improvements</u>. In exchange for Lessee's agreement to above adjustment to the Lease rent, Lessor shall provide Lessee with the necessary tenant improvements for continuation of self storage operations and needed deferred maintenance capital improvements. Lessee shall have the same rights and remedies that it has under this Lease in the event Lessor fails to provide the necessary Tenant Improvements for self storage operations or to complete the Lessor's requirement.

3.   <u>Continued Effectiveness of the Lease</u>. Except as herein expressly provided, all of the terms, provisions and conditions of the Lease shall be unaffected by this Amendment and shall remain in full force and effect.

4.   <u>Counterparts</u>. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute a single instrument.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment as of the day and year first above written.

LESSOR:

Pacific Thomas Corporation

LESSEE:

Pacific Trading Ventures doing business as Safe Storage Management Company

By: _____
Randall Whitney, Chief Operating Officer

By: _____
V. Jill Worsley, Chief Operating Officer

2

EXHIBIT "B"

# Form 1120S

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.

Department of the Treasury
Internal Revenue Service (77)

**2010**

For calendar year 2010 or tax year beginning _____, and ending _____

| A S election effective date | 01/01/1993 | Name | **Pacific Thomas Corporation** | | D Employer identification number ** - ******* |
| B Business activity code number (see instructions) | 454110 | TYPE OR PRINT | Number, street, and room or suite no. If a P.O box, see instructions **1818 Mt. Diablo Blvd., Suite D** | | E Date incorporated 03/12/1992 |
| C Check if Sch. M-3 attached ☒ | | | City or town, state, and ZIP code **Walnut Creek, CA 94596-4430** | | F Total assets (see instructions) 14,564,348. |

G Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No If "Yes," attach Form 2553 if not already filed

H Check if: (1) ☐ Final return (2) ☐ Name change (3) ☐ Address change (4) ☐ Amended return (5) ☐ S election termination or revocation

I Enter the number of shareholders who were shareholders during any part of the tax year ▶

**Caution.** Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

| | | | | |
|---|---|---|---|---|
| **Income** | 1a Gross receipts or sales 1,196,097. | b Less returns and allowances | c Bal ▶ | 1c 1,196,097. |
| | 2 Cost of goods sold (Schedule A, line 8) | | | 2 3,704. |
| | 3 Gross profit. Subtract line 2 from line 1c | | | 3 1,192,393. |
| | 4 Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | 4 |
| | 5 Other income (loss) (attach statement) | Statement 1 | | 5 69,447. |
| | 6 Total income (loss). Add lines 3 through 5 | | ▶ | 6 1,261,840. |
| **Deductions (See instructions for limitations)** | 7 Compensation of officers | Statement 2 | | 7 |
| | 8 Salaries and wages (less employment credits) | | | 8 |
| | 9 Repairs and maintenance | | | 9 10,246. |
| | 10 Bad debts | | | 10 |
| | 11 Rents | | | 11 |
| | 12 Taxes and licenses | Statement 3 | | 12 146,648. |
| | 13 Interest | | | 13 763,765. |
| | 14 Depreciation not claimed on Schedule A or elsewhere on return (attach Form 4562) | | | 14 161,013. |
| | 15 Depletion (Do not deduct oil and gas depletion.) | | | 15 |
| | 16 Advertising | | | 16 |
| | 17 Pension, profit-sharing, etc., plans | | | 17 21,638. |
| | 18 Employee benefit programs | | | 18 |
| | 19 Other deductions (attach statement) | Statement 4 | | 19 150. |
| | 20 Total deductions. Add lines 7 through 19 | | ▶ | 20 469,010.  1,572,470. |
| | 21 Ordinary business income (loss). Subtract line 20 from line 6 | | | 21 -310,630. |

| | | | | |
|---|---|---|---|---|
| **Tax and Payments** | 22a Excess net passive income or LIFO recapture tax (see instructions) | 22a | | |
| | b Tax from Schedule D (Form 1120S) | 22b | | |
| | c Add lines 22a and 22b | | | 22c |
| | 23a 2010 estimated tax payments and 2009 overpayment credited to 2010 | 23a | | |
| | b Tax deposited with Form 7004 | 23b | | |
| | c Credit for federal tax paid on fuels (attach Form 4136) | 23c | | |
| | d Add lines 23a through 23c | | | 23d |
| | 24 Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | | 24 |
| | 25 Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | | | 25 |
| | 26 Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | | 26 |
| | 27 Enter amount from line 26 Credited to 2011 estimated tax ▶ | | Refunded ▶ | 27 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Signature of officer _____ Date _____ ▶ **President** Title

May the IRS discuss this return with the preparer shown below (see instructions)? ☒ Yes ☐ No

**Paid Preparer Use Only**

| Preparer's name | Timothy F. Brophy CPA, MBA | Preparer's signature | | Date 09/15/11 | Check ☒ if self-employed | PTIN P00708418 |
| Firm's name ▶ | Timothy F. Brophy, CPA, MBA(Tax) | | | | Firm's EIN ▶ ** - ******* | |
| Firm's address ▶ | 395 Civic Drive, Ste J  Pleasant Hill, CA 94523 | | | | Phone no. (925) 884-8468 | |

LWA For Paperwork Reduction Act Notice, see separate instructions. Form **1120S** (2010)

Δ EXHIBIT
Deponent 16004
Date 2.12.21

Form 1120S (2010)    **Pacific Thomas Corporation**    **-*******    Page 2

## Schedule A   Cost of Goods Sold   (see instructions)

| | | |
|---|---|---:|
| 1 | Inventory at beginning of year | |
| 2 | Purchases | 3,704. |
| 3 | Cost of labor | |
| 4 | Additional section 263A costs (attach statement) | |
| 5 | Other costs (attach statement) | |
| 6 | **Total.** Add lines 1 through 5 | 3,704. |
| 7 | Inventory at end of year | |
| 8 | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on page 1, line 2 | 3,704. |

9a Check all methods used for valuing closing inventory:
   (i) ☐ Cost as described in Regulations section 1.471-3
   (ii) ☐ Lower of cost or market as described in Regulations section 1.471-4
   (iii) ☐ Other (specify method used and attach explanation.) ▶
b Check if there was a writedown of subnormal goods as described in Regulations section 1.471-2(c) ▶ ☐
c Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ▶ ☐
d If the LIFO inventory method was used for this tax year, enter percentage (or amounts) of closing inventory computed under LIFO | 9d |
e If property is produced or acquired for resale, do the rules of Section 263A apply to the corporation? ☐ Yes ☒ No
f Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation. ☐ Yes ☒ No

## Schedule B   Other Information   (see instructions)   | Yes | No

1 Check accounting method:  (a) ☐ Cash   (b) ☒ Accrual   (c) ☐ Other (specify) ▶
2 See the instructions and enter the:
  (a) Business activity ▶ **Real Estate**   (b) Product or service ▶ **Rentals**
3 At the end of the tax year, did the corporation own, directly or indirectly, 50% or more of the voting stock of a domestic corporation? (For rules of attribution, see section 267(c).) If "Yes," attach a statement showing: (a) name and employer identification number (EIN), (b) percentage owned, and (c) if 100% owned, was a QSub election made? | | X
4 Has this corporation filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, provide information on any reportable transaction? | | X
5 Check this box if the corporation issued publicly offered debt instruments with original issue discount ▶ ☐
  If checked, the corporation may have to file Form 8281, Information Return for Publicly Offered Original Issue Discount Instruments.
6 If the corporation: (a) was a C corporation before it elected to be an S corporation or the corporation acquired an asset with a basis determined by reference to its basis (or the basis of any other property) in the hands of a C corporation and (b) has net unrealized built-in gain in excess of the net recognized built-in gain from prior years, enter the net unrealized built-in gain reduced by net recognized built-in gain from prior years ▶ $
7 Enter the accumulated earnings and profits of the corporation at the end of the tax year ▶ $
8 Are the corporation's total receipts (see instructions) for the tax year and its total assets at the end of the tax year less than $250,000? If "Yes," the corporation is not required to complete Schedules L and M-1 | | X
9 During the tax year, did the corporation have any non-shareholder debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? If "Yes," see instructions | | X

## Schedule K   Shareholders' Pro Rata Share Items   | Total amount

| | | | |
|---|---|---|---:|
| | 1 Ordinary business income (loss) (page 1, line 21) | | 1 | -310,630. |
| | 2 Net rental real estate income (loss) (attach Form 8825) | **Statement 5** | 2 | -83,314. |
| | 3a Other gross rental income (loss) | 3a | | |
| | b Expenses from other rental activities (attach statement) | 3b | | |
| | c Other net rental income (loss). Subtract line 3b from line 3a | | 3c | |
| | 4 Interest income | | 4 | |
| | 5 Dividends: a Ordinary dividends | 5a | | |
| | b Qualified dividends | 5b | | |
| | 6 Royalties | | 6 | |
| | 7 Net short-term capital gain (loss) (attach Schedule D (Form 1120S)) | | 7 | |
| | 8a Net long-term capital gain (loss) (attach Schedule D (Form 1120S)) | | 8a | |
| | b Collectibles (28%) gain (loss) | 8b | | |
| | c Unrecaptured section 1250 gain (attach statement) | 8c | | |
| | 9 Net section 1231 gain (loss) (attach Form 4797) | | 9 | |
| | 10 Other income (loss) (see instructions) Type ▶ | | 10 | |

JSA   Form **1120S** (2010)

| | Shareholders' Pro Rata Share Items (continued) | | Total amount |
|---|---|---|---|
| **Deductions** | 11  Section 179 deduction (attach Form 4562) | 11 | |
| | 12a Contributions | 12a | |
| | b  Investment interest expense | 12b | |
| | c  Section 59(e)(2) expenditures  (1) Type ▶ | | |
| |     (2) Amount ▶ | 12c(2) | |
| | d  Other deductions (attach statement) | 12d | |
| **Credits** | 13a Low-income housing credit (section 42(j)(5)) | 13a | |
| | b  Low-income housing credit (other) | 13b | |
| | c  Qualified rehabilitation expenditures (rental real estate) (attach Form 3468) | 13c | |
| | d  Other rental real estate credits (see instructions)  Type ▶ | 13d | |
| | e  Other rental credits (see instructions)  Type ▶ | 13e | |
| | f  Alcohol and cellulosic biofuel fuels credit (attach Form 6478) | 13f | |
| | g  Other credits (see instructions)  Type ▶ | 13g | |
| **Foreign Transactions** | 14a Name of country or U.S. possession ▶ | | |
| | b  Gross income from all sources | 14b | |
| | c  Gross income sourced at shareholder level | 14c | |
| | Foreign gross income sourced at corporate level | | |
| | d  Passive category | 14d | |
| | e  General category | 14e | |
| | f  Other (attach statement) | 14f | |
| | Deductions allocated and apportioned at shareholder level | | |
| | g  Interest expense | 14g | |
| | h  Other | 14h | |
| | Deductions allocated and apportioned at corporate level to foreign source income | | |
| | i  Passive category | 14i | |
| | j  General category | 14j | |
| | k  Other (attach statement) | 14k | |
| | Other information | | |
| | l  Total foreign taxes (check one) ▶ ☐ Paid   ☐ Accrued | 14l | |
| | m  Reduction in taxes available for credit (attach statement) | 14m | |
| | n  Other foreign tax information (attach statement) | | |
| **Alternative Minimum Tax (AMT) Items** | 15a Post-1986 depreciation adjustment | 15a | 12,828. |
| | b  Adjusted gain or loss | 15b | |
| | c  Depletion (other than oil and gas) | 15c | |
| | d  Oil, gas, and geothermal properties—gross income | 15d | |
| | e  Oil, gas, and geothermal properties—deductions | 15e | |
| | f  Other AMT items (attach statement) | 15f | |
| **Items Affecting Shareholder Basis** | 16a Tax-exempt interest income | 16a | |
| | b  Other tax-exempt income | 16b | |
| | c  Nondeductible expenses       Statement 6 | 16c | 247. |
| | d  Distributions (attach statement if required) | 16d | |
| | e  Repayment of loans from shareholders | 16e | |
| **Other Information** | 17a Investment income | 17a | |
| | b  Investment expenses | 17b | |
| | c  Dividend distributions paid from accumulated earnings and profits | 17c | |
| | d  Other items and amounts (attach statement) | | |
| **Recon- ciliation** | 18  Income/loss reconciliation. Combine the amounts on lines 1 through 10 in the far right column. From the result, subtract the sum of the amounts on lines 11 through 12d and 14l | 18 | -393,944. |

ws
Form **1120S** (2010)

11130915 790162 PT-PACIPTHOM  2010.03050 Pacific Thomas Corporation  PT-PACI1

Case: 12-46534  Doc# 183-4  Filed: 12/18/12  Entered: 12/18/12 16:40:23  Page 3 of 26

Case: 12-46534  Doc# 341-3  Filed: 07/26/13  Entered: 07/26/13 11:45:15  Page 24 of 34

| Schedule L | Balance Sheets per Books | Beginning of tax year | | End of tax year | |
|---|---|---|---|---|---|
| | Assets | (a) | (b) | (c) | (d) |
| 1 | Cash | | 23,417. | | 5,794. |
| 2a | Trade notes and accounts receivable | 3,193. | | 0. | |
| b | Less allowance for bad debts | | 3,193. | | 0. |
| 3 | Inventories | | 9,271. | | 7,862. |
| 4 | U.S. government obligations | | | | |
| 5 | Tax-exempt securities | | | | |
| 6 | Other current assets (att. stmt.) | Statement 8 | 54,870. | | 90,804. |
| 7 | Loans to shareholders | | 99,187. | | 120,463. |
| 8 | Mortgage and real estate loans | | | | |
| 9 | Other investments (att. stmt.) | | | | |
| 10a | Buildings and other depreciable assets | 7,691,483. | | 7,820,020. | |
| b | Less accumulated depreciation | 1,848,608. | 5,842,875. | 2,025,113. | 5,794,907. |
| 11a | Depletable assets | | | | |
| b | Less accumulated depletion | | | | |
| 12 | Land (net of any amortization) | | 5,082,709. | | 3,319,535. |
| 13a | Intangible assets (amortizable only) | 238,515. | | 307,979. | |
| b | Less accumulated amortization | 63,688. | 174,827. | 127,559. | 180,420. |
| 14 | Other assets (att. stmt.) | Statement 9 | 5,578,532. | | 5,044,563. |
| 15 | Total assets | | 14,897,881. | | 14,564,348. |
| | Liabilities and Shareholders' Equity | | | | |
| 16 | Accounts payable | | 157,378. | | 292,047. |
| 17 | Mortgages, notes, bonds payable in less than 1 year | | 0. | | 206,100. |
| 18 | Other current liabilities (att. stmt.) | Statement 10 | 76,512. | | 74,452. |
| 19 | Loans from shareholders | | | | |
| 20 | Mortgages, notes, bonds payable in 1 year or more | | 11,758,525. | | 11,466,185. |
| 21 | Other liabilities (att. stmt.) | Statement 11 | 3,059,781. | | 3,073,772. |
| 22 | Capital stock | | 1,000,000. | | 1,000,000. |
| 23 | Additional paid-in capital | | 105,873. | | 105,873. |
| 24 | Retained earnings | Statement 12 | -1,259,890. | | -1,654,081. |
| 25 | Adjustments to shareholders' equity (att. stmt.) | | | | |
| 26 | Less cost of treasury stock | | | | |
| 27 | Total liabilities and shareholders' equity | | 14,897,881. | | 14,564,348. |

## Schedule M-1 — Reconciliation of Income (Loss) per Books With Income (Loss) per Return

Note: Schedule M-3 required instead of Schedule M-1 if total assets are $10 million or more — see instructions

| | | | | | |
|---|---|---|---|---|---|
| 1 | Net income (loss) per books | -394,191. | 5 | Income recorded on books this year not included on Schedule K, lines 1 through 10 (itemize): | |
| 2 | Income included on Schedule K, lines 1, 2, 3c, 4, 5a, 6, 7, 8a, 9, and 10, not recorded on books this year (itemize): | | | a Tax-exempt interest $ | |
| 3 | Expenses recorded on books this year not included on Schedule K, lines 1 through 12 and 14l (itemize): | | 6 | Deductions included on Schedule K, lines 1 through 12 and 14l, not charged against book income this year (itemize): | |
| | a Depreciation $ | | | a Depreciation $ | |
| | b Travel and entertainment $ _____ 247. | | 7 | Add lines 5 and 6 | |
| 4 | Add lines 1 through 3 | 247. -393,944. | 8 | Income (loss) (Schedule K, line 18). Line 4 less line 7 | -393,944. |

## Schedule M-2 — Analysis of Accumulated Adjustments Account, Other Adjustments Account, and Shareholders' Undistributed Taxable Income Previously Taxed (see instructions)

| | | (a) Accumulated adjustments account | (b) Other adjustments account | (c) Shareholders' undistributed taxable income previously taxed |
|---|---|---|---|---|
| 1 | Balance at beginning of tax year | -2,018,110. | 1,146. | |
| 2 | Ordinary income from page 1, line 21 | | | |
| 3 | Other additions | | | |
| 4 | Loss from page 1, line 21 | 310,630. | | |
| 5 | Other reductions | Statement 7 | 83,561. | |
| 6 | Combine lines 1 through 5 | -2,412,301. | 1,146. | |
| 7 | Distributions other than dividend distributions | | | |
| 8 | Balance at end of tax year. Subtract line 7 from line 6 | -2,412,301. | 1,146. | |

4

Case: 12-46534  Doc# 341-3  Filed: 07/26/13  Entered: 07/26/13 11:45:15  Page 25 of 34

NOT A COPY

**SCHEDULE M-3**
**(Form 1120S)**

Department of the Treasury
Internal Revenue Service

# Net Income (Loss) Reconciliation for S Corporations With Total Assets of $10 Million or More

▶ Attach to Form 1120S.
▶ See separate instructions.

OMB No. 1545-0130

**2010**

Name of corporation: Pacific Thomas Corporation

Employer identification number: **-*******

## Part I   Financial Information and Net Income (Loss) Reconciliation (see instructions)

**1a** Did the corporation prepare a certified audited non-tax-basis income statement for the period ending with or within this tax year?

☐ Yes. Skip line 1b and complete lines 2a through 11 with respect to that income statement.

☒ No. Go to line 1b.

**b** Did the corporation prepare a non-tax-basis income statement for this period?

☐ Yes. Complete lines 2a through 11 with respect to that income statement.

☒ No. Skip lines 2a through 3b and enter the corporation's net income (loss) per its books and records on line 4a.

**2** Enter the income statement period: Beginning _____ Ending _____

**3a** Has the corporation's income statement been restated for the income statement period on line 2?

☐ Yes. (If "Yes," attach an explanation and the amount of each item restated.)
☐ No.

**b** Has the corporation's income statement been restated for any of the five income statement periods preceding the period on line 2?

☐ Yes. (If "Yes," attach an explanation and the amount of each item restated.)
☐ No.

**4a** Worldwide consolidated net income (loss) from income statement source identified in Part I, line 1 | **4a** | -394,191.

**b** Indicate accounting standard used for line 4a (see instructions):

(1) ☐ GAAP   (2) ☐ IFRS
(3) ☒ Tax-basis   (4) ☐ Other (specify) _____

**5a** Net income from nonincludible foreign entities (attach schedule) | **5a** | ( )
**b** Net loss from nonincludible foreign entities (attach schedule and enter as a positive amount) | **5b** |

**6a** Net income from nonincludible U.S. entities (attach schedule) | **6a** | ( )
**b** Net loss from nonincludible U.S. entities (attach schedule and enter as a positive amount) | **6b** |

**7a** Net income (loss) of other foreign disregarded entities (attach schedule) | **7a** |
**b** Net income (loss) of other U.S. disregarded entities (except qualified subchapter S subsidiaries) (attach schedule) | **7b** |
**c** Net income (loss) of other qualified subchapter S subsidiaries (QSubs) (attach schedule) | **7c** |

**8** Adjustment to eliminate transactions between includible entities and nonincludible entities (attach schedule) | **8** |

**9** Adjustment to reconcile income statement period to tax year (attach schedule) | **9** |

**10** Other adjustments to reconcile to amount on line 11 (attach schedule) | **10** |

**11** Net income (loss) per income statement of the corporation. Combine lines 4a through 10 | **11** | -394,191.

Note. Part I, line 11, must equal Part II, line 26, column (a).

**12** Enter the total amount (not just the corporation's share) of the assets and liabilities of all entities included or removed on the following lines:

| | Total Assets | Total Liabilities |
|---|---|---|
| **a** Included on Part I, line 4 | 14,564,348. | 15,112,556. |
| **b** Removed on Part I, line 5 | | |
| **c** Removed on Part I, line 6 | | |
| **d** Included on Part I, line 7 | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 1120S.

5

Schedule **M-3** (Form 1120S) 2010

JWA

11130915 790162 PT-PACIFTHOM   2010.03050 Pacific Thomas Corporation   PT-PACI1

Pacific Thomas Corporation                                                    **-*******

| Form 1120S | Other Deductions | Statement 4 |
|---|---|---|

| Description | Amount |
|---|---|
| Amortization Expense | 75,407. |
| Auction Expense | 1,560. |
| Bank Charges | 16,081. |
| Computer Services | 5,169. |
| Dues & Subscriptions | 1,759. |
| Equipment Lease | 721. |
| Insurance | 14,934. |
| Legal & Accounting | 148,211. |
| Meals and Entertainment | 247. |
| Miscellaneous Expense | 3,231. |
| Office Supplies | 5,319. |
| Operating Supplies | 492. |
| Outside Services | 1,610. |
| Postage | 7,527. |
| Printing | 757. |
| Professional Services | 6,242. |
| Security | 525. |
| Service Fees | 125,609. |
| Travel | 5,010. |
| Utilities and Telephone | 48,599. |
| Total to Form 1120S, Page 1, Line 19 | 469,010. |

| Schedule K | Net Rental Real Estate Income (Loss) | | Statement 5 |
|---|---|---|---|

| Description | Income | Expenses | Net Amount |
|---|---|---|---|
| Commercial - Tuffy Building, Oakland, CA | 0. | 0. | 0. |
| Commercial - Morse Building, Oakland, CA | 46,760. | 130,074. | -83,314. |
| Total Net Amount to Schedule K, Line 2 | 46,760. | 130,074. | -83,314. |

| Schedule K | Nondeductible Expenses | Statement 6 |
|---|---|---|

| Description | Amount |
|---|---|
| Excluded Meals and Entertainment Expenses | 247. |
| Total to Schedule K, Line 16c | 247. |

Case: 12-46534   Doc# 183-4   Filed: 12/18/12   Entered: 12/18/12 16:40:23   Page 26
Case: 12-46534   Doc# 341-3   Filed: 07/26/13   Entered: 07/26/13 11:45:15   Page 27
of 34

# Form 1120S

## U.S. Income Tax Return for an S Corporation

▶ Do not file this form unless the corporation has filed or is attaching Form 2553 to elect to be an S corporation.

OMB No. 1545-0130

**2011**

Department of the Treasury
Internal Revenue Service (77)

For calendar year 2011 or tax year beginning _____ and ending _____

**D** Employer identification number

| | | |
|---|---|---|
| **A** S election effective date **01/01/1993** | **TYPE OR PRINT** | Name **Pacific Thomas Corporation** |
| **B** Business activity code number (see instructions) **454110** | | Number, street, and room or suite no. If a P.O. box, see instructions. **1818 Mt. Diablo Blvd., Suite D** |
| **C** Check if Sch. M-3 attached **X** | | City or town, state, and ZIP code **Walnut Creek, CA 94596-4430** |

**E** Date incorporated **03/12/1992**

**F** Total assets (see instructions) **$ 14,577,175.**

**G** Is the corporation electing to be an S corporation beginning with this tax year? ☐ Yes ☒ No  If "Yes," attach Form 2553 if not already filed

**H** Check if: **(1)** ☐ Final return **(2)** ☐ Name change **(3)** ☐ Address change **(4)** ☐ Amended return **(5)** ☐ S election termination or revocation

**I** Enter the number of shareholders who were shareholders during any part of the tax year ▶ **4**

**Caution:** Include only trade or business income and expenses on lines 1a through 21. See the instructions for more information.

### Income

| | | | | |
|---|---|---|---|---|
| 1 a | Merchant card and third party payment (for 2011 enter -0-) | **0.** b Gross receipts or sales not reported on line 1a | **1,354,494.** c Balance Add lines 1a and 1b | 1c **1,354,494.** |
| d | Returns and allowances plus any other adjustments (see instrs.) | | e Subtract line 1d from line 1c | 1e **1,354,494.** |
| 2 | Cost of goods sold (attach Form 1125-A) | | | 2 **4,601.** |
| 3 | Gross profit. Subtract line 2 from line 1e | | | 3 **1,349,893.** |
| 4 | Net gain (loss) from Form 4797, Part II, line 17 *(attach Form 4797)* | | | 4 |
| 5 | Other income (loss) *(attach statement)* | | Statement 1 | 5 **927.** |
| 6 | **Total income (loss).** Add lines 3 through 5 | | ▶ | 6 **1,350,820.** |

### Deductions (See the instructions for limitations)

| | | | |
|---|---|---|---|
| 7 | Compensation of officers | Statement 2 | 7 |
| 8 | Salaries and wages (less employment credits) | | 8 |
| 9 | Repairs and maintenance | | 9 **12,620.** |
| 10 | Bad debts | | 10 **56,206.** |
| 11 | Rents | | 11 |
| 12 | Taxes and licenses | Statement 3 | 12 **120,814.** |
| 13 | Interest | | 13 **278,417.** |
| 14 | Depreciation not claimed on Form 1125-A or elsewhere on return (attach Form 4562) | | 14 **123,961.** |
| 15 | Depletion **(Do not deduct oil and gas depletion.)** | | 15 |
| 16 | Advertising | | 16 **23,857.** |
| 17 | Pension, profit-sharing, etc., plans | | 17 |
| 18 | Employee benefit programs | | 18 |
| 19 | Other deductions *(attach statement)* | Statement 4 | 19 **560,232.** |
| 20 | **Total deductions.** Add lines 7 through 19 | ▶ | 20 **1,176,107.** |
| 21 | Ordinary business income (loss). Subtract line 20 from line 6 | | 21 **174,713.** |

### Tax and Payments

| | | | |
|---|---|---|---|
| 22 a | Excess net passive income or LIFO recapture tax (see instructions) | 22a | |
| b | Tax from Schedule D (Form 1120S) | 22b | |
| c | Add lines 22a and 22b | | 22c |
| 23 a | 2011 estimated tax payments and 2010 overpayment credited to 2011 | 23a | |
| b | Tax deposited with Form 7004 | 23b | |
| c | Credit for federal tax paid on fuels (attach Form 4136) | 23c | |
| d | Add lines 23a through 23c | | 23d |
| 24 | Estimated tax penalty (see instructions). Check if Form 2220 is attached ▶ ☐ | | 24 |
| 25 | Amount owed. If line 23d is smaller than the total of lines 22c and 24, enter amount owed | | 25 |
| 26 | Overpayment. If line 23d is larger than the total of lines 22c and 24, enter amount overpaid | | 26 |
| 27 | Enter amount from line 26 ☐ Credited to 2012 estimated tax _____ Refunded ▶ | | 27 |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| | | |
|---|---|---|
| ▶ _____ Signature of officer | Date | ▶ **President** Title |

May the IRS discuss this return with the preparer shown below (see instrs.)? **X** Yes ☐ No

**Paid Preparer Use Only**

| | | |
|---|---|---|
| Print/Type preparer's name **Timothy F. Brophy CPA, MBA** | Preparer's signature **Timothy F. Brophy, CPA, MBA(Tax)** | Date **09/12/12** Check ☐ if self-employed **X** PTIN **P00708418** |
| Firm's name ▶ **395 Civic Drive, Ste J** | | Firm's EIN ▶ |
| Firm's address ▶ **Pleasant Hill, CA 94523** | | Phone no. **(925) 884-8468** |

LWA  For Paperwork Reduction Act Notice, see separate instructions.

Form **1120S** (2011)

Case: 12-46534   Doc# 184-1   Filed: 12/18/12   Entered: 12/18/12 16:52:09   Page 17 of 26

Case: 12-46534   Doc# 341-3   Filed: 07/26/13   Entered: 07/26/13 11:45:15   Page 28 of 34

Pacific Thomas Corporation

| Form 1120S | Other Income | Statement 1 |
|---|---|---|

| Description | Amount |
|---|---|
| Other Income | 927. |
| Total to Form 1120S, Page 1, Line 5 | 927. |

| Form 1120S | Compensation of Officers | Statement 2 |
|---|---|---|

| Name of Officer | Social Security Number | Time Devoted to Business | Pct of Stock | Amount of Compensation |
|---|---|---|---|---|
| Randall Whitney | | Full | 25.00% | 0. |
| Roger W. Worsley | | Part | 25.00% | 0. |
| Virginia J. Worsley | | Full | 25.00% | 0. |
| Stephen T. Worsley | | Full | 25.00% | 0. |
| Total Compensation of Officers | | | | 0. |
| Less: Compensation Claimed Elsewhere Employment Credit Reduction | | | | |
| Total to Form 1120S, Page 1, Line 7 | | | | |

| Form 1120S | Taxes and Licenses | Statement 3 |
|---|---|---|

| Description | Amount |
|---|---|
| Licenses & Permits | 2,124. |
| Property Taxes | 117,890. |
| California Taxes - Based on Income | 800. |
| Total to Form 1120S, Page 1, Line 12 | 120,814. |

| Form 1120S | Other Deductions | Statement 4 |
|---|---|---|

| Description | Amount |
|---|---|
| Amortization Expense | 34,907. |
| Auction Expense | 2,008. |
| Bank Charges | 17,289. |
| Computer Services | 10,975. |
| Dues & Subscriptions | 55. |

## Pacific Thomas Corporation

| | |
|---|---:|
| Equipment Lease | |
| Insurance | 615. |
| Late fees | 18,908. |
| Legal & Accounting | 15,800. |
| Meals and Entertainment | 129,491. |
| Miscellaneous Expense | 358. |
| Office Supplies | 8,747. |
| Operating Supplies | 6,118. |
| Outside Services | 1,056. |
| Postage | 11,208. |
| Printing | 6,016. |
| Professional Services | 708. |
| Security | 105,512. |
| Service Fees | 210. |
| Travel | 122,539. |
| Utilities and Telephone | 12,504. |
| | 55,208. |
| **Total to Form 1120S, Page 1, Line 19** | 560,232. |

---

| Schedule K | Net Rental Real Estate Income (Loss) | | | Statement 5 |
|---|---|---|---|---|

| Description | Income | Expenses | Net Amount |
|---|---:|---:|---:|
| Commercial - Tuffy Building, Oakland, CA | 12,240. | 68,589. | -56,349. |
| Commercial - Morse Building, Oakland, CA | 43,313. | 90,333. | -47,020. |
| **Total Net Amount to Schedule K, Line 2** | 55,553. | 158,922. | -103,369. |

---

| Schedule K | Interest Income | Statement 6 |
|---|---|---|

| Description | Amount |
|---|---:|
| Interest income | 259. |
| **Total to Schedule K, Line 4** | 259. |

---

| Schedule K | Charitable Contributions | | | | Statement 7 |
|---|---|---|---|---|---|

| Description | No Limit | 50% / 100% Limit | 30% Limit | 20% Limit |
|---|---|---:|---|---|
| Miscellaneous Charitable Donations | | 550. | | |
| **Totals to Schedule K, Line 12a** | | 550. | | |

EXHIBIT "C"

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $8,100,000.00 | 07-27-2007 | 07-27-2009 | 1018144 | | 112003020 | 176 | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * " has been omitted due to text length limitations.

**Borrower:** Pacific Thomas Corporation
1818 Mount Diablo Blvd, Ste D
Walnut Creek, CA 94596

**Lender:** Summit Bank
OAKLAND OFFICE
2969 BROADWAY
OAKLAND, CA 94611

---

**Principal Amount: $8,100,000.00**     **Interest Rate: 8.250%**     **Date of Note: July 27, 2007**

**PROMISE TO PAY.** Pacific Thomas Corporation ("Borrower") promises to pay to Summit Bank ("Lender"), in lawful money of the United States of America, the principal amount of Eight Million One Hundred Thousand & 00/100 Dollars ($8,100,000.00) or so much as may be outstanding, together with interest at the rate of 8.250% on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 27, 2009. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 27, 2007, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges. The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**PREPAYMENT; MINIMUM INTEREST CHARGE.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law. In any event, even upon full prepayment of this Note, Borrower understands that Lender is entitled to a minimum interest charge of $100.00. Other than Borrower's obligation to pay any minimum interest charge, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Summit Bank, 2969 Broadway Oakland CA 94611.

**INTEREST RESERVES.** Borrower authorizes Lender to place $1,000,000.00 of the Principal Amount as an interest reserve, which is an estimate of the interest due on the Note ("Interest Reserve"). All interest payments shall be paid from the Interest Reserve. Lender may automatically deduct accrued unpaid interest from the Interest Reserve. Interest will accrue, as described in this Note, on amounts deducted from the Interest Reserve. In the event the interest due under this Note exceeds the Interest Reserve, Borrower will pay accrued unpaid interest when due according to the terms of this Note. Upon maturity, Lender will not advance or disburse the remaining Interest Reserve, if any, to Borrower. The principal due upon maturity will not include any remaining Interest Reserve.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, the interest rate on this Note shall, if permitted under applicable law, immediately increase by 4.000 percentage points.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note.

    **Payment Default.** Borrower fails to make any payment when due under this Note.

    **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

    **Environmental Default.** Failure of any party to comply with or perform when due any term, obligation, covenant or condition contained in any environmental agreement executed in connection with any loan.

    **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf, or made by Guarantor, or any other guarantor, endorser, surety, or accommodation party, under this Note or the related documents in connection with the obtaining of the loan evidenced by this Note or any security document directly or indirectly securing repayment of this Note is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

    **Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

    **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

    **Execution; Attachment.** Any execution or attachment is levied against the Collateral, and such execution or attachment is not set aside, discharged or stayed within thirty (30) days after the same is levied.

    **Change in Zoning or Public Restriction.** Any change in any zoning ordinance or regulation or any other public restriction is enacted, adopted or implemented, that limits or defines the uses which may be made of the Collateral such that the present or intended use of the Collateral, as specified in the related documents, would be in violation of such zoning ordinance or regulation or public restriction, as changed.

**Default Under Other Lien Documents.** A default occurs under any other mortgage, deed of trust or security agreement covering all or any portion of the Collateral.

**Judgment.** Unless adequately covered by insurance in the opinion of Lender, the entry of a final judgment for the payment of money involving more than ten thousand dollars ($10,000.00) against Borrower and the failure by Borrower to discharge the same, or cause it to be discharged, or bonded off to Lender's satisfaction, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor, or any other guarantor, endorser, surety, or accommodation party of any of the indebtedness or any Guarantor, or any other guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Change In Ownership.** Any change in ownership of twenty five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default: (1) cures the default within ten (10) days; or (2) if the cure requires more than ten (10) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ALAMEDA County, State of California.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $20.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A) a Deed of Trust dated July 27, 2007, to a trustee in favor of Lender on real property located in Alameda County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property, whether legal, beneficial or equitable, whether voluntary or involuntary, whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Trustor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Trustor. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B) an Assignment of All Rents to Lender on real property located in Alameda County, State of California.

(C) inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated July 27, 2007.

**LINE OF CREDIT.** This Note evidences a straight line of credit. Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances. Advances under this Note may be requested orally by Borrower or as provided in this paragraph. All oral requests shall be confirmed in writing on the day of the request. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**FINANCIAL STATEMENTS.** Borrower agrees to provide Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**DEFAULT CLAUSE:** If Borrower fails to pay accrued interest and/or principal on Loan Maturity Date or a Notice of Default is recorded under the Deed of Trust, which secures the Loan, then the Note Rate provided shall, without notice, increase by 4% percentage points.

**NEGATIVE PLEDGE:** As material consideration for Lender entering into this Loan, Borrower hereby grants to Lender the first right of refusal to refinance the property of Borrower at 2615 East 12th Street. In the event that Borrower determines that it wishes to refinance this subject property, Borrower shall provide Lender a commitment letter from a bona fide lender unrelated to Borrower, which states the terms and conditions upon which this property may then be refinanced. Lender shall have 25 days from its receipt of this commitment letter to provide Borrower written notice that Lender will provide financing on the same terms and conditions set forth in the bona fide's commitment lender. This first right of refusal shall not apply to the use of 2615 East 12th Street as partial collateral in any larger loan package which replaces the present Loan of $8.1 million.

**HOLD HARMLESS:** Borrower shall defend, indemnify, and hold Bank harmless from and against any and all claims of any third party of any nature arising from this loan transaction and/or the Property taken as security herein.

**RESTRICTION ON NEW DEVELOPMENT PROJECTS OR NEW ACQUISITIONS:** Borrower shall not participate in any new development projects and acquire additional real property investments during the term of this loan commitment without the Bank's prior written consent, which will not be unreasonably withheld.

**FINANCIAL REPORTING:** (a) ANNUAL REPORTING - Borrower shall provide Summit Bank with its CPA compiled FYE financial statements and

Case: 12-46534    Doc# 341-3    Filed: 07/26/13    Entered: 07/26/13 11:45:15    Page 33 of 34

its corporate tax return within 120 days of year end. (b) SEMI-ANNUAL REPORTING. Borrower shall provide Summit Bank with semi-annual company prepared financial statements within 45 days of the period end.

**DEPOSIT RELATIONSHIP:** Borrower will maintain its primary deposit relationship with Summit Bank including all operating and savings accounts related to Pacific Thomas Corporation or its affiliates. If accounts are not established with Summit Bank and maintained, then the interest rate otherwise applicable will be increased by one half percent (0.50%).

**COMPREHENSIVE INSURANCE:** Borrower shall maintain Comprehensive public liability insurance naming Summit Bank as an additional insured with single limit coverage of not less than $2,000,000.00.

**BUSINESS INTERRUPTION INSURANCE:** Borrower shall provide Bank with a copy of Business Interruption Insurance and/or loss of "rental value" insurance with respect to the properties.

**SECONDARY FINANCING:** No subordinate financing shall be placed on the properties without the prior written consent of Summit Bank.

**APPROVAL OF LEASES:** Bank to approve all leases and tenancies affecting the property, and all documentation in connection with the leases entered into by Borrower prior to closing. Prior to closing Borrower shall provide to Bank, on Banks form, executed estoppels certificates and non-disturbance and subordinations agreements form each tenants with the exception of self storage tenants if applicable. As of 7-16-07, Borrower does not have tenants.

**PROPERTY TAXES:** Property Taxes relating to the seven collateralized properties must remain current.

**DUE ON SALE:** Any sale, transfer, conveyance or other encumbrance of the Property without the prior written consent of Summit Bank or as expressly permitted in the Loan documents shall be a default under the Loan Documents and shall entitle Lender to accelerate all sums due under the loan.

**ASSUMPTION:** The Loan may not be assumed.

**RELEASES AND RECONVEYANCES:** Bank agrees to provide one or more partial reconveyances to facilitate future parcel uses by the Borrower. These partial reconveyances shall be subject to an objective determination by the Bank that the subject Loan is adequately secured by the properties not to be released in such amounts or ratios needed to maintain or exceed the original loan-to-value and related tests. This objective determination shall be based on the performance of the properties to be left encumbered and securing the $8,100,000 Loan, the relative appraisals for such remaining properties, and any other factors which would enter into a competent loan-to-value and/or other test by which the remaining parcels encumbered by the Deed of Trust for the $8,100,000 Loan might be evaluated. Each such partial reconveyance shall be permitted only so long as, under the above objective tests, the reconveyance out of the Deed of Trust does not impair the value or functionality of the remaining parcels serving as collateral for the Loan. Borrower shall pay a reasonable Loan modification fee for each partial reconveyance allowed hereunder.

The process of arriving at the "objective determination" as used in this Section (Releases and Reconveyances) shall mean that the Borrower will identify the parcel(s) it desires to be released pursuant to this Section. The Bank shall obtain, at Borrower's sole expense, an appraisal of the remaining parcels, by an appraiser of the Bank's choice. If the appraised value of the remaining parcels is such that the Bank's security, upon release, will be no less than it was at the inception of the Loan, and provided Borrower is not in default of any other term or condition of the Promissory Note or the related documents, Borrower shall be entitled to a partial release as contemplated in this Section.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**NOTIFY US OF INACCURATE INFORMATION WE REPORT TO CONSUMER REPORTING AGENCIES.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Summit Bank 2969 Broadway Oakland, CA 94611.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

PACIFIC THOMAS CORPORATION

By: _____                          By: _____
Randall C/ M. Whitney, President of Pacific Thomas          Jill V. Worsley, Vice President of Pacific Thomas
Corporation                                                Corporation