**Matlock Law Group, P.C.**
Anne-Leith Matlock, SBN 244351
K. Brian Matlock, SBN 243812
Kathrin Dimas, SBN 263316
1485 Treat Blvd., Suite 200
Walnut Creek, CA 94597
Tel.:     (925) 944-7131
Fax:      (925) 944-7138
E-mail: anne-leith@matlocklawgroup.com

Attorneys for Debtor
Pacific Thomas Corporation

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>Pacific Thomas Corporation<br><br>　　　　　　Debtor. | Case No. 12-46534<br><br>Chapter 11<br><br><br>Date:   January 16, 2014<br>Time:  10:30 a.m.<br>Place:  **Courtroom 215**<br><br>Judge:  Hon. M. Elaine Hammond |

**DEBTOR'S FOURTH AMENDED DISCLOSURE STATEMENT IN SUPPORT OF FOURTH AMENDED PLAN OF REORGANIZATION, DATED DECEMBER 31, 2013**

**The Debtor is a corporation, tax id # xxx-xx-5859 The Debtor's address is 1818 Mt. Diablo Blvd., Suite D, Walnut Creek, CA**

# **TABLE OF CONTENTS**

ARTICLE I. INTRODUCTION ........................................................................ 4
1.01        Purpose of this Document ...................................................... 8
1.02        Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing. ... 9
1.02.1   Time and Place of the Confirmation Hearing ........................... 9
1.02.2   Deadline for Voting to Accept or Reject the Plan...................... 10
1.02.3   Deadline for Objecting to the Confirmation of the Plan ................ 10
1.02.4   Identity of Person to Contact for More Information Regarding the Plan .... 11
1.03        Disclaimer.................................................................... 11
1.04        Definitions, Interpretations and Rules of Construction ................ 14
1.04.1   Definitions................................................................. 14
1.04.2   Undefined Terms............................................................ 23
1.05        Interpretations, Computation of Time and Governing Law ............... 23
1.05.1   Rules of Interpretation.................................................... 23
1.05.2   Computing Time Periods .................................................... 25
1.05.3   Section Numbers ........................................................... 25
1.05.4   Notices and Delivery of Documents ........................................ 25

ARTICLE II. BACKGROUND........................................................................ 25
2.01        Description and History of the Debtor's Business ...................... 25
2.02        Insiders of Debtor's Business ......................................... 28
2.03        Management of the Debtor Before and After the Bankruptcy .............. 28
2.04        Events Leading to Chapter 11 Filing.................................... 29
Significant Events During the Bankruptcy ................................................ 30
i.      Bankruptcy Proceedings ........................................................ 30
ii.     Other Legal Proceedings ...................................................... 33
iii.    Procedures Implemented to Resolve Financial Problems .............. 33
2.05        Actual and Projected Recovery of Avoidable Transfers ................. 34
2.06        Claims Objections ..................................................... 34
2.07        Current and Historical Financial Conditions .......................... 35

ARTICLE III. SUMMARY OF THE PLAN OF REORGANIZATION ................................. 38
3.01        What Creditors and Interest Holders Will Receive Under The Proposed Plan 38
3.02        Unclassified Claims ................................................... 39
3.02.1   Administrative Expenses................................................... 39
3.02.2   Priority Tax Claims....................................................... 41
3.03        Classified Claims and Interests....................................... 42
3.03.1   Classes of Secured Claims ................................................ 42
3.03.2   Classes of Priority Unsecured Claims ..................................... 55
3.03.3   Classes of General Unsecured Claims ...................................... 55
3.03.4   Classes of Interest Holders .............................................. 59
3.03.5   Deadline for §1111(b) Election ........................................... 59
3.03.6   Resolution of State Court Actions ........................................ 60
3.04        Means of Effectuating Plan ............................................ 60
3.04.1   Funding for the Plan...................................................... 60

|  |  |  |
|---|---|---|
| 3.04.2 | Post-Confirmation Management | 60 |
| 3.04.3 | Disbursing Agent | 61 |
| 3.05 | Risk Factors | 61 |
| 3.06 | Other Provisions of the Plan | 62 |
| 3.06.1 | Executory Contracts and Unexpired Leases | 62 |
| 3.06.2 | Changes in Rates Subject to Regulatory Commission | 63 |
| 3.06.3 | Retention of Jurisdiction | 63 |
| 3.07 | Tax Consequences of Plan | 64 |
| 3.08 | The Absolute Priority Rule and New Value Exception | 65 |

ARTICLE IV. CONFIRMATION REQUIREMENTS AND PROCEDURES ...... 66

| 4.01 | Who May Vote or Object | 67 |
|---|---|---|
| 4.01.1 | Who May Object to Confirmation of the Plan | 67 |
| 4.01.2 | Who | 67 |
| 4.01.3 | Who Is Not Entitled to Vote | 68 |
| 4.01.4 | Who Can Vote in More Than One Class | 68 |
| 4.01.5 | Votes Necessary to Confirm the Plan | 68 |
| 4.01.6 | Votes Necessary for a Class to Accept the Plan | 69 |
| 4.01.7 | Treatment of Non-Accepting Classes | 69 |
| 4.02 | Liquidation Analysis | 69 |
| 4.03 | Feasibility | 77 |

ARTICLE V. EFFECT OF CONFIRMATION OF PLAN ...... 83

| 5.01 | Discharge | 83 |
|---|---|---|
| 5.02 | Injunction and Stay | 84 |
| 5.03 | Revesting of Property in the Debtor | 84 |
| 5.04 | Modification of Plan | 84 |
| 5.05 | Post-Confirmation Status Report | 84 |
| 5.06 | Post-Confirmation Conversion/Dismissal | 84 |
| 5.07 | Final Decree | 85 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# ARTICLE I.

## INTRODUCTION

Pacific Thomas Corporation the Debtor (hereinafter referred to as "Debtor" in this Case[1]), provides this Disclosure Statement to all of its Creditors, Equity Security Holders, and to other parties in interest in the Case.

The Debtor commenced its Bankruptcy case by filing a voluntary Chapter 11 petition under the United States Bankruptcy Code, ("Code") Sections 101-1330, on August 6, 2012 (the "Petition Date"). The Debtor was continuing in the operation and management of its business pursuant to Bankruptcy Code Sections 1107 and 1108 until a Chapter 11 trustee was appointed on January 8, 2013.

Section 1125 of the Bankruptcy Code requires that, at the time when the Plan is delivered to Creditors, the Plan be accompanied by this Disclosure Statement[2]. The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, so far as is reasonably practicable, in light of the nature and history of the Debtor and the condition of the Debtor's books and records, to enable a typical Creditor or Equity Security Holder to make an informed judgment about the Plan and to enable such Creditor or Equity Security Holder to determine whether it is in his best interest to vote for (accept) or against (reject) the Plan.

Chapter 11 of the Bankruptcy Code allows Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The plan may provide for Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both. The Debtor is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE

---

[1]  The definitions of the capitalized terms used in this Disclosure Statement are contained in Section 1.04 of this Disclosure Statement.

[2]  Section 1125(b) provides, in pertinent part, as follows: An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. . . . 11 U.S.C. § 1125(b).

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 4 of 85

STATEMENT FOR THE ENCLOSED PLAN. This Disclosure Statement contains a description of the Plan and other information relevant to the decision whether to vote to accept or to reject the Plan. The Debtor urges you to read this Disclosure Statement because it contains important information concerning the Debtor's history, business, assets, and liabilities and sets forth a summary of the Plan.

The Debtor's Plan is a reorganizing plan accomplished through the continuation of Debtor's primary business, the ownership, management, leasing, and/or refinance/sale of commercial real estate. In other words, the Plan Proponent (i.e., the Debtor) seeks to accomplish payment under the Plan primarily from the net proceeds and revenues generated through the refinance or sale of the Pacific Thomas Properties. The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, refinancing assets of the estate or a combination of all of the above. The Debtor, Pacific Thomas Corporation, is the party proposing the Plan sent to you in the same envelope as this document. THE DOCUMENT YOU ARE READING IS THE DISCLOSURE STATEMENT FOR THE ENCLOSED PLAN.

This is a combination refinancing and restructuring plan. The refinancing portion is through a proposed loan by Thorofare Capital (formerly referred to as Option A), with the balance of the plan proposed with a restructuring financed by the cash flow of the reorganized debtor within sixty months for all remaining allowed claims except for the Alameda County taxes which shall be paid off in a restructuring financed under a forty-eight month note. In other words, the Proponent seeks to refinance some secured claims, as outlined below, and the balance of plan payments to be accomplished by restructuring notes within sixty months. The secured creditors shall be paid the present value of their secured claim at a market interest rate through proceeds from the Thorofare Capital refinance loan and/or a sixty month restructured note payable from net income generated by the Reorganized Debtor, or, with regard to Jacol and PMF, a stipulated pay-off or pay-down amount, through the Thorofare Capital refinance loan. The unsecured creditors, Class 6A, shall be paid the proposed plan amounts over sixty months. The Effective Date of the proposed Plan is projected to be thirty (30) days after Confirmation. Payments will be due on the 15th day of the

month, starting in the first full month after plan confirmation; the pay-off and pay-down payments will be due within Two (2) court days of the funding of Debtor's refinance loan.

The Plan will be implemented through the following means:

- A senior financial executive or real estate professional will act as the Reorganized Debtor's CEO, will provide oversight and will be the key-decision maker with **_final decision-making_** authority for the Reorganized Debtor. Randall Whitney will provide assistance in the operation of the Reorganized Debtor's business and day-to-day management decisions. Loh Realty (http://www.lohrealty.com) and the Oakland office of Collier's International (http://www.colliers.com/en-us/oakland) shall serve as the Reorganized Debtor's Property Manager and Leasing Agent.

- The Reorganized Debtor will work to maximize its income from operations and further develop the Pacific Thomas Properties providing funds for the payment of its creditors.

- Debtor will have sufficient cash on hand to pay administrative claims on the Effective Date of the Plan; the source of this cash will be cash in Debtor's DIP bank accounts, cash from third party funding sources (new value), and cash from the Thorofare loan proceeds, subject to lender approval. If the insiders should not be able to liquidate the Hawaii real estate prior to plan confirmation, they will deed the Hawaii real property to the Reorganized Debtor at Confirmation.

- The funds from Debtor's refinance loan will be used to make pay-off / pay-down payments to the Alameda County Treasurer and certain secured creditors.

- The Reorganized Debtor will refinance the Thorofare loan before the expiration of its loan term, as extended; if the Reorganized Debtor is not able to refinance the Thorofare loan before the expiration of its loan term, as extended, the Reorganized Debtor agrees to sell the safe storage parcels of the Pacific Thomas Properties.

Case: 12-46534   Doc# 449   Filed: 12/31/13   Entered: 12/31/13 13:12:53   Page 6 of 85

- The proceeds from net income resultant from the leasing, and/or the refinance/sale of the Pacific Thomas Properties will be used to fund the monthly payments to both Secured and Non-Insider Unsecured Creditors provided for under the Plan. It is anticipated that there will be sufficient funds from the above-referenced sources to pay all Allowed Secured and 50% of all Allowed Non-Insider Unsecured Claims as follows:

- The Alameda County Treasurer's claims 5(ii)-(iv) and 5(viii) will be paid in full at the closing of a refinance loan, and its claims 5(i), (v), (vi), (vii), and (ix) will be paid off in equal monthly installments over a period of five (5) years from the Petition Date.

- The allowed secured claim of Summit Bank, Class 1, will be paid in sixty (60) equal monthly installments and a balloon payment on or before the sixtieth (60th) month following the Effective Date.

- Secured Creditor Bank of the West, Class 2, shall be paid in full by proceeds from the Thorofare Capital refinancing loan on the earlier of the Effective Date or upon the closing of the Thorofare Capital refinance loan.

- The allowed secured claim of Private Mortgage Fund, LLC, Class 3, will be paid in a stipulated amount upon the closing of a refinance loan on the earlier of the loan transaction closing or the Effective Date.

- The allowed secured claim of Jacol, Class 4, will be paid in parts, in a stipulated amount, from the refinancing loan proceeds, on the earlier of the Effective Date or upon the closing of the Thorofare Capital refinancing loan, with the remaining balance being paid in full on or before the sixtieth (60th) months following the Effective Date.

- Allowed Non-Insider Unsecured Creditors, Class 6A will receive 50% of their allowed claim on or before the sixtieth (60th) month following the Effective Date.

Debtor's Fourth Amended Disclosure Statement - 7

- Allowed Class 6B Unsecured Claims of Insiders will not receive any of their allowed claims.

- Class 7 insiders shall have their existing shares of Pacific Thomas Corporation cancelled and shall be issued new shares in the Reorganized Debtor, a newly organized entity, in exchange for a new value investment from the sale of unrelated real estate property in Hawaii.

**A MORE COMPLETE DESCRIPTION OF THE PROVISIONS OF THE PLAN AND THE MEANS OF EFFECTUATING THE PLAN ARE LOCATED AT ARTICLE III BELOW.**

**1.01      Purpose of this Document**.

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan. This Disclosure Statement does not purport to be a complete description of the Plan, the financial data pertaining to the Debtor's business operations, the applicable provisions of the Bankruptcy Code, or any other matter which may be deemed significant by Creditors or Interest Holders. Out of practical necessity, this Disclosure Statement represents an attempt to summarize extensive overall data, legal documents and legal principles, including provisions of the Bankruptcy Code, and to set them forth in understandable, readable form. Creditors are cautioned that the financial analysis of this Disclosure Statement is an **<u>estimated projection only</u>**, and the actual payoff amounts will likely change when claims become allowed or disallowed and the total amount of all allowed claims is known.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

1. **WHO CAN VOTE OR OBJECT;**

2. **WHAT THE TREATMENT OF YOUR CLAIM IS, (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN LIQUIDATION;**

3. **THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING THE BANKRUPTCY;**

4. **WHAT THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN;**

5. **WHAT IS THE EFFECT OF CONFIRMATION; AND**

6. **WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you. Be sure to read the Plan as well as all of this Disclosure Statement.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has conditionally approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party can now solicit votes for or against the Plan. However, the statements and conclusions set forth in this document are, unless otherwise noted, those of the Proponent of the Plan. The accuracy has not yet been determined by the Court, and the Court may determine such accuracy at the hearing regarding whether or not to confirm the Plan.

**1.02** **Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing.**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THE CASE.**

**1.02.1** **Time and Place of the Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan will take place on _____, 2014, at _____ A.M., in the Courtroom of the Honorable M.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 9 of 85

Elaine Hammond, Courtroom 215, 1300 Clay Street, Oakland, California.

### 1.02.2    Deadline for Voting to Accept or Reject the Plan

If you are entitled to vote to accept or reject the Plan, vote on the enclosed ballot and return the ballot in the enclosed envelope to **Matlock Law Group, P.C.,** to the attention of Anne-Leith Matlock, 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597 Telephone: (925) 944-7131, by _____, 2014, at 5:00 P.M. California time. See Article IV for a discussion of voting eligibility requirements.

Your ballot must be received and served upon **Matlock Law Group, P.C.,** to the attention of Anne-Leith Matlock, 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597 Telephone: (925) 944-7131, by _____, 2014, at 5:00 P.M. California time (the "Voting Deadline").

**<u>IMPORTANT NOTICE:  IF YOU ARE ELIGIBLE TO VOTE AND YOUR COMPLETED BALLOT IS NOT RECEIVED AND SERVED UPON MATLOCK  LAW GROUP, P.C., TO ATTENTION OF ANNE-LEITH MATLOCK, 1485 TREAT BLVD., SUITE 200, WALNUT CREEK, CA 94597 ON OR BEFORE THE VOTING DEADLINE, YOU MAY LOSE YOUR RIGHT TO VOTE ON THE PLAN.</u>**

### 1.02.3    Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must be filed with the Court and served upon **Matlock Law Group, P.C.** to the attention of Anne-Leith Matlock, 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597 Telephone: (925) 944-7131, by _____, 2014, at 5:00 P.M. California time.

At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to Section 1129 of the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims and Interests created under the Plan, and if not, whether the Bankruptcy Court should nevertheless confirm the Plan. If at the Confirmation Hearing the Bankruptcy Court determines that the Plan meets all of the requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will enter a Confirmation Order. Pursuant to Section 1141 of the Bankruptcy Code, the effect of the Confirmation Order will be to make the provisions of the Plan binding upon

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 10 of 85

the Debtor and each of its Creditors and Interest Holders, regardless of whether each Creditor or Interest Holder voted to accept the Plan.

### 1.02.4 Identity of Person to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan may contact Anne-Leith Matlock at **Matlock Law Group, P.C.,** 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597, Telephone: (925) 944-7131.

### 1.03 Disclaimer

The Plan involves the payment of Claims from available Cash on the Effective Date and the Reorganized Debtor's post-confirmation net income. Additionally, Debtor contemplates payment of Claims through a refinance or sale of one or more parcels of the Pacific Thomas Properties within 60 months of the Effective Date. Based on Debtor's financial projections, the Debtor projects that there will be sufficient funds available to make the payments called for under the Plan. The Debtor's financial projections are filed in support of the Plan (included in **Exhibit C** attached hereto) and were prepared by the Debtor.

THE PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT REPRESENT A PREDICTION OF FUTURE EVENTS BASED UPON CERTAIN ASSUMPTIONS SET FORTH WITH SUCH PROJECTIONS. THESE FUTURE EVENTS MAY OR MAY NOT OCCUR, AND THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS WHICH WILL OCCUR. BECAUSE OF THE UNCERTAINTIES INHERENT IN PREDICTIONS OF FUTURE EVENTS, THE DEBTOR'S ACTUAL CASH FLOW MAY WELL BE DIFFERENT FROM THAT PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE INTERESTS OF THE CREDITORS.

The projections are intended to assess the future cash flow available to the Debtor for making the distributions required by the Plan. Significant assumptions underlying the financial projections include the following:

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 11 of 85

1.      Effective Date of the Plan

For the purpose of the Projections, the Debtor estimates that the Confirmation Date will occur in or about February 2014 and hence, that the Effective Date will occur thirty (30) days after Confirmation.

2.      Earnings Generated by Pacific Thomas Properties.

The Debtor's projection of the future earnings which will be generated by the Pacific Thomas Properties through rental revenues and or the refinance or sale of Pacific Thomas Properties is derived from Debtor's estimate of the revenue which the Pacific Thomas Properties will generate after the Confirmation Date.

3.      Expenses of the Debtor

The Debtor has assumed for the purpose of the Projections that its expenses will not increase by any significant amount, except as specifically set forth in the Projections, during the term of the Plan.

The information contained in this Disclosure Statement is provided by the Debtor. The Plan Proponent represents that everything stated in the Disclosure Statement is true to the Proponent's best knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

The financial data relied upon in formulating the Plan is based on the Debtor's post-petition financial projections, the Debtor's Bankruptcy Schedules, and the financial information contained in pleadings filed with the Bankruptcy Court. This information was not audited or reviewed by an independent accountant and the Debtor is unable to warrant or represent that such financial information is without any inaccuracies, although Debtor believes it has made reasonable efforts under the circumstances to present such financial information fairly and accurately. The Debtor represents that everything stated in the Disclosure Statement is true to the best of Debtor's knowledge. The Court has not yet determined whether or not the Plan is confirmable and makes no recommendation as to whether or not you should support or oppose the Plan.

**THIS IS A SOLICITATION BY THE DEBTOR. THE REPRESENTATIONS**

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 12 of 85

HEREIN ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR CONSULTANTS. NO REPRESENTATIONS CONCERNING THE DEBTOR OR POST-CONFIRMATION DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE POST-CONFIRMATION DEBTOR'S FUTURE ACTIVITIES, THE VALUE OF ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE DEBTOR'S ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY IN INTEREST. ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT REGARDING THE DEBTOR HAS NOT BEEN SUBJECT TO CERTIFIED AUDIT. RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR. THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION AS ACCURATELY AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS. HOWEVER, THE FINANCIAL INFORMATION CONTAINED HEREIN REGARDING THE DEBTOR IS NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY. COUNSEL FOR THE DEBTOR HAS NOT INDEPENDENTLY VERIFIED THE

INFORMATION CONTAINED HEREIN AND MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO REVIEW CAREFULLY THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO VOTING ON THE PLAN. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS, OR TAX ADVICE. EACH CREDITOR AND OTHER PARTY IN INTEREST SHOULD CONSULT WITH HIS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT, AND/OR ACCOUNTANT PRIOR TO VOTING TO ENSURE A COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN. THIS DISCLOSURE STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS AND INTEREST HOLDERS OF THE DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION OF ACCEPTANCES TO THE PLAN BY THE DEBTOR, ASSUMING IT IS ACCURATE. HOWEVER, THE BANKRUPTCY COURT HAS NOT YET DETERMINED THE ACCURACY OF SUCH INFORMATION. IT MAY DO SO AT THE CONFIRMATION HEARING.

    **1.04**    <u>**Definitions, Interpretations and Rules of Construction**</u>

        **1.04.1**    **Definitions**

1.    "<u>**Administrative Claim**</u>" means a Claim for costs and expenses of the administration of the Case under Sections 503(b) or 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor (such as wages, salaries, or

---

Case: 12-46534   Doc# 449   Filed: 12/31/13   Entered: 12/31/13 13:12:53   Page 14 of 85

commissions for services); (b) all Claims of professionals employed at the expense of the Estate; and (c) any fees or charges assessed against the Estate under 28 U.S.C. § 1930.

2. "**Allowed Administrative Claim**" means an Administrative Claim allowed pursuant to Sections 503(b) or 507(b) of the Bankruptcy Code.

3. **"Allowed Amount"** means the amount of any Claim against the Debtor determined in accordance with Sections 502 and 506(a) of the Bankruptcy Code and any other applicable Section of the Bankruptcy Code, and recognized by the Debtor as value or allowed by Final Order of the Court, except to the extent described or defined otherwise herein.

4. "**Allowed Claim**" means a Claim: (a) with respect to which a Proof of Claim has not been filed but the Claim has been listed in the Schedules filed with the Bankruptcy Court by the Debtor and not listed as disputed, contingent, or unliquidated as to amount and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order; or (b) with respect to which a Proof of Claim has been filed within the time period fixed by the Bankruptcy Court, and as to which no objection is filed within the time period fixed by the Bankruptcy Court, or as to which any such objection has been determined by a Final Order.

5. "**Allowed General Unsecured Claim**" means an unsecured Allowed Claim against the Debtor, however arising, not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, an Allowed Claim based on the rejection of an executory contract or unexpired lease.

6. "**Allowed Priority Claim**" means an Allowed Administrative Claim, Allowed Priority Tax Claim, or Allowed Priority Unsecured Claim.

7. "**Allowed Priority Tax Claim**" means an Allowed Claim entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

8. "**Allowed Priority Unsecured Claim**" means an Allowed Claim entitled to priority pursuant to Sections 507(a)(3), 507(a)(4), or 507(a)(6) of the Bankruptcy Code.

//

---

Debtor's Fourth Amended Disclosure Statement - 15

9. "**Allowed Secured Claim**" means an Allowed Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under Section553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Allowed Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

10. "**Avoidance Action**" means any action which is filed or which may be filed pursuant to the provisions of Sections 510, 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code, any actions based on applicable non Bankruptcy law that may be incorporated or brought under the foregoing sections of the Bankruptcy Code, or any other similar action or proceeding filed to recover property for or on behalf of the Estate or to avoid a lien or transfer.

11. "**Ballot**" means the form distributed to holders of claims and interests on which is to be stated an acceptance or rejection of the Plan.

12. "**Bankruptcy Code**" means Title 11 of the United States Code, as now in effect or hereafter amended. All citations in the Plan to section numbers are to the Bankruptcy Code unless otherwise expressly indicated.

13. "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California, Oakland Division which has jurisdiction over the Case and the Estate of the Debtor, or such successor court or tribunal as may hereafter be confirmed or created by lawful authority with power to confirm reorganization plans under Chapter 11 of the Bankruptcy Code and all applicable statutes, rules, and regulations pertaining thereto.

14. "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for use in the Bankruptcy Court, as now in effect or hereafter amended.

15. "**Bank of the West Note 1**" means that certain Promissory Note secured by a 1st deed of trust encumbering the Bank of the West Note 1 Collateral

16. "**Bank of the West Note 1 Collateral**" means the 1st deed of trust encumbering the property located at 2615 East 12th Oakland, CA, on APN 25-701-6-4, and Bank of the West's

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 16 of 85

UCC-1 Financing Statement encumbering any and all rights, title and interest of Debtor in, under, and to any Swap Contract.

17. **"Bar Date"** means the last date for filing Proofs of Claim other than Administrative Claims or Claims based upon the rejection of any executory contracts or unexpired leases. The Bar Date for filing Proofs of Claim for all creditors except a governmental unit was set by the Bankruptcy Court as December 10, 2012.

18. **"Case"** means the Debtor's Chapter 11 case which was filed in the Bankruptcy Court, as 12-46534

19. **"Claim"** means: (a) a right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

20. **"Claimant"** means the holder of a Claim.

21. **"Confirmation"** means the entry of the Confirmation Order by the Bankruptcy Court.

22. **"Confirmation Date"** means the date on which the Confirmation Order is entered by the Bankruptcy Court.

23. **"Confirmation Hearing"** means the hearing, including any continued or postponed session thereof, at which time the Bankruptcy Court will consider and determine whether to confirm the Plan.

24. **"Confirmation Order"** means the order, as entered, of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

25. **"Creditor"** means the holder of an Allowed Claim.

26. **"Debtor"** means Pacific Thomas Corporation, the debtor in this Case.

//

---

27. "**Disallowed Claim**" means a Claim against the Debtor, which Claim is disallowed pursuant to an order of the Bankruptcy Court as to which eleven (11) calendar days have passed following entry of such order and no stay pending an appeal of such order is obtained during such period

28. "**Disbursing Agent**" means the Person or entity charged with making Distributions pursuant to the terms of the Plan. Pursuant to the Plan, the Court shall appoint a neutral person or entity to serve as the Disbursing Agent under the Plan.

29. "**Disclosure Statement**" means the Disclosure Statement (and all exhibits or schedules annexed thereto or referenced therein) which accompanies the Plan, as the Disclosure Statement may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

30. "**Disputed Claim**" means any Claim: (a) listed on the Debtor's Schedules as unliquidated, disputed, or contingent; or (b) as to which the Debtor, or any other party in interest, has interposed a timely objection or request for estimation or subordination in accordance with the Bankruptcy Code and the Bankruptcy Rules, which objection or request for estimation or subordination has not been withdrawn or determined by a Final Order. A Claim will be considered a Disputed Claim in its entirety if an objection is timely filed to any portion of such Claim.

31. "**Distribution**" means the Cash which is required to be distributed under the Plan to the holders of Allowed Claims.

32. "**Effective Date**" means the date not later than thirty (30) days following the date upon which the Confirmation Order becomes a Final Order; provided, however, that, if an appeal of the Confirmation Order is timely filed, the Debtor may elect to cause the Plan to become effective, notwithstanding the pendency of such appeal, so long as no stay of the Confirmation Order is in effect, by filing with the Bankruptcy Court a notice of such election, in which event the Plan will become effective as provided herein.

33. "**Equity Security Holder**" means the holder of an Interest in the Debtor.

//

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 18 of 85

34. "**Estate**" means the estate created under Section 541 of the Bankruptcy Code in the Case.

35. "**Exhibits**" means those exhibits annexed to the Plan or Disclosure Statement or incorporated by reference in the Plan or Disclosure Statement.

36. "**Final Distribution**" means, for each Class, the last Distribution to be made to holders of Allowed Claims in that Class

37. "**Final Order**" means an order or judgment of the Bankruptcy Court, or of any court of competent jurisdiction where there is pending an action in which the Debtor is a party, which has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for reargument or rehearing shall then be pending; or (b) any right to appeal, petition for certiorari, reargument, or rehearing shall have been waived in writing in form and substance satisfactory to the Debtor; or (c) any appeal, petition for certiorari, reargument or rehearing has been resolved by the highest court to which the order or judgment was appealed timely or from which certiorari, reargument, or rehearing was sought.

38. "**General Unsecured Claim**" means an unsecured Claim against the Debtor that is not entitled to priority under Section 507(a) of the Bankruptcy Code, including, without limitation, a Claim based on the rejection of an executory contract or unexpired lease.

39. "**Jacol**" means the group of individuals and entities that holds the beneficial interest in the 2nd deed of trust encumbering the Jacol Note 1 Collateral; said group is comprised of Jacol LLC, as to an undivided 48.43% interest, Robert Petersen, as to an undivided 21.43% interest, Pensco Trust Company Custodian FBO Emily Williams, IRA, as to an undivided 12.29% interest, Kenneth Hill, as to an undivided 10.71% interest, Shirley Meloy, as to an undivided 7.14% interest.

40. "**Jacol Note 1**" means that certain Promissory Note secured by a second deed of trust encumbering Jacol Note 1 Collateral.

//

---

Case: 12-46534   Doc# 449   Filed: 12/31/13   Entered: 12/31/13 13:12:53   Page 19 of 85

41.    **<u>Jacol Note 1 Collateral</u>** means the 2nd deed of trust encumbering the Property located in Oakland, CA on APNs 25-697-2-4, 25-697-3-6, 25-697-7-14.

42.    **<u>Order</u>**" means an order or judgment of the Bankruptcy Court as entered on the Court's docket.

43.    **<u>Pacific Thomas Properties</u>** means the Properties located on APNs 25-697-2-4, 25-697-3-6, 25-697-7-14, APN 25-701-6-4, and APNs 25-693-8, 19-102-4, 25-701-11, 25-697-7-15, 25-707-14-2.

44.    "**<u>Person</u>**" means any individual, corporation, general partnership, limited partnership, association, joint stock company, joint venture, estate, trust, government or any political subdivision, governmental unit (as defined in the Bankruptcy Code) or official committee appointed by the United States Trustee.

45.    "**<u>Petition Date</u>**" means August 6, 2012, the date on which the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code, commencing the Case.

46.    "**<u>Plan</u>**" means the Debtor's Chapter 11 Plan of Reorganization, as the Plan may be amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code and Bankruptcy Rules.

47.    **<u>"Post-Confirmation Estate Claims</u>** "means any and all claims and causes of action which constitute property of the Estate including, but not limited to, any Avoidance Actions, whether or not such claims or causes of action are the subject of litigation pending as of the Effective Date.

48.    "**<u>Post-Petition Earnings</u>**" means any funds received by Debtor since the Petition Date.

49.    "**<u>Priority Claim</u>**" means an Administrative Claim, Priority Tax Claim, or Priority Unsecured Claim.

50.    "**<u>Priority Tax Claim</u>**" means a Claim asserted to have priority under Section 507(a)(8) of the Bankruptcy Code.

//

---

Debtor's Fourth Amended Disclosure Statement - 20

51. "**Priority Unsecured Claim**" means a Claim asserted to have priority under Sections 507(a)(3), 507(a)(4), or 507(a)(6) of the Bankruptcy Code.

52. "**Private Mortgage Fund Note 1**" means that certain Promissory Note secured by a 1st deed of trust encumbering the Private Mortgage Fund Note 1 Collateral.

53. "**Private Mortgage Fund Note 1 Collateral**" means the 1st deed of trust encumbering the Property located at 1111 29th Ave, 2783 East 12th Avenue and the, 2801 East 12th Street parking lot in Oakland, CA on APNs 25-697-2-4, 25-697-3-6, 25-697-7-14.

54. "**Professionals**" means professionals, such as attorneys, consultants or accountants employed by the Debtor in this case after the Confirmation of the Plan, including but not limited to, Matlock Law Group, P.C.

55. "**Pro Rata**" means the proportional amount of any one Claim or Equity Interest in a Class or a group of Claims to the aggregate amount of all Claims or Equity Interests in the same Class or group, including Disputed Claims until disallowed.

56. "**Proof of Claim**" means a statement under oath filed in the Case by a Claimant in which the Claimant sets forth the amount claimed to be owed to it and sufficient detail to identify the basis for the Claim, in accordance with Federal Rule of Bankruptcy Procedure 3001.

57. "**PTC**" means Pacific Thomas Corporation.

58. "**Reorganized Debtor**" means the Debtor, Pacific Thomas Corporation and its successor in interest, Safe Storage Oakland, Inc., on and after the Effective Date, who shall assume all of the rights and obligations of the Debtor together with title to and control of the Debtor's assets and liabilities upon Confirmation of the Plan, as such rights, obligations, assets and liabilities are modified in the Plan.

59. "**Schedules**" means the Schedules of Assets and Liabilities and Statement of Financial Affairs filed by the Debtor in the Case, as amended, modified, or supplemented from time to time.

60. "**Secured Claim**" means a Claim secured by a lien, security interest or other charge against property in which the Estate has an interest, or which is subject to setoff under

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 21 of 85

Section 553 of the Bankruptcy Code, to the extent of the value, determined in accordance with Section 506(a) of the Bankruptcy Code, of the interest of the holder of such Secured Claim in the Estate's interest in such property, or to the extent of the amount subject to any setoff, as the case may be.

61.     "**Secured Creditor**" shall mean the holder of an Allowed Secured Claim.

62.     "**Summit Bank Note 1**" means that certain Promissory Note for loan number ending 8144, which is secured by a 1st deed of trust encumbering the Summit Bank Note 1 Collateral.

63.     "**Summit Bank Note 1 Collateral**" means the 1st deed of trust encumbering the properties located at 1113-1115 29th Ave, the 23rd Ave Cul de sac parking area, and the 2901 East 12th Street Parking Lot(s) located in Oakland, CA on APNs 25-693-8, 19-102-4, 25-701-11, 25-697-7-15, 25-707-14-2, 25-693-3-3, as well as Summit Bank's UCC-1 Financing Statement encumbering Debtor's Inventory, Chattel Paper, Accounts, Equipment, and General Intangibles. The terms "Inventory", "Chattel Paper", "Accounts", "Equipment", and "General Intangibles", in the context of Summit Bank's UCC-1 Financing Statement, shall have the meaning set forth in the respective subsections of UCC §9-102 that define such term(s).

64.     "**Swap Agreement**" means the Interest Rate Protection Agreement that was entered into by and between Debtor and Bank of the West on or around December 18, 2008; pursuant to the Swap Agreement, Debtor is obliged to pay 6.25% interest for a day count fraction of "Actual/360" for the Notional Amount each month minus the Floating Rate Amount payable by Bank of the West until the termination date of December 5, 2013. The Floating Rate Amount shall mean a rate of One (1) month Libor USD plus 3.59% for a day count fraction of "Actual/360".

65.     "**Swap Contract**" means (a) any rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions,

collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement.

66.    "**Tax Collector**" means the County Treasurer/Tax Collector or its successors-in-interest

67.    "**Unclaimed Distribution**" means any Distribution which is unclaimed as a result of any of the following: (a) checks which have been returned as undeliverable without a proper forwarding address; (b) checks which were not mailed or delivered because of the absence of a proper address to which to mail or deliver the same; (c) checks which remain un-negotiated for a period of ninety (90) days after the date of issuance.

68.    "**Unclassified Claims**" means the Allowed Amount of all Administrative Claims of the Debtor's Case, allowed pursuant to Section 503(b) of the Bankruptcy Code; and (ii) all Priority Tax Claims entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code.

69.    "**Unsecured Creditors**" means Creditors holding Allowed Unsecured Claims against the Debtor for which there are no assets of the Debtor serving as a security, but not including Priority Claims.

### 1.04.2    Undefined Terms

Any term used in the Disclosure Statement that is not defined in the Disclosure Statement, either in Section 1.03.1 (Definitions) or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules.

### 1.05    **Interpretations, Computation of Time and Governing Law**

#### 1.05.1    Rules of Interpretation

For the purposes of the Disclosure Statement:

1.    Whenever, from the context, it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural.

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 23 of 85

2.     Any reference in the Plan to a contract, instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.

3.     Any reference in the Plan to an existing document or Exhibit Filed or to be Filed means such document or Exhibit, as it may have been or may be amended, modified, or supplemented as of the Confirmation Date.

4.     Unless otherwise specified in a particular reference in the Plan, all references in the Plan to Sections, Articles or Exhibits are references to Sections, Articles and Exhibits of or to the Plan.

5.     Unless otherwise specified in a particular reference in the Plan, the words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan in its entirety rather than only to a particular paragraph, subparagraph, or clause contained in the Plan.

6.     Captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan.

7.     The rules of construction set forth in Bankruptcy Code Section 102 shall apply.

8.     The provisions of the Plan will control over any description thereof contained in the Disclosure Statement.

9.     Any term used in the Plan that is not defined in the Plan, but that is used in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules. Without limiting the foregoing, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply hereto. The definitions and rules of construction contained herein do not apply to the Disclosure Statement or to the exhibits to the Plan except to the extent expressly so stated in the Disclosure Statement or in each exhibit to the Plan.

10.     Except to the extent that federal law, including the Bankruptcy Code or the Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be

governed by, and construed and enforced for all purposes in accordance with, the laws of the state of California, without giving effect to any principles of conflict of laws thereof.

11.  All exhibits to the Disclosure Statement and Plan are incorporated into the Disclosure Statement and Plan, respectively, and will be deemed to be included in the Disclosure Statement and Plan, respectively, regardless of when they are filed.

### 1.05.2  Computing Time Periods

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### 1.05.3  Section Numbers

References in the Plan and Disclosure Statement to a Code section are references to the United States Bankruptcy Code (Title 11 of the United States Code) except as otherwise indicated.

### 1.05.4  Notices and Delivery of Documents

All notices, correspondence, and other deliveries under this Disclosure Statement must be directed as follows:

| To the Debtor or Reorganized Debtor: | Pacific Thomas Corporation Attn: Randall Whitney 1818 Mt. Diablo Blvd., Suite D, Walnut Creek, CA |
|---|---|
| With a Copy to: | Matlock Law Group, P.C. Anne-Leith Matlock 1485 Treat Blvd., Suite 200, Walnut Creek, CA 94597 Telephone: (925) 944-7131 |

## ARTICLE II.

## BACKGROUND

### 2.01  Description and History of the Debtor's Business

The Debtor Pacific Thomas Corporation (PTC) is a real estate investment and development company doing business since 1992 in California and, previously, also Hawaii. PTC currently controls an approximate ten (10) acre site next door to Fruitvale BART station in Oakland California, which is assembled with nine (9) legal and contiguous parcels. The portfolio is

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 25 of 85

anchored by the company-owned self-storage facility "Safe Storage" that is currently leased to Pacific Trading Ventures.

This lease between Debtor and PTV has been in place since January 1, 2005, was renewed on January 1, 2010, and amended and modified on August 1, 2012 to reflect current market rates. Apparently in an effort to market the Self Storage properties, the Chapter 11 Trustee has given a termination notice to Pacific Trading Ventures in or around April 2013. Pacific Trading Ventures believes this termination was invalid and had no effect. If the notice should be valid, the Debtor, upon confirmation of Debtor's Fourth Amended Plan, will either re-sign the master lease with Pacific Trading Ventures or execute leases with the individual Safe Storage (sub-)tenants. Debtor believes that this will have only minor, if any, impact on the amount of income generated from the Safe Storage real properties. In particular, even though Debtor may be able to collect more rent through leases with the safe storage tenants than it does pursuant to its Master Lease with Pacific Trading Ventures, the additional income will be needed for operating expenses related to the self storage parcels (which are currently paid for by Pacific Trading Ventures).

PTC's property portfolio comprises a total of 10 acres of transit-oriented site area in Oakland California adjacent to the Fruitvale BART station. The properties are situated within Oakland's Coliseum/Airport redevelopment project area.

A significant part of PTC's Oakland portfolio property is master leased by the Pacific Trading Ventures, the Safe Storage Management Company business. See **Exhibit G**. The Safe Storage/Safe Parking business operation occupies approximately 210,000 SF site area, and consists of approximately 100,000 SF of net rentable square feet spanning 11 self storage buildings and 80 parking stalls for RV & Boat storage.

Next to the Safe Storage self storage operation are two commercial buildings, primarily consisting of (1) 7200 SF commercial building on a 25,000 SF lot and (2) a 10,000 commercial building on a 12,500 SF lot. Both buildings have adjacent parking, as well, both share a corner lot (approx 13,500 SF) which provides parking to either building. These buildings and corner parking lot comprise entire corner property at busy intersection of East 12th Street and 29th Avenue,

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 26 of 85

Oakland Ca. This intersection is one of three primary entries into the entire community from the major 880 Interstate highway.

The first building is located at 1111 29th Avenue, Oakland CA 94601 (APN#: 25-697-3-6) also referred to as the "Tuffy Building". The subject property houses a commercial, retail-grade building, which sits immediately adjacent to the Safe Storage facility. The building has approximately 7,200 square feet of lease space and a total land size of 24,882 square feet. This building will need tenant improvements as required by the prior lease agreement with PPMM group, but is also ideal for a similar commercial lease with another tenant, given the proximity to the Fruitvale BART station and commercial retail developments in the area.

The second building is located at 2783 East 12th Street, Oakland, CA (APN #: 25- 697-02-04), also referred to as the "Morse Building". This subject property is currently the main offices for the Safe Storage Management Company (using approximately 1450 SF for offices and retail lobby space). Additionally, Clark Construction is leasing approximately 3,000 SF of commercial space in this building since approximately January 2013. The building has approximately 10,000 SF of gross leasable area and total land size of 12,669 SF. MUA Group utilizes approximately 2000 SF of the mezzanine floor.

The remainder of the property consists of the parking lot area next to the Fruitvale BART station – this site is comprised of approximately 60,000 SF of gross leasable square feet. This subject site has adjacent proximity to existing BART parking facilities and is best suited for parking support to the congested BART station. As of October 2010, BART sold off the last 600 stall parking lot to private development for future housing/mixed use, which will continue to provide a high demand for parking availability within the neighborhood.

Another 18,646 SF exists on the opposite side of the Safe Storage site and was utilized to support the SAFE PARKING and BUDGET Truck Rental operations. All of Debtor's leases but the Master Lease, **Exhibit G**, were managed by Pacific Trading Ventures. Currently, the Chapter 11 trustee manages all leases.

//

Debtor's Fourth Amended Disclosure Statement - 27

### 2.02     __Insiders of Debtor's Business__

The Debtor Pacific Thomas Corporation consists of 5 shareholders, Edwin Thomas Revocable Living Trust, Randall Whitney, Jill Worsley, Roger W. Worsley, Stephen T. Worsley. Other family members and related entities are listed as creditors including, Richard Douglas Worsely, Thomas Koolaupoko Inv. c/o Darow/Whitney, Buhla R. Darrow Trust, Thomas Capital Investments, and Darrow Family Partners.

### 2.03     __Management of the Debtor Before and After the Bankruptcy__

Management of the Debtor both before and after the filing of the Bankruptcy, until a Chapter 11 Trustee was appointed, has been provided by the Debtor's officers, Randall Whitney and Jill Worsley, with management of all Pacific Thomas Properties but the Pacific Thomas Properties that are subject to the Master Lease, **Exhibit G**, both before and after the filing of the Bankruptcy, by Pacific Trading Ventures. On January 8, 2013, the Court entered an order approving the appointment of Chapter 11 Trustee, who has been managing the Debtor since shortly thereafter.

Post-Confirmation, the Reorganized Debtor's business operations will be managed by a senior financial executive or real estate development and investment professional with background in Bay Area communities. Said individual will act as Debtor's CEO and will have final decision making authority for the term of the Plan. The CEO will be a non-insider of the Debtor. He or she will receive an hourly compensation of approximately $250 for his/her management services; Debtor estimates the CEO's monthly compensation at $3,000 per month as shown in **Exhibit C**. The Debtor has created an ad hoc executive search committee that is currently in the process of searching for and interviewing prospective candidates meeting the above-stated criteria; said committee is comprised of Connie White ( Community Staffing Resources), Andrew Audet (Executive Search Consultant), John Loh (Loh Realty), James McMasters (Colliers International), and Dean Keller (Bancap Self Storage Group).

The Reorganized Debtor's CEO will be supported by Randall Whitney, in an *assisting* role only. Randall Whitney has significant experience, and, in fact, received a ceremonial resolution

---

Debtor's Fourth Amended Disclosure Statement - 28

from the Oakland City Council for the years of services Safe Storage has provided to Oakland and for his commitment to Oakland's community. See **Exhibit P**. Randall Whitney and any and all officers and directors besides the Reorganized Debtor's CEO will not be paid any compensation for their services.

Loh Realty (http://www.lohrealty.com) and the Oakland office of Collier's International (http://www.colliers.com/en-us/oakland) have offer services to the Debtor and will be retained as Debtor's post-confirmation property management company and leasing agent. Loh Realty will handle all property management whereas Collier's International will serve as Debtor's leasing agent. The proposed terms of these business relationships are attached hereto as **Exhibit M** and **N**. Collier will also take on a consulting role in the Debtor's real estate planning and design development activities.

### 2.04    Events Leading to Chapter 11 Filing

Here is a brief summary of the circumstances that led to the filing of this Chapter 11 case:

The Debtor's loan with Summit Bank matured in March 2011, and its loans with the remaining secured creditors are/were set to mature in November 1, 2014 (Private Mortgage Fund, LLC) and December 2013 (Bank of the West). The Debtor commenced discussions and negotiations with Summit Bank to pay off its loan. Summit Bank, however, consistently refused to provide the Debtor with an actual payoff amount resulting in the Debtor losing various refinance opportunities as Summit Bank never provided its payoff amount. Instead, Summit Bank commenced an action for specific performance to appoint a receiver in Alameda Superior Court, RG11574626, approximately 30 days after it received a $2,150,000 down-payment from Debtor's refinance with Jacol and PMF. On numerous occasions before and during the receiver action, counsel for Summit failed to respond to informal requests via fax or in writing from Debtor, the title company, potential lenders, and Debtor's counsel, for updated payoff amounts, insisting that said requests were not made pursuant to a statutory payoff demand. However, more than once, such statutory payoff demands were made directly by a title company or potential lender and were met with silence from Summit's litigation counsel. Summit Bank denies that it ever refused to

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 29 of 85

provide a payoff demand. The Superior Court appointed a receiver on January 20, 2012, who attempted to collect rents from parcels that did/do not serve as Summit's collateral; Bank of the West filed a complaint in intervention in said action and Debtor repeatedly objected to the receiver overstepping its authority. On July 20, 2012, however, the Superior Court modified its January 20, 2012 order, *nunc pro tunc*, to purportedly authorize the receiver to collects rents from parcels that were not collateralized by Summit, which Debtor believes was in violation of applicable law. Also on July 20, 2012, the Superior Court entered a judgment that purported to be based on a violation of the January 20, 2012 order, but in effect, Whitney was held in contempt of the modified order that had just issued *nunc pro tunc*.

Unable to refinance due to the Summit Bank intransigence, battling Summit against its unreasonable attempts to collect all of PTC's rents and its foreclosing efforts regarding (parts of) Debtor's properties that were no longer collateralized by Summit's security agreements, and with the Summit Bank loan due, on August 6, 2012, the Debtor had to file for protection under Chapter 11 of the federal bankruptcy code. Summit disputes that Debtor made any payoff demands.

### Significant Events During the Bankruptcy

#### i. Bankruptcy Proceedings

The following is a chronological list of significant events which have occurred <u>during</u> this case:[3]

This case was commenced by Debtor's filing of a voluntary petition for relief under Chapter 11 on August 6, 2012. Subsequent to the filing of the case, Matlock Law Group, P.C. filed its application for employment on August 15, 2012. See Court Docket No. 16-18. On September 10, 2012, the First Meeting of Creditors under section 341 of the Bankruptcy Code was held and concluded. On October 4, 2012, the Court issued an order approving the employment of Matlock Law Group, P.C.as Debtor and Debtor-In-Possession's general insolvency counsel. Court Docket

---

[3] This is only a summary of the docket and the Orders described above. The docket and the Orders should be consulted for an exact description of their contents and terms. In the event of any discrepancy between this summary and the docket or the Orders, the terms of the docket and the Orders shall control.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 30 of 85

No. 106. On November 21, 2012, Matlock Law Group, P.C. filed an interim fee application, Court Docket No. 152 and 153, and the Court granted an interim fee award on December 18, 2012. Court Docket No 180. On September 20, 2013, the Court approved on an interim basis the cash collateral stipulations Debtor had negotiated and entered into with Private Mortgage Fund, LLC, Jacol, and Summit Bank, respectively, on an interim basis, pending final hearing. Court Docket No. 90, 91, 92. After a final hearing, the Court approved the afore-mentioned stipulations. Court Docket No. 122, 127, 127[4]. On November 2, 2012, the Court approved the cash collateral stipulation by and between Debtor and Bank of the West Court Docket No. 137.

The Court found that the decision whether cause exists to appoint a trustee pursuant to §1104(a)(1) is a "close call", but that the appointment of a Chapter 11 trustee was warranted pursuant to the best interest standard, which requires a broad view. Consequently, on January 8, 2013, an order approving the appointment of Chapter 11 Trustee was entered, Pacific Thomas Corporation was no longer the debtor-in-possession and was ordered to not make any disbursements. On April 26, 2013, the Court approved the cash collateral stipulations entered into by the Chapter 11 Trustee and Bank of the West, Summit Bank, Private Mortgage Fund, LLC, and Jacol, respectively. On April 11, 2013 an Emergency Motion for Issuance of Temporary Restraining Order was filed by the Chapter 11 Trustee. Also on April 11, 2013, the Chapter 11 Trustee filed a complaint against Randall Whitney, Pacific Trading Ventures, Pacific Trading Ventures, Ltd., and Jill Worsley, Adv. Case No. 13-04079, alleging that no lease exists between Debtor and Pacific Trading Ventures and that Trustee is entitled to the difference between the rents Pacific Trading Ventures collects from its tenants and the rent it pays to Debtor under the master lease (**Exhibit G**). These funds are used by Pacific Trading Ventures to pay for its operating expenses and, whatever remains after expenses, constitutes the net profits of Pacific Trading Ventures.

_____

[4] An amended order after final hearing was entered by the Court on October 23, 2012. Court Docket No. 131.

Case: 12-46534   Doc# 449   Filed: 12/31/13   Entered: 12/31/13 13:12:53   Page 31 of 85

On May 30, 2013, the Chapter 11 Trustee filed a motion to sell certain real property free and clear of Pacific Trading Ventures' leasehold interest, based on the allegation that the 2007 Promissory Note between Debtor and Summit includes an ambiguous clause that states, and that the Debtor allegedly signed, that there are no tenants as of July 16, 2007 except Self Storage tenants. On July 1, 2013, the Court authorized the Chapter 11 trustee to market and sell the Self Storage facility free and clear of Pacific Trading Venture's Interests. The trustee has not yet obtained court approval of any sale of any of Debtor's assets free and clear of the secured creditors' interests. However, the trustee's counsel filed a motion for order approving sale of property of the estate on December 24, 2013, which is set for hearing on February 13, 2014, and which is contingent upon the trustee's obtaining Bank of the West's, Private Capital Investment's, Private Mortgage Fund's, and Summit Bank's consent prior to the closing of any possible sale. See Court Docket Docs. #444-447. Pursuant to the Chapter 11 trustee's motion, its broker solicited 5 purchase offers so far, and proposes to sell the property to Barker Pacific Group and Artemis Real Estate Partners for $13,750,000, which is less than Debtor's total secured debt, or any other prospective buyer who bids more.

On October 16, 2013, the Chapter 11 trustee filed an ex parte application for issuance of a temporary restraining order to remove Pacific Trading Ventures as the management company of the Pacific Thomas Properties; said order was docketed on November 18, 2013. See **Exhibit Q**. The order requires, *inter alia*, that any and all rents and other proceeds generated from the Pacific Thomas Properties be collected by and paid directly to the Chapter 11 trustee and that the Defendants in the Adversary Case may not, *inter alia*, collect any rents, enter the Pacific Thomas Properties, or interfere with the trustee's operations of the Pacific Thomas Properties. Randall Whitney appealed to the U.S. District Court from the order granting the preliminary injunction. See Court Docket for Case #13-04079, Docs #81, 100, 104-106.

Please see the Court's Docket for a detailed list of orders and proceedings in Debtor's Chapter 11 case and the related adversary matter.

//

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 32 of 85

Additionally, please see a letter, attached as **Exhibit U**, stating language received from Summit Bank and Bank of the West further clarifying Debtor's Disclosure Statement, as amended, as discussed by the parties and requested by the Court at the hearing on Debtor's Third Amended Disclosure Statement on December 12, 2013.

### ii. Other Legal Proceedings

In addition to the proceedings discussed above, the Debtor is/was involved in the following non-Bankruptcy legal proceedings in the State of California Superior Court for the County of Alameda:,

    a) Summit Bank vs. Pacific Thomas (RG11) Case # RG11574626,

    b) Pacific Thomas vs. Summit Bank (RG12) Case # RG12624629 (dismissed).

Additionally, Randall Whitney filed an appeal regarding the Order Granting Chapter 11 Trustee Kyle Everett's Motion to Sell Real Property Free and Clear of Certain Interests, #NC-13-1354, which was dismissed as interlocutory by the U.S. Bankruptcy Appellate Panel of the Ninth Circuit on September 27, 2013.

### iii. Procedures Implemented to Resolve Financial Problems

To attempt to fix the problems that led to the Bankruptcy filing, Debtor has implemented the following procedures:

The Debtor has worked with a lender, Thorofare Captial, for several weeks and has obtained a Commitment Letter regarding a prospective loan to refinance four of its real property parcels. The Debtor intends to use Thorofare Capital's loan to refinance some secured claims encumbering the Pacific Thomas Properties. Debtor will work to close the refinance loan and seek respective Court approval as quickly as possible. The Thorofare Capital conditional loan commitment makes provision for an ***interest reserve*** so that on any given month as revenues fluctuate, the mortgage payment and payments to the unsecured creditors under the plan continue to be made. See **Exhibit F**, p.2, and **Exhibit C**. As described in Section 3.03.1 below, the allowed secured claims of Classes 1-5(ix) shall be paid in parts from the refinance funds upon the

---

Debtor's Fourth Amended Disclosure Statement - 33

Effective Date with the balance being paid within sixty months from the Effective Date[5] from net income resultant from the leasing, and or the sale of the Pacific Thomas Properties.

**2.05    Actual and Projected Recovery of Avoidable Transfers**

After a diligent review of its general ledger and its corporate books and records, the Debtor believes there are no voidable preferential transfers, fraudulent conveyances, or other avoidance actions to pursue. Debtor's counsel has conferred with Trustee's counsel for input from the Trustee on these issues, but so far no information has been received that could indicate that any voidable preferential transfers occurred. Trustee's counsel is, however, still in the process of analyzing the books and records of the Debtor and the numerous transactions of the Debtor's officers to confirm that all transactions had an appropriate and legitimate business purpose. If any preferential transfers should be discovered that could bring a net value to the Debtor's estate, the Debtor is committed to pursuing such transfers through an independent third party for the benefit of its bankruptcy estate. The Debtor does not believe that there were any transactions that did not comport to arms-length, market transactions or that were in any way unfair to the Debtor and its creditors and/or that no single action merits litigation costs when compared to the benefits available to the bankruptcy estate. Furthermore, Trustee's counsel confirmed that there were no preferential transfers within the 90 days before the commencement of the instant bankruptcy case.

**2.06    Claims Objections**

Debtor intends to object to **Claims 6, 7, 18, 20, 22, 27, 28, 32**, and **33**, as these claims are not secured by property of Debtor's bankruptcy estate and these purported creditors have no valid, contractual relations with the Debtor. They have no valid claims against the Debtor, and the Debtor reserves the right to proceed in actions against the respective third party borrowers who

---

[5] The Alameda County Treasurer will be paid in parts upon the closing of a refinance loan with the remaining balance being paid in full on or before, but no later than, the sixtieth (60th) month following the Petition Date.

---

Debtor's Fourth Amended Disclosure Statement - 34

fraudulently recorded grant deeds[6] on such unrelated real properties. Moreover, Debtor reserves the right to object to **Claims 24** and **25** as any and all permissible fees of these two claimants, as approved by court order of the Alameda Superior Court, were already paid. In fact, Debtor asserts that said claimants may still hold funds of the Debtor that it will seek to recover.

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtor reserves the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputing disputed claims are set forth in Article VI of the Plan.

The deadline for filing objections to claims is 90 days after the Confirmation Date, or 90 days after the applicable claims deadline, whichever is later.

### 2.07    Current and Historical Financial Conditions

Prior to the appointment of the Trustee in this case, PTC was in the midst of converting two commercial buildings into a newly modernized, medical corner plaza to better serve the surrounding community.  Pursuant to those plans and upon confirmation of its Fourth Amended Plan of Reorganization, PTC will be converting this historical industrial corner into a new dual purpose medical clinic base. PTC expects to sign leases with the following groups within 90 days of the Confirmation Date[7]:

- NorCal Imaging aka Norcal Imaging – 3000 SF (www.radnet.com)
- ACMC Highland Hospital – offsite parking and logistics(www.acmedctr.org)

---

[6] It appears that these claims are based on grant deeds that purport to transfer real property into the name of a trust, and that the respective borrowers claim that Debtor has a beneficial interest in said trust. Debtor was unaware of each transaction until the respective lenders filed a claim, and Debtor never authorized or ratified said transactions.

[7] Debtor has not entertained any lease negotiations with potential tenants. However, Debtor has been approached by potential tenants with whom Debtor had negotiated leases prior to the appointment of the Chapter 11 trustee, who expressed and confirmed that they are still interested in leasing commercial space from Debtor, and who expressed frustration about not having received any feedback from the Chapter 11 trustee in response to their inquiries.

---

RADNET aka NorCal Imaging (www.radnet.com) is currently considering 3600 SF, with monthly rental income targeted at approximately $7,000 NNN. NorCal Imaging is the dominant service provider of medical diagnostic imaging services, such as XRay, CatScan, MRI and Mammography. NorCal Imaging would draw customers from Oakland's Fruitvale and Chinatown/East Lake Merritt districts, as well as, Alameda medical community.

Norcal Imaging (www.radnet.com) would provide the diagnostic imaging component that would create a more comprehensive specialized clinic. The expansion to our market is the result of the increasing demands for health care services in the Fruitvale neighborhood.

Additionally, Debtor had an executed lease with Planned Parenthood at the time the instant bankruptcy proceeding was commenced. As the lease was terminated by stipulation between Planned Parenthood and the Chapter 11 Trustee, Debtor will seek a like tenant at market rates to lease the available 7200 SF commercial unit. Debtor will set aside funds in an amount of at least $100,000 in order to complete tenant improvements, if any should be necessary. See **Exhibit F**, p.6 (Tuffy Building CapEx). Debtor estimates that it will be able to collect $12,000 or more starting no later than three months after the Effective Date as various companies have already/previously expressed interest in the available rental space. See **Exhibit C**, p.9 (Projected Income Statement - Tuffys).

From rental income generated by the Pacific Thomas Properties, the Chapter 11 Trustee currently makes adequate protection payments to Debtor's secured creditors. Even though the Chapter 11 Trustee's operating reports show that the Debtor is generating a net profit, it appears that he is not current on said payments. Prior to the Chapter 11 Trustee's appointment, Debtor made adequate protection payments to the secured creditors pursuant to the negotiated and stipulated cash collateral budgets that had been approved by the court. See Section 2.04 *supra*.

The Debtor estimates as of the writing of this disclosure Statement that it will meet its debt service obligations on the Pacific Thomas Properties on the Effective Date and through the term of the Plan through cash flow generated by the net rental proceeds. See **Exhibit C**. Additionally, Debtor contemplates to meet its debt service obligations on the Pacific Thomas

---

Debtor's Fourth Amended Disclosure Statement - 36

Properties through a refinance or sale of the Pacific Thomas Properties upon confirmation of its Fourth Amended Plan and as of the Effective Date and subsequent closing of its Motion to Approve Post-Petition Financing with Thorofare Capital pursuant to the Amended Conditional Commitment Letter. See **Exhibit F**.

The identity and the estimated fair market value of the estate's assets are listed in **Exhibit A**, pursuant to lender Thorofare Capital's underwriting valuation review and recent appraisals from CBRE, Integra Realty Resources, and Cushman Wakefield. Further, Debtor and its counsel continue to more thoroughly evaluate any actual or projected value that can be obtained from voidable preferential transfers, fraudulent conveyances, or other avoidance actions, if any. See Section 2.05. Trustee's counsel confirmed that there were no preferential transfers within the 90 days before the commencement of the instant bankruptcy case.

A summary of Debtor's projected monthly income and expenses is attached hereto as **Exhibit C**. A summary of the Debtors' periodic operating reports filed since the commencement of the Debtors' bankruptcy case is set forth in the following table:

|  | Gross Income | Expenses | Net Income | Ct. Docket # |
|---|---|---|---|---|
| August 2012 | $45,649 | $45,100 | $7,686 | 125 |
| September 2012 | $71,800 | $49,366 | $22,434 | 132 |
| October 2012 | $58,000 | $55,249 | $2,751 | 160 |
| November 2012 | $114,113 | $148,558 | ($3,445) | 201 |
| December 2012 | $78,728 | $155,055 | ($76,328) | 244 |
| January 2013 | $156,325 | $331 | $155,994 | 245 |
| February 2013 | $46,501 | $375 | $46,126 | 246 |
| March 2013 | $72,425 | $17,402 | $55,023 | 273 |

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 37 of 85

| | | | |
|---|---|---|---|
| April 2013 | $54,408 | $73,102[8] | ($18,694) | 285 |
| May 2013 | $108,466 | $140,615[9] | (32,149) | 313 |
| June 2013 | $63,207 | $155,076[10] | (21,326) | 334 |
| July 2013 | $75,574 | $63,718 | $11,856 | 365 |
| August 2013 | $78,795 | $60,450 | $18,344 | 378 |
| September 2013 | $79,672 | $63,717 | $15,955 | 412 |
| October 2013 | $108,274 | $67,659 | $40,615 | 435 |
| November 2013 | $43,572 | $64,690 | (21,119) | 441 |
| *TOTAL:* | $1,255,509 | $1,160,463 | $203,724 | |
| *AVERAGE:* | $78,469 | $64,690 | $12,733 | |

## ARTICLE III.

## SUMMARY OF THE PLAN OF REORGANIZATION

### 3.01 What Creditors and Interest Holders Will Receive Under The Proposed Plan

As required by the Bankruptcy Code, the Plan classifies claims and equity interests in various classes and describes the treatment each class will receive. The Plan states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan. The Plan provides for a refinancing of certain real property pursuant to Debtor's Motion to Approve Post-Petition Financing and the Fourth Amended Disclosure Statement and Plan outlined in Thorofare Capital's loan sizing table and Debtor's proposed financials. See attached **Exhibits C** and **F**. The refinancing loan from Thorofare will pay off in its entirety, Class 2, according to its allowed claim, and Classes 5(ii)-(iv) and 5(viii). Furthermore, the refinancing proposal provides, pursuant to stipulations /

---

[8] This amount includes $65,000 for debt servicing expenses (see Statement of Cash Receipts & Disb.).
[9] This amount includes $133,020 for debt servicing expenses (see Statement of Cash Receipts & Disb.).
[10] This amount includes $104,500 for debt servicing expenses (see Statement of Cash Receipts & Disb.).

Debtor's Fourth Amended Disclosure Statement - 38

memorandums of understanding, payments for Classes 3 and 4 secured claims, subject to the Court's approval of Debtor's Refinancing Motion and confirmation of Debtor's Fourth Amended Plan of Reorganization. Payments of administrative claims shall be made upon the Effective Date. The balance of the allowed, secured claims 3 and 4 beyond the pay-down amounts, if any, shall be paid as set forth below. The Class 1 claimant's allowed secured claim shall be repaid over five years per the treatment below, with a balloon payment for any balance of the secured claim prior to the sixtieth (60th) month. The Plan proposes to pay the Class 5(i), (v), (vi), (vii) and (ix) claims according to the payoff schedules with the corresponding real property secured claims but in no case later than at the end of the 60th month from the order for relief. Class 6 consists of the Allowed Claims of Unsecured Creditors and shall be payable over five years per the treatment below. All of the allowed claims shall be treated as outlined in more detail below.

### 3.02 Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Proponent has not placed the following claims in a class.

### 3.02.1 Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code section 507(a)(2). The Code requires that all administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists all of the Debtor's § 507(a)(2) estimated but unverified administrative claims and their treatment under the Plan.

| Name | Amount Owed | Treatment |
|---|---|---|
| Matlock Law Group, P.C., Debtor's Counsel | $175,000(est.) | Paid on the Effective Date of the Plan. |
| Chapter 11 Trustee | $150,000 (est.) | Paid on the Effective Date of the Plan. |

Debtor's Fourth Amended Disclosure Statement - 39

| | | |
|---|---|---|
| Chapter 11 Trustee Counsel | $350,000 (est.) | Paid on the Effective Date of the Plan. |
| Chapter 11 Trustee Accountant / Other | $25,000 (est.) | Paid on the Effective Date of the Plan. |
| Clerk's Office Fees | $0.00 (est.) | Paid on the Effective Date of the Plan. |
| Office of the U.S. Trustee Fees | $650 (1st qtr 2014) | Paid on the Effective Date of the Plan. |
| | TOTAL $700,650.00 | |

The above figures are estimates by the Debtor as of the date this disclosure statement was filed. Please note that Debtor received unverified information from other parties that indicate that the total administrative claims could currently be as high as $700,650, and trustee's counsel indicated that he estimates the administrative fees to be *in excess of $1,000,000* by the Confirmation Date. Debtor respectfully points out that any and all footnote discussions of the administrative fee amount estimates, as criticized in **Exhibit U**, had been removed prior to Debtor's Third Amended Disclosure Statement. Debtor reserves the right to vigorously object to any and all unreasonable and excessive fees, and Debtor is currently not on notice to any interim fee applications filed by any party other than Debtor's counsel. Nevertheless, Debtor respectfully points out that it will have the necessary funds available at Confirmation (through cash in Debtor's DIP accounts, third party funding, and, subject to approval, funds from the Thorofare refinance) to pay any and all administrative claims and expenses in the amounts eventually determined and approved by the Court. See Section 4.03.

### 3.02.1.1 **Court Approval of Fees Required**

The Court must rule on all professional fees listed in the above-stated chart before the fees will be owed. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed professional fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be owed and required to be paid under this Plan.

//

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 40 of 85

As indicated above, the Debtor will need to pay the administrative claims of the professionals shown in the table above, which are currently estimated at $700,650 by the Debtor and $1,000,000 by the Chapter 11 trustee, on the Effective Date of the Plan unless the claimant has agreed to be paid later or the Court has not yet ruled on the claim. As indicated in Section 4.03, Debtor will have sufficient cash on hand to pay administrative claims on the Effective Date of the Plan. The source of this cash will be cash in Debtor's DIP bank accounts, cash from third party funding sources (new value), and cash from the Thorofare loan proceeds, subject to lender approval, that was previously earmarked for Planned Parenthood capital expenditures in an estimated amount to pay off the allowed administrative claims. The third party funding sources are insiders of the Debtor who will receive shares in the Reorganized Debtor, pursuant to a newly executed stock purchase agreement by a newly formed entity, within ten days of Confirmation Date of the Plan. The cash on hand plus allocated capital pursuant to the Thorofare Capital Amended Conditional Commitment Letter and subsequent closing, will be utilized to pay administrative claims and possible tenant improvements. See Section 2.07.

### 3.02.2    Priority Tax Claims

Priority tax claims are certain unsecured income, employment, and other taxes described by Code Section 507(a)(8). Except to the extent  the holder of a particular Allowed Priority Tax Claim agrees to a different treatment thereof, the Code requires that each holder of an Allowed Priority Tax Claim receive on account of such Claim regular installment payments: 1) of a total value, as of the Effective Date of the Plan, equal to the allowed amount of such Claim; 2) over a period ending not later than five years after the Petition Date under Section 301, 302 or 303; and 3) in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan (other than Cash payments made to a class of creditors under Section 1122(b)).

### 3.02.2.1  Treatment of Allowed Priority Tax Claims

The Debtor has no Section 507(a)(8) Priority Tax Claims. If it is determined that there are allowed Section 507(a)(8) Priority Tax Claims, such Allowed Priority Tax Claims will be paid in monthly installment payments such that they are paid in full within five years of the Petition Date,

---

Debtor's Fourth Amended Disclosure Statement - 41

with payments to commence within thirty days of the Effective Date, will include annual interest at the January 31, 2014 published rate for one-year Treasury constant maturities of (.26%), and will be fully amortized in 42 equal payments. Alternatively, the Allowed Claim amount may be paid in full on the Effective Date.

The following chart lists <u>all</u> of the Debtor's Section 507(a)(8) priority tax claims and their treatment under the Plan: **The Debtor has no Section 507(a)(8) priority tax claims**. [11]

| Description | Amount Owed | Treatment |
|---|---|---|
| · Name = Not Applicable<br><br>· Type of tax = None<br><br>· Date tax assessed = Not Applicable | 0.00 | · Pymt interval      =<br>· Est. pymt amt/interval  =<br>· Begin date          =<br>· End date            =<br>· Interest rate %      =<br>· Total payout amount%    = $ |

### 3.03      <u>Classified Claims and Interests</u>

#### 3.03.1    **Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate. Allowed Secured Claims are claims secured by the property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under §506 of the Bankruptcy Code.[12]  If the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a non-insider business  creditor unsecured claim. Upon Confirmation of the Plan, the below-listed classes relinquish their claims to and/or liens on Debtor's personal property assets, including but not limited to Debtor's cash collateral

---

[11]       In the event any taxing agencies filed Priority Tax Claims, the Debtor reserves the right to file an objection to such Claims on any appropriate grounds.

[12] The Debtor reserves its right to object to any of the Claims filed by the following Creditors on any reasonable grounds. Furthermore, Debtor will file objections to **Claims 7, 18, 20, 22, 27, 28, 32,** and **33** as these claims are not secured by property of Debtor's bankruptcy estate and as these purported creditors have no valid, contractual relations with the Debtor and no valid claims against the Debtor. The Debtor reserves the right to proceed in actions against third party borrowers' fraudulently recorded grant deeds on unrelated real properties.

accounts. The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under the Plan.

### 3.03.1.1 **Class 1**

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 1 | Secured claim of:<br><br>· Name = Summit Bank<br><br>· Collateral description = (see Definitions: Summit Bank Note 1 Collateral)<br><br>· Priority of security int. = 1st<br><br>· Amount owed = est. $8,350,000[13]<br><br>· Post-pet. arrearage amount = 0 (est) | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Pymt interval = Monthly<br>· Est. pymt amt/interval = $34,791.67 months 1-30 and $44,824.61 months 31-60<br>· Est. Balloon pymt = $8,030,100.42<br>· Begin date = 2/15/2014<br>· End date = 1/15/2019<br>Interest rate % = 5.0% fixed interest only months 1-30 and amortized over 30 years in months 31-60.<br>· Total payout % = 100%<br>Est. $10,418,588.40 will be paid over on 100% of a principal balance of est. $8,350,000.<br>· Treatment of lien = Lien on the Summit Bank Note 1 Collateral is retained and in full force and effect. |

Comments:

Class 1 consists of the Allowed Claims of Summit Bank or the holder of the Summit Bank Note 1. Class 1 is impaired under the Plan.

As of the Confirmation Date of the Plan, all defaults under the Summit Bank Security Documents shall be nullified and shall be deemed "cured" and all consequences of default shall be eliminated, including, but not limited to, the accrual of interest at the default rate and the imposition of late fees.

The allowed secured claim of Summit Bank is estimated to be in an amount of $8,350,000 or such other amount as determined by this Court under 11 U.S.C. § 506 (the "Allowed Secured Claim of Summit Bank"). Pursuant to the Plan, in the event that the Court enters a Final Order determining that the value of the Debtor's interest in the Summit Bank Note 1 Collateral is less than the Summit Bank's Claim amount, then the unsecured balance of the amount owed to

---

[13] This amount may not yet include all post-petition reasonable attorney's fees, arrearages, costs, and fees, if any, which this creditor may be entitled to pursuant to the loan documents, and as approved by the court in confirmed plan.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 43 of 85

Summit Bank (the balance of the Class 1 Claimant's Claim less the value of the Debtor's interest in the Summit Bank Note 1 Collateral) shall be paid under Class 6A of the Plan.

In full and complete satisfaction of the Allowed Secured Claim of Summit Bank, Summit Bank or the holder of the Allowed Class 1 Claim shall receive the following:

Payments to Summit Bank shall be made in monthly installments of interest, with interest calculated with reference to a fixed annual rate of interest of five percent (5%) and shall be interest only for the first thirty (30) months, after which payments shall be principal and interest based on an amortization schedule of thirty (30) years and be made in months 31-60. Interest shall begin to accrue as of the Effective Date. The first (1st) payment to Summit Bank shall be paid on the Effective Date, and the subsequent payment shall be due on the fifteenth (15th) day of the first (1st) full month following the Effective Date, with all subsequent payments of the fifteenth (15th) day of each following month, and shall be in an amount equal to a percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator). Once the final interest only payment is made in the thirtieth (30th) month, principal and interest payments shall commence on the thirty-first (31st) month and be due on the fifteenth (15th) day of each and every month until the sixtieth (60th) month after the Effective Date at which time the entire outstanding balance of the Allowed Secured Claim of Summit Bank shall be all due and payable. Upon payment in full of the Allowed Secured Claim of Summit Bank, the Summit Bank Note 1 Security Documents shall be deemed satisfied and shall be deemed canceled.

In the event that the Reorganized Debtor defaults in its obligation to pay each payment due and payable to Summit Bank pursuant to the Plan, the holder of the Summit Bank Note 1 shall be entitled to record a notice of default and accelerate the entire unpaid indebtedness and/or exercise such other remedies as provided under the Summit Bank Note 1 and the Summit Bank Note 1 Security Documents or under applicable California law. The Reorganized Debtor shall be entitled to cure and reinstate any such default under applicable California law.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 44 of 85

Any provisions and/or terms in the Summit Bank Note 1 and the Summit Bank Note 1 Security Documents that are inconsistent with Debtor's Plan or that require the Reorganized Debtor to pay a penalty or other charge for a pre-payment of any amount of the Allowed Secured Claim of Summit Bank shall be unenforceable and shall be deemed void.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 1 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

### 3.03.1.2 **Class 2**

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 2 | Secured claim of: <br> · Name =Bank of the West <br> · Collateral description = (see Definitions: Bank of the West Note 1 Collateral) <br> Collateral value = Fully secured <br> Priority of security int. = (see Definitions: Bank of the West Note 1 collateral) <br> · Amount owed = est. $3,278,510.00[14] <br> · Pre-pet. Arrearage amount = $ (included above) <br> · Post-pet. arrearage amount = $0(est) <br> · Total allowed secured claim amount = est. $3,278,510.00 | N | N <br><br> Not Impaired, Claims in this class are not entitled to vote on the Plan. | · Pay-Off on Effective Date: est. $3,278,510.00 <br><br> · Total payout % = 100% Est. $3,278,510 will be paid on 100% of est. principal balance of est. $3,278,510.00. <br> · Treatment of lien = Lien shall be cancelled and terminated upon receipt of Pay-Off Payment. |

Comments:

Class 2 consists of the Allowed Claims of Bank of the West or the holder of the Bank of the West Note 1. Class 2 is not impaired under the Plan. Since the Bank of the West Note 1 will

---

[14] This amount may not yet include all post-petition reasonable attorney's fees, arrearages, costs, and fees, if any, which this creditor may be entitled to pursuant to the loan documents, and as approved by the court in confirmed plan.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 45 of 85

be paid in full pursuant to the Plan, any event of default that may have existed pre-petition with respect to the Bank of the West Note 1 and/or the Bank of the West Note 1 Security Documents shall be deemed cured and any notice of default which may have been recorded pre- or post-petition with respect to the Bank of the West Note 1 and the Bank of the West Note 1 Security Documents shall be deemed null and void and of no further force or effect, and Bank of the West or the holder of the Bank of the West Note 1 shall execute any documents or instruments necessary to reflect the same, including the execution and recordation of a release of notice of default.

Debtor shall payoff in full the claims of Class 2, in an amount estimated at $3,278,510 on the Bank of the West Note 1 to Bank of the West on the Effective Date. There shall be no prepayment penalty, and the Swap Agreement shall be terminated.

Upon Debtor's making a lump-sum payment in an amount estimated at $3,278,510.00 to Bank of the West on the Bank of the West Note 1, which constitutes payment in full of the Bank of the West Note 1, the lien evidenced by the Bank of the West Note 1 Security Documents shall be deemed satisfied and shall be canceled. Bank of the West shall execute and record a reconveyance of its deed of trust and shall cancel and terminate any and all of its security interests, including but not limited to its UCC-1 Financing Statement.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 2 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

//

//

//

//

//

//

//

---

### 3.03.1.3 **Class 3**

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 3 | Secured claim of: · Name =Private Mortgage Fund, LLC · Collateral description = (see Definitions: Private Mortgage Fund Note 1 Collateral) · Collateral value = Fully secured Priority of security int. = (see Definitions: Private Mortgage Fund Note 1 Collateral) · Amount owed = est. $1,899,476.42[15] · Pre-pet. Arrearage amount = $ (included above) · Post-pet. arrearage amount = $0 (est) · Total allowed secured claim amount = est. $1,855,000.00 | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Down-Payment on Effective Date: $1,855,000.00 ·Remaining Balance: waived · Treatment of lien = Lien shall be cancelled and terminated upon receipt of Down-Payment. |

Comments:

Class 3 consists of the Allowed Claims of Private Mortgage Fund, LLC the holder of the Private Mortgage Fund Note 1. Class 3 is impaired under the Plan. Since Private Mortgage Fund, LLC is being paid $1,855,000.00 and waives the remaining balance pursuant to the Plan and the stipulation by and between Debtor and Private Mortgage Fund, LLC, any event of default that may have existed pre-petition with respect to the Private Mortgage Fund Note 1 and/or the Private Mortgage Fund Note 1 Security Documents shall be deemed cured and any notice of default which may have been recorded pre or post-petition with respect to the Private Mortgage Fund Note 1 and the Private Mortgage Fund Note 1 Security Documents shall be deemed null and void

---

[15] This amount may not yet include all post-petition reasonable attorney's fees, arrearages, costs, and fees, if any, which this creditor may be entitled to pursuant to the loan documents, and as approved by the court in confirmed plan. Private Mortgage Fund, LLC estimates the total value of its claim at an amount of $1,899,476.42 as of July 8, 2013.

1  and of no further force or effect, and Private Mortgage Fund, LLC or the holder of the Private

2  Mortgage Fund Note 1 shall execute any documents or instruments necessary to reflect the same,

3  including the execution and recordation of a release of notice of default.

4  Debtor shall make a lump-sum down-payment in an amount of $1,855,000 on the Private

5  Mortgage Fund Note 1 to Private Mortgage Fund, LLC on the Effective Date and Private

6  Mortgage Fund, LLC shall waive any remaining balance on the Private Mortgage Fund Note 1

7  pursuant to the stipulation by and between Debtor and Private Mortgage Fund, LLC. Exhibit K.

8  There shall be no prepayment penalty.

9  Upon the Reorganized Debtor's making a lump-sum payment in an amount of $1,855,000

10  to the Class 3 Claimant, the lien evidenced by the Private Mortgage Fund Note 1 Security

11  Documents shall be deemed satisfied and shall be canceled. Private Mortgage Fund, LLC shall

12  execute and record a reconveyance of its deed of trust and shall cancel and terminate any and all

13  of its security interests.

14  Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the

15  Class 3 claim to seek recovery on its claim as against any party other than the Reorganized

16  Debtor.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

### 3.03.1.4  Class 4

| CLASS # | DESCRIPTION | INSIDERS Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 4 | Secured claim of: · Name =Jacol · Collateral description = (see Definitions: Jacol  Note 1 Collateral) · Collateral value = Partially secured Priority of security int. = (see Definitions: Jacol  Note 1 Collateral) · Amount owed = est. $773,500[16] · Pre-pet. arrearage amount = $ (included above) · Post-pet. arrearage amount = $0 (est) · Total allowed secured claim amount = est. $650,000.00 | N | Impaired, Claims in this class are entitled to vote on the Plan. | · Down-payment of Effective Date: $200,000; · Balance of allowed secured claim is paid as follows: - Pymt interval after down-payment = Monthly - Est. pymt amt/interval = $2,697.98 months 2-7, $3,000.00 months 8-14, and $3,301.94 months 15-60 - Balloon pymt = est. $434,215.27 - Begin date = 2/15/2014 - End date = 1/15/2019 - Interest rate % = 6.0% fixed interest only months 2-7, 8% fixed interest only months 8-14, and amortized over 30,years in months 15-60 · Total payout % = 100% · $816,990.45   will be paid over sixty months on 100% of a principal balance of $650,000.00. · Treatment of lien = Lien on the Jacol Note 1 Collateral is subordinated to the Refinance Lender's lien but is otherwise retained and in full force and effect. |

Comments:

Class 4 consists of the Allowed Claims of Jacol or the holder of the Jacol Note 1. Class 4 is impaired under the Plan.

In full and complete satisfaction of the Allowed Secured Claim of Jacol, Jacol of the holder of the Allowed Class 4 Claim shall receive the following:

The allowed secured claim of Jacol is estimated to be in an amount of $650,000 or such other amount as determined by the Court under 11 U.S.C. §506 (the "Allowed Secured Claim of Jacol"). Pursuant to the Plan, in the event that the Court enters a Final Order determining that the

---

[16] Final amount would additionally include reasonable attorney's fees, arrearages, costs, and fees, if any, which this creditor may be entitled to pursuant to the loan documents, and as approved by the court in confirmed plan but is discounted by party stipulation.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 49 of 85

value of the Debtor's interest in the Jacol Note 1 Collateral is less than the Class 4 Claimant's Claim, then the unsecured balance of the amount owed to Jacol (the balance of the Class 4 Claimant's Claim less the value of the Debtor's interest in the Jacol Note 1 Collateral) shall be paid under Class 6A of the Plan.

The Debtor shall make a lump-sum paydown in an amount of $200,000 on the Allowed Secured Claim of Jacol on the earlier of the closing of the refinance loan or upon the Effective Date. The balance of the Allowed Secured Claim less the paydown amount of $200,000 shall be paid in sixty (60) monthly payments. For the first six (6) months, the Reorganized Debtor shall make monthly installments payments of interest only calculated at a fixed interest rate of six percent (6.0%). Thereafter, the Reorganized Debtor shall make interest only payments calculated at a fixed interest rate of eight percent (8.0%) for six (6) months. For the remaining 45 months, the Reorganized Debtor shall pay interest calculated at eight percent (8.0%) plus principal amortized over a term of 30 years. Interest shall begin to as of the Effective Date. The first (1st) monthly payment shall be due on the fifteenth (15th) day of the second (2nd) full month following the Effective Date. The interest amount of the first (1st) monthly payment shall be in an amount equal to a full monthly interest payment plus the percentage of a full monthly installment payment derived from the number of days remaining in the month in which the Effective Date occurs (the numerator) divided by the number of days in the month in which the Effective Date occurs (the denominator). Thereafter, payments shall be due on the fifteenth (15th) day of each and every month until the sixtieth (60th) month after the Effective Date at which time the entire outstanding balance of Jacol's Allowed Secured Claim shall be all due and payable. There shall be no prepayment penalty.

Jacol's lien on the Jacol Note 1 Collateral shall be subordinated to the lien(s) of Thorofare Capital, the refinance lender, effective the earlier of the closing of the refinance loan or upon the Effective Date.

Any event of default that may have existed pre-petition with respect to the Jacol Note 1 and/or the Jacol Note 1 Security Documents shall be deemed cured and any notice of default

which may have been recorded pre or post-petition with respect to the Jacol Note 1 and the Jacol Note 1 Security Documents shall be deemed null and void and of no further force or effect, and Jacol or the holder of the Jacol Note 1 shall execute any documents or instruments necessary to reflect the same, including the execution and recordation of a release of notice of default.

Upon payment in full of Jacol's Allowed Secured Claim, the Jacol Note 1 Security Documents shall be deemed satisfied and shall be deemed canceled.

In the event that the Reorganized Debtor defaults in its obligation to pay each payment due and payable to Jacol pursuant to this Plan, the holder of the Jacol Note 1 shall be entitled to record a notice of default and accelerate the entire unpaid indebtedness and/or exercise such other remedies as provided under the Jacol Note 1 and the Jacol Note 1 Security Documents or under applicable California law. The Reorganized Debtor shall be entitled to cure and reinstate any such default under applicable California law.

Any provisions and/or terms in the Jacol Note 1 and the Jacol Note 1 Security Documents that are inconsistent with Debtor's Plan or that require the Reorganized Debtor to pay a penalty or other charge for a pre-payment of any amount of the Jacol's Allowed Secured Claim shall be unenforceable and shall be deemed void.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 4 claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

//
//
//
//
//
//
//
//

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 51 of 85

### 3.03.1.5 **Class 5**

| CLASS# | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|---|
| 5(i) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Property Tax Lien APN 25-693-8<br>· Priority of security int. = 1st<br>Principal owed = $20,445.23<br>· Post-pet. Arrearage amount = $4,537.70 (est.)<br>Total allowed claim amount = $24,982.93 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payment of post-petition arrearage amount on Effective Date, then:<br>· Pymt interval = Monthly<br>· Est. pymt amt/interval = $659.65<br>· Balloon pymt = 0<br>· Begin date = 2/15/2014<br>· End date = 07/14/2017<br>· Interest rate % = 18.0%<br>· Total payout % = 100<br>$27,705.30 will be paid over 42 months at $659.65 per month on 100% of a principal balance of $20,445.23 unless Debtor finalizes and closes a refinance loan or the Pacific Thomas Property or Properties securing the lien is sold at which time the Class 5(i) Claimant will be paid in full at close of escrow. Treatment of lien = Lien is retained and in full force and effect. |
| 5(ii) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-701-6-4<br>· Priority of security int. = 1st<br>Principal owed = $67,298.70<br>· Post-pet. Arrearage amount = $70,935.59 (est.)<br>Total claim amount = $138,234.29 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payoff of total allowed claim amount, $138,234.29, on Effective Date |
| 5(iii) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-697-2-4<br>· Priority of security int. = 1st<br>Principal owed = $14,111.55<br>· Post-pet. Arrearage amount = $14,925.77 (est.)<br>Total claim amount = $29,047.32 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payoff of total allowed claim amount, $29,047.32, on Effective Date |
| 5(iv) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-697-3-6<br>· Priority of security int. = 1st<br>Principal owed = $14,046.11<br>· Post-pet. Arrearage amount = $14,665.22 (est.)<br>Total claim amount = $28,711.33 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payoff of total allowed claim amount, $28,711.33, on Effective Date |

| 5(v) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Property Tax Lien APN 19-102-4<br>· Priority of security int. = 1st<br>Principal owed = $8,727.82<br>· Post-pet. Arrearage amount = $2,286.48 (est.)<br>Total claim amount = $11,014.30 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payment of post-petition arrearage amount on Effective Date, then:<br>· Pymt interval = Monthly<br>· Est. pymt amt/interval = $281.60<br>· Balloon pymt = 0<br>Begin date = 2/15/2014<br>End date = 07/14/2017<br>· Interest rate % = 18.0%<br>· Total payout % = 100<br>$11,827.20 will be paid over 42 months at $281.60 per month on 100% of a principal balance of $8,727.82 unless Debtor finalizes and closes a refinance loan or the Pacific Thomas Property or Properties securing the lien is sold at which time the Class 5(v) Claimant will be paid in full at close of escrow. Treatment of lien = Lien is retained and in full force and effect. |
| 5(vi) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-701-11<br>· Priority of security int. = 1st<br>Principal owed = $104,603.25<br>· Post-pet. Arrearage amount = $27,104.94 (est.)<br>Total claim amount = $131,708.19 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payment of post-petition arrearage amount on Effective Date, then:<br>· Pymt interval = Monthly<br>· Est. pymt amt/interval = $3,374.95<br>· Balloon pymt = 0<br>Begin date = 2/15/2014<br>End date = 07/14/2017<br>· Interest rate % = 18.0%<br>· Total payout % = 100<br>$141,747.90 will be paid over 42 months at $3,374.95 per month on 100% of a principal balance of $104,603.25 unless Debtor finalizes and closes a refinance loan or the Pacific Thomas Property or Properties securing the lien is sold at which time the Class 5(vi) Claimant will be paid in full at close of escrow. Treatment of lien = Lien is retained and in full force and effect. |
| 5(vii) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-697-7-15<br>· Priority of security int. = 1st<br>Principal owed = $64,178.50<br>· Post-pet. Arrearage amount = $16,635.95 (est.)<br>Total claim amount = $80,814.75 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payment of post-petition arrearage amount on Effective Date, then:<br>· Pymt interval = Monthly<br>· Est. pymt amt/interval = $2,070.67<br>· Balloon pymt = 0<br>Begin date = 2/15/2014<br>End date = 07/14/2017<br>· Interest rate % = 18.0%<br>· Total payout % = 100<br>$86,968.14 will be paid over 42 months at $2,070.67 per month on 100% of a principal balance of $64,178.50 unless Debtor finalizes and closes a refinance loan or the Pacific Thomas Property or Properties securing the lien is sold at which time the Class 5(vii) Claimant will be paid in full at close of escrow. Treatment of lien = Lien is retained and in full force and effect. |
| 5(viii) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-697-7-14<br>· Priority of security int. = 1st | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payoff of total allowed claim amount, $11,468.22, on Effective Date |

| | | | | |
|---|---|---|---|---|
| | Principal owed = $4,692.80<br>· Post-pet. Arrearage amount = $6,775.42 (est.)<br>Total claim amount = $11,468.22 | | | |
| 5(ix) | Secured claim of:<br>· Name = Alameda County Treasurer<br>· Collateral description = Real Prop Tax Lien APN 25-707-14-2 (for 2012/2013 and Escape Tax)<br>· Priority of security int. = 1st<br>Principal owed = $1,935.05<br>· Post-pet. Arrearage amount = $1,385.80 (est.)<br>Total claim amount = $3,320.85 | N | Unimpaired, Claims in this class are not entitled to vote on the Plan. | Payment of post-petition arrearage amount on Effective Date, then:<br>· Pymt interval = Monthly<br>· Est. pymt amt/interval = $62.43<br>· Balloon pymt = 0<br>Begin date = 2/15/2014<br>End date = 07/14/2017<br>· Interest rate % = 18.0%<br>· Total payout % = 100<br>$2,622.06 will be paid over 42 months at $62.43 per month on 100% of a principal balance of $1,935.05 unless Debtor finalizes and closes a refinance loan or the Pacific Thomas Property or Properties securing the lien is sold at which time the Class 5(ix) Claimant will be paid in full at close of escrow. Treatment of lien = Lien is retained and in full force and effect |

Comments:

Classes 5(i) through 5(ix) consists of any and all secured claims for Real Property Taxes pertaining to the Pacific Thomas Properties. Classes 5(i) through 5(ix) are unimpaired under the Debtor's Plan.

The Debtor shall pay all Class 5 post-petition arrearages on the Effective Date.

The Debtor shall satisfy the (remaining) Allowed Secured Claims of the 5(ii), (iii), (iv), and (viii) claimants by paying their full claim amount, including any and all accrued post-petition interest and penalties, as a lump sum-payment on the Effective Date.

Payments on the (remaining) Allowed Secured Claims of the 5(i), (v), (vi), (vii), and (ix) claimants shall be made as described below:

The Class 5(i), (v), (vi), (vii), and (ix) claimants shall receive their post-petition interest and penalties on the Effective Date, after which deferred cash payments equal to the value of their Allowed Secured Claims as of the Effective Date will be paid in equal monthly installments of principal and interest sufficient to amortize the Allowed Secured Claim over a period of five (5) years from the Petition Date, all due in five (5) years from the Petition Date, commencing on the tenth (15th) day of the first full month after the Effective Date the outstanding and unpaid amount

---

Debtor's Fourth Amended Disclosure Statement - 54

of the Allowed Secured Claim Class 5 claimants will bear interest, commencing on the Effective Date and continuing until such Allowed Secured Claim is paid in full. Interest on the tax claim will be paid in accordance with applicable non-bankruptcy law at the rate of 18.0% per annum.

There shall be no prepayment penalty. Upon payment in full of each respective class 5 claimant pursuant to its treatment, the respective lien of said class 5 claimant shall be deemed satisfied, shall be deemed cancelled, and shall be withdrawn by said class 5 claimant,

### 3.03.2 Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a Claim receive cash on the Effective Date equal to the allowed amount of such Claim. However, a Class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claim. **The Debtor has no Claims of the type identified in Code Sections 507(a)(3), (4), (5), (6), and (7)**.

### 3.03.3 Classes of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following chart identifies the Plan's treatment of the classes containing all of Debtor's General Unsecured Claims:[17]

#### 3.03.3.1 **Class 6A**

//

//

//

//

//

---

[17]     The Debtor reserves its right to object to any of the Claims filed by the following Creditors on any reasonable grounds.

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 6A(i) | Non-insider unsecured claim of:<br><br>• Name = BKD, LLP<br><br>• Total amt of claim = $11,135.00 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $11,135.00 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $92.79<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
| 6A(ii) | Non-insider unsecured claim of:<br><br>• Name = Environmental Science Associates, Inc.<br><br>• Total amt of claim = $9,400.00 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $9,400.00 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $78.33<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
| 6A(iii) | Non-insider unsecured claim of:<br><br>• Name = Wendel, Rosen, Black & Dean, LLP<br><br>• Total amt of claim = $12,635.01 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of a principal balance of $12,635.01 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $105.30<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
| 6A(iv) | Non-insider unsecured claim of:<br><br>• Name = KCA Engineers, Inc.<br><br>• Total amt of claim = $28,926.01 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $28,926.01 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $241.05<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
| 6A(v) | Non-insider unsecured claim of:<br><br>• Name =Pacific Gas & Electric Co.<br><br>Total amt of claim = $3,689.11 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $3,689.11 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $30.74<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
| 6A(vi) | Non-insider unsecured claim of:<br><br>• Name = Mujeres Unidas y Activas<br><br>Total amt of claim = $3,500.00 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $3,500.00 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. 29.17<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 56 of 85

| 6A(vii) | Non-insider unsecured claim of:<br><br>• Name = Jacol (bifurcated)<br><br>• Total amt of claim = $123,500.00 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $123,500.00 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $1,029.17<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |
|---|---|---|---|
| 6A(viii) | Non-insider unsecured claim of:<br><br>• Name = Planned Parenthood Mar Monte, Inc.<br><br>• Total amt of claim = $36,720.00 | Y<br><br>Impaired claims in this class are entitled to vote on the plan | Claim will be paid 50% of its principal balance of $36,720.00 over sixty months:<br><br>- Pymt interval = Monthly<br>- Est. pymt amt/interval = est. $306.00<br>- Interest rate % = 0%<br>- Balloon pymt = $0.00 |

Comments:

Class 6A consists of the Allowed Claims of Non-Insider Trade and Business Creditors. Class 6A is impaired under the Plan. The Class 6A Claimants shall be treated as follows:

The Class 6A Claimants shall receive 50% of their respective claim amounts through sixty (60) equal monthly payments. No interest shall accrue on allowed claims of the Class 6A Claimants. The first (1st) monthly payment shall be due on the fifteenth (15th) day of the first (1st) full month following the Effective Date.

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 6A claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

//

//

//

//

//

//

//

//

//

Debtor's Fourth Amended Disclosure Statement - 57

### 3.03.3.2 **Class 6B**

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 6B | General unsecured claims of insiders<br><br>· Total amt of claim = $2,819,646.31 | Y<br><br>Impaired claims in this class are NOT entitled to vote on the plan | Claim will be paid only after payment in full to classes 1 through 5(ix) and Class 6A<br><br>· Pymt interval = Monthly<br><br>· Est. pymt amt/interval = t0.00<br><br>· Balloon pymt = $0.00<br><br>· Begin date = 2/15/2014<br><br>· End date = 1/15/2019<br><br>· Interest rate % = 0%<br><br>· Total payout = $0.00<br><br>· Treatment of lien = N/A. |

Comments:

     Class 6B consists of the Allowed unsecured Claims of insiders. Class 6B is impaired under the Plan. Class 6B Claimants shall be paid only after payment in full of Classes 1 through 6A.

     Class 6B claimants shall receive nothing hereunder should all creditors in Classes 1-6A not receive an amount whose present value equals its allowed claims under Debtor's Fourth Amended Plan.

     Further, the insiders of Class 6B intend to provide substantial new investment in the form of cash or sales proceeds from the sale of real property located in Hawaii to the Fourth Amended Plan in exchange for shares in the reorganized debtor entity that shall be formed to receive the proceeds of the Thorofare loan and confirmation of the Plan, along with the new investment of insiders. This investment will come from the proceeds of a sale of real property located in Molokai owned by Thomas Land Investments.

//

//

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 58 of 85

Nothing in the Plan shall enhance or otherwise increase the rights of the holder of the Class 6B claim to seek recovery on its claim as against any party other than the Reorganized Debtor.

### 3.03.4    Classes of Interest Holders

Interest holders are the party who hold ownership interest (i.e., equity interest) in the debtor. If the debtor is a corporation, entities holding preferred or common stock in the debtor are the interest holders. If the debtor is a partnership, the interest holders include both general and limited partners. If the debtor is an individual, the debtor is the interest holder. The following chart identifies the Plan's treatment of the class of interest holders.

#### 3.03.4.1 **Class 7**

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---|---|---|---|
| 7 | Interest holders<br><br>Randall Whitney Shareholder and President 2%<br><br>Jill Worsley Shareholder, Secretary and 2%<br><br>Edwin Thomas Revocable Living Trust Shareholder 92%<br><br>Roger W. Worsley Shareholder 2%<br><br>Stephen T. Worsley Shareholder 2% | Insider; claims in this class are not entitled to vote on the Plan | Class 7 is unimpaired under the Plan and will receive the pro-rata share of monies available after payment to classes 1 through 6A, B and C.<br><br>Class 7 equity holders will retain their equity in the reorganized Debtor subject to a share repurchase agreement for new value investors |

**Notwithstanding any other provision of the Plan, no payments or Distributions shall be made on account of any Disputed Claim or Disputed Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest, and then only to the extent it becomes an Allowed Claim or Allowed Interest. Any Proof of Claim or Proof of Interest filed which differs from the Scheduled amount is deemed to be a Disputed Claim or Disputed Interest.**

### 3.03.5    Deadline for §1111(b) Election

Creditors with an allowed secured claim can make a timely election under section 1111(b) no later than 14 days before the first date set for the hearing on confirmation of the Plan.

//

//

Debtor's Fourth Amended Disclosure Statement - 59

### 3.03.6 Resolution of State Court Actions

The Debtor believes the following state court action will be resolved prior to or shortly after the Effective Date:

Summit Bank v. Pacific Thomas (RG11) - Case # RG11574626.

### 3.04 Means of Effectuating Plan

#### 3.04.1 Funding for the Plan

The Plan will be funded by the following: The Reorganized Debtor shall make all payments due under the Plan out of the funds on hand in the Debtor's Estate as of the Effective Date and through the income generated through the leasing of the Pacific Thomas Properties. Additionally, Debtor contemplates to fund the Plan through a refinance or sale of one or more parcels of the Pacific Thomas Properties. Substantial new value investment provided by insiders shall provide the cash to pay off Administrative claims[18] on the Effective Date of the confirmation of the Fourth Amended Plan.

#### 3.04.2 Post-Confirmation Management

Loh Realty (http://www.lohrealty.com) and the Oakland office of Collier's International have offer services to the Debtor and will be retained as Debtor's post-confirmation property management company and leasing agent. Their duties will include supervision of the on-site manager, management of Debtor's commercial leases, and contracting with contractors for construction. Loh Realty and the Oakland office of Collier's International shall receive a management fee for the above-listed management services similar to the terms of Pacific Trading Venture's management contract. See **Exhibit C**.

The post-confirmation management of the Debtor itself will be as described in Section 2.03 *supra*.

//

---

[18] Property taxes, i.e. classes 5(ii), (iii), (iv), (viii), will be paid on the Effective Date from the proceeds of the Thorofare refinance.

---

Debtor's Fourth Amended Disclosure Statement - 60

### 3.04.3 Disbursing Agent

A neutral Person or entity shall be appointed by the Court to act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan. Debtor proposes that its CEO acts as Debtor's Disbursing Agent. The Disbursing Agent shall serve <u>without</u> bond and shall receive no fee for its services as a Disbursing Agent. The Disbursing Agent shall be responsible for the Distribution of the Debtor's Cash or any recoveries to Creditors pursuant to the provisions of the Bankruptcy Code and the Plan. The duties of the Disbursing Agent shall include preparing and filing the Post-Confirmation Status Reports with the Office of the United States Trustee and paying all post-confirmation quarterly fees of the Office of the United States Trustee until the bankruptcy case is dismissed or a final decree has been entered, whichever occurs first. The Debtor, not the Disbursing Agent, shall be responsible for operating the Debtor's business, maximizing the Debtor's business affairs, preserving the assets of the Debtor's bankruptcy state, and pursuing any claims held by the Debtor's bankruptcy estate, including any Avoidance Actions and Post-Confirmation Estate Claims. Any recovery from Avoidance Actions will be utilized to pay the Classes 1, 2, 3, 4, 5(i) – 5(ix), and 6A creditors in full.

### 3.05 <u>Risk Factors</u>

The proposed Plan has the following risks which could adversely impact the Debtor's ability to make Plan payments: (1) there is a possibility of default, i.e., possibility of inability to pay Plan payments, (2) the financial projections provided by the Plan Proponent may not be realized, (3) the business environment and real estate sale market may decline from its present level, (4) competition in the real estate market may increase, (5) the legal environment in terms of laws and regulations could change and have a negative impact upon the Debtor, (6) the reorganized Debtor could be sued and the costs and expenses of litigation could impact the Debtor's financial circumstances.

//

//

//

---

**3.06**      <u>Other Provisions of the Plan</u>

     **3.06.1**     **Executory Contracts and Unexpired Leases**

        3.06.1.1 **Assumptions**

The following are the unexpired leases to be assumed as obligations of the reorganized Debtor under this Plan:

     a)      Pacific Trading Ventures
                Commercial Lease

     b)      Mujeres Unidas Y Activas
                Commercial Lease

     c)      Avila Trucking
                Commercial Lease

     d)      Performance Contracting, Inc.
                Commercial Lease

     e)      Clark Construction
                Commercial Lease

     f)      Budget Parking
                Commercial Lease

     g)      Safe Parking
                Commercial Lease

See **Exhibit D** for unexpired leases and executory contracts being assumed.

On the Effective Date, the unexpired leases listed above if any shall be assumed as obligations of the reorganized Debtor. The Order of the Court confirming the Plan shall constitute an Order approving the assumption of the lease listed above. If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section 1.02.3 of this document for the specific date.

The following are the executory contracts to be assumed as obligations of the Reorganized Debtor under this Plan:

Debtor's Fourth Amended Disclosure Statement - 62

Sprint
Wireless Services Contract

AT&T Advertising Solutions

East Bay Municipal Utility District
4 Contracts

Pacific Gas & Electric Co.,
5 accounts.

3.06.1.2 <strong>Rejections</strong>

On the Effective Date, the following executory contracts and unexpired leases will be rejected:

Pacific Trading Ventures
Management Contract

Planned Parenthood Mar Monte, Inc.
Commercial Lease.

The Order Confirming the Plan shall constitute an Order approving the rejection of the lease or contract. If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section 1.02.3 of this document for the specific date.

THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF A LEASE OR CONTRACT IS <u>not applicable</u>. Any claim based on the rejection of a contract or lease will be barred if the proof of claim is not timely filed, unless the Court later orders otherwise.

### 3.06.2 Changes in Rates Subject to Regulatory Commission

This Debtor <u>is not</u> subject to governmental regulatory commission approval of its rates.

### 3.06.3 Retention of Jurisdiction

The Court will retain jurisdiction to the extent provided by law.

### 3.07 Tax Consequences of Plan

The following are the anticipated tax consequences of the Plan:

The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to the Debtor. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action on Debtor' tax liability.

The following are the tax consequences which the Plan will have on the Debtor' tax liability:

DUE TO THE UNSETTLED AND COMPLEX NATURE OF SOME OF THE TAX ISSUES, AS WELL AS THE POSSIBILITY THAT DEVELOPMENTS SUBSEQUENT TO THE DATE HEREOF COULD AFFECT THE TAX CONSEQUENCES OF THE PLAN, THE FOLLOWING DISCUSSION SHOULD NOT BE REGARDED AS DEFINITIVE OR AS COVERING ALL POSSIBLE TAX CONSEQUENCES. ADDITIONALLY, THIS SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR CREDITOR OR HOLDER OF AN EQUITY INTEREST IN LIGHT OF ITS INDIVIDUAL CIRCUMSTANCES OR TO CERTAIN CREDITORS AND HOLDERS OF EQUITY INTERESTS SUBJECT TO SPECIAL TREATMENT UNDER THE FEDERAL INCOME TAX LAWS (FOR EXAMPLE, LIFE INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, FOREIGN CORPORATIONS AND INDIVIDUALS WHO ARE NOT CITIZENS OR RESIDENTS OF THE UNITED STATES). THIS SUMMARY DOES NOT DISCUSS ANY ASPECT OF STATE, LOCAL OR FOREIGN TAXATION. HOLDERS OF CLAIMS ARE STRONGLY URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FEDERAL, STATE, LOCAL, AND FOREIGN) TO THEM OF THE PLAN.

---

This summary is based upon the laws, regulations, rulings, and decisions in effect on the date hereof and upon certain proposed and temporary regulations, all of which are subject to change (possibly with retroactive effect) by legislation, administrative action or judicial decision. Moreover, due to a lack of definitive judicial or administrative authority and interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. No rulings have been or are expected to be requested from the IRS or any state tax agency concerning any of the tax matters described herein. There can be no assurance that the IRS or any state tax agency will not challenge the positions taken by the Debtor with respect to any of the issues addressed herein or that a court of competent jurisdiction would not sustain such a challenge. The amount of tax liabilities, if any, will be affected by any deductions the Debtor will be entitled to take during the year. Debtor intends to consult with tax counsel prior to filing any post-confirmation tax returns and intends to take the maximum deductions allowable by law, offsetting some portion of tax liabilities, if any. Thus, at this time, the Debtor cannot estimate the amount of tax liabilities that will be incurred.

General tax consequences on creditors of any discharge, and the general tax consequences of receipt of plan consideration after confirmation cannot be quantified by the Debtor and creditors and interest holders are advised to consult with their own tax advisors respecting the tax consequences, if any, of the Plan, including state and local tax consequences.

### 3.08 The Absolute Priority Rule and New Value Exception

The absolute priority rule as codified under 11 U.S.C. §1129(b) prohibits the bankruptcy court from approving a plan that gives the holder of a claim anything at all unless all objecting classes senior to him have been paid in full. The absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under a reorganization plan. Thus, a plan may not give property of the holders of any junior claims or interest on account of those claims or interests, unless all classes of senior claims either receive full value of their claims or give their consent.

//

---

Debtor's Fourth Amended Disclosure Statement - 65

It is the Debtor's position that one may avoid the impact of the absolute priority rule in situations where the Debtor or equity holders who would be receiving or retaining property under the plan may make a substantial contribution. Here, insiders will supply new value, the cash necessary to raise sufficient proceeds to pay the Debtor's Administrative Claims. In particular, one or more of its insiders will sell real property in Hawaii that is currently owned by such insider(s) to raise sufficient proceeds to pay Administrative claims. See **Exhibit L**. If the insiders should not be able to liquidate the Hawaii real estate prior to plan confirmation, they will transfer title to the Hawaii real property into the name of the Reorganized Debtor at Confirmation, conditioned on Debtor's Plan, as amended, being confirmed as new value.

## **ARTICLE IV.**

## **CONFIRMATION REQUIREMENTS AND PROCEDURES**

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THIS PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Proponent CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a Plan. Some of the requirements include that the Plan must be proposed in good faith, acceptance of the Plan, whether the Plan pays creditors at least as much as creditors would receive in a Chapter 7 liquidation, and whether the Plan is feasible. These requirements are <u>not</u> the only requirements for confirmation. For a plan to be confirmable, the Plan must meet the requirements of Bankruptcy Code §1129(a) and §1129(b). Confirmation is sought under §1129(b) pursuant to the Fourth Amended Disclosure Statement and Plan of Reorganization under the Debtor's Proposed Refinancing and specifically requests confirmation of its Plan under 1129(b). Proponent's Plan

---

Debtor's Fourth Amended Disclosure Statement - 66

meets all requirements of §1129(a) except §1129(a)(8) and therefore confirmation of the Fourth Amended Plan is sought under §1129(b).

### 4.01    <u>Who May Vote or Object</u>

#### 4.01.1    Who May Object to Confirmation of the Plan

Any party in interest may object to the confirmation of the Plan, but as explained below not everyone is entitled to vote to accept or reject the Plan.

#### 4.01.2    Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

##### 4.01.2.1  What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an <u>allowed claim or interest</u> to have the right to vote. Generally, any proof of claim or interest will be allowed, unless a party in interest brings a motion objecting to the claim. When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE BAR DATE FOR FILING A PROOF OF CLAIM IN THIS CASE was December 10, 2012.

A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed. A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim. An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

##### 4.01.2.2  What Is an Impaired Claim/Interest

As noted above, an allowed claim or interest only has the right to vote if it is in a class that is <u>impaired</u> under the Plan. As provided in §1124 of the Bankruptcy Code, a class is impaired if

---

Debtor's Fourth Amended Disclosure Statement - 67

the Plan alters the legal, equitable, or contractual rights of the members of that class. For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that Class 100% of what they are owed.

In this case, the Proponent believes that classes 1, 3, 4, and Class 6A are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Proponent believes that classes 2 and 5(i) through 5(ix) are unimpaired. Holders of claims in unimpaired classes do not have the right to vote to accept or reject the Plan. Parties who dispute the Proponent's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Proponent has incorrectly characterized the class.

### 4.01.3    Who Is Not Entitled to Vote

The following four types of claims are not entitled to vote:  (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Code sections 507(a)(1), (a)(2), and (a)(7) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

### 4.01.4    Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject a Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

### 4.01.5    Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class,

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 68 of 85

and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed later in Section 4.01.7.

### 4.01.6    Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted, voted in favor of the Plan. A class of interests is considered to have "accepted" the Plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted, voted to accept the Plan.

**IMPORTANT NOTICE;  IF YOU ARE ELIGIBLE TO VOTE AND YOUR COMPLETED BALLOT IS NOT RECEIVED BY MATLOCK LAW GROUP, P.C., OFFICE ON OR BEFORE THE VOTING DEADLINE YOU WILL BE DEEMED TO HAVE VOTED TO ACCEPT THE PLAN.**

### 4.01.7    Treatment of Non-Accepting Classes

As noted above, even if all impaired classes do not accept the proposed Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Code. The process by which non-accepting classes are forced to be bound by the terms of a Plan is commonly referred to as "cramdown."  The Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

### 4.02    Liquidation Analysis

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such

---

holder would receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, the Debtor's assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien. Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any. For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons:  The Debtor's primary asset is the Pacific Thomas Properties. The Pacific Thomas Properties are encumbered by deeds of trust in favor of Jacol, Bank of the West, Private Mortgage Fund, LLC, and Summit Bank. The balance of the notes securing the Pacific Thomas Properties as of the Petition Date was approximately $13,420,000 (currently estimated at $13,877,219.42).

Based upon a very conservative estimate by the Debtor and pursuant to recent appraisals from CBRE, Integra Realty Resources, and Cushman Wakefield as well as recent estimates from storage industry professionals about potential values possible in a forced sale process, the liquidation value of the Pacific Thomas Properties is approximately $10,948,000. See **Exhibits H-J**.

This amount is lower than the fair market value of the properties because (1) in a Chapter 7 proceeding, only the liquidation value could be obtained, most likely with each parcel being sold separately or "cherry picked", which significantly reduces their overall value, and (2) there would be normal costs of sale and other costs of administration attendant to the Chapter 7 proceeding, including 6-12% of the sale price for brokerage fees, 10-15% for attorney's fees, and 15% or more for resulting income tax for this fully taxable transaction. The result is a 31 - 42%

---

Debtor's Fourth Amended Disclosure Statement - 70

reduction, according to various accounting professionals familiar with such a process in a Chapter 11 proceeding. This means there would not be sufficient proceeds generated by a liquidation sale of the Pacific Thomas Properties to pay all of the secured creditors in full. Although the Storage facility itself appears to be in strong market demand, such a sale could potentially negatively affect the sale price of the remaining parcels and ultimately hinder the ability to pay off all of the secured creditors. Therefore, a liquidation sale of the most valuable property alone may not be in the best interest of all of the creditors as a whole.

Similarly, the liquidation value of Debtor's personal property assets is significantly less than the value listed in Debtor's Schedule B[19] because said schedule requires updating and correction. As shown in detail in **Exhibit A**, Debtor believes that the majority of its notes receivable and (a significant part of its) "loans to shareholders" should have been written off or corrected in Debtor's books long before the instant bankruptcy case was filed and/or are not collectible, For example, PTC's payments for the business expenses of its shareholders were incorrectly booked as loans to shareholders, dividend payments to shareholders were booked as notes receivables, and PTC's investment in a land use development project was incorrectly booked as a note receivable. Additionally, the claim against Terry Hepler, Jose Coronado, and Ken Blunt is not collectible as Debtor is not aware of the whereabouts of said individuals, and Debtor made respective inquiries and believes that the costs to collect on the notes receivable would outweigh their value. Finally Debtor believes that its security access equipment is a fixture whose value increased and is included in the fair market value of Debtor's real properties.

Additionally, for liquidation purposes, Debtor estimates that only 20% of its Notes Receivable and Accounts Receivable can be collected. This is percentage is higher than the customary 3-16% debt buyers pay for such items, depending on their age and history.

//

---

[19] Schedule B will need to be corrected in particular with regards to the above-stated personal property items.

The conclusion that necessarily follows is that Unsecured Creditors of the Debtor's Estate would not receive any distribution were this Chapter 11 proceeding converted to one under Chapter 7 of the Code. The plan, which provides for a distribution to Unsecured Creditors, clearly provides a greater return to Unsecured Creditors than that which would be achieved in a Chapter 7. Consequently, the Debtor believe that the Plan, as proposed, provides to Unsecured Creditors more than they would receive were the Debtor's Case converted to one under chapter 7 of the Code. The Plan proposes to pay general unsecured creditors, Class 6A, approximately 50% of their total claims while a liquidation of the Debtor's estate would result in a 0% dividend. In a Chapter 7 case, a trustee is appointed and entitled to compensation from the Bankruptcy estate in an amount not to exceed 25% on the first $5,000 of moneys disbursed, 10% on any amount over $5,000 but less than $50,000, 5% on any amount over $50,000 but not in excess of $1 million and 3% on all amounts over $1 million. In this case, the trustee's compensation is estimated to equal $351,480.53 based upon a liquidated value of the Pacific Thomas Properties of $10,647,960.99 and a liquidation value of Debtor's personal properties of $222,462.00. See *supra*. Through the Plan, however, no Chapter 7 trustee's compensation will be incurred.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation. Please refer to **Exhibit A** for a detailed explanation of ***how*** the fair market value of the following assets was determined. This information is provided by the Debtor but incorporates proposed Lender Thorofare Capital's underwriting valuations pursuant to its Amended Conditional Commitment Letter, loan sizer, and recent appraisals from CBRE, Integra Realty Resources, and Cushman Wakefield, excerpts of which are also attached. See **Exhibits F, H**, **I**, and **J**.

//

//

//

//

# ASSETS VALUED AT LIQUIDATION VALUE

| Description | Liquidation Value | Secured Claim[20] | Net Proceeds |
|---|---|---|---|
| 2615 E 12th Street, Oakland, CA 94601 (APN 25-701-6-4) "Safe Storage" | $4,769,855.07<br><br>Less $138,234.29 tax liens equals:<br>$4,631,620.78 | $3,278,510.00 Bank of the West | $1,353,110.78 |
| 29th Avenue, Oakland, CA 94601 (APN 25-693-8; industrial-vacant land) "Derby" | $ 714,000.00<br><br>Less $24,982.93 tax liens equals:<br>$689,017.07 | $7,925,733.00 Summit Bank | $0.00 |
| 23rd Avenue, Oakland, CA 94601 (APN 019-102-004) | $306,000.00<br><br>Less $11,014.30 tax liens equals:<br>$294,985.70 | | $0.00 |
| 26th Avenue in Oakland, CA 94601 (APN 25-701-11) "Safe Storage Annex" | $1,748,946.86<br><br>Less $131,708.19 tax liens equals:<br>$1,617,238.67 | | $0.00 |
| 2783 E 12th Street, Oakland, CA 94601 (APN 25-697-7-15) "Safe Storage Annex" | $914,222.22<br><br>Less $80,814.75 tax liens equals:<br>$833,407.47 | | $0.00 |

[20] Final amount of each secured claim will additionally include reasonable attorney's fees, arrearages, costs, and fees, if any, which each respective creditor may be entitled to pursuant to the loan documents, and as determined / approved by the court in a confirmed plan.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 73 of 85

| | | | |
|---|---|---|---|
| 25th Avenue Oakland, CA 94601 (partial APN 25-707-14-2) "Safe Storage Annex" | $794,975.85<br><br>Less $3,320.85 tax liens equals:<br>$791,655.00 | | $0.00 |
| 2783 E. 12th Street, Oakland, CA 94601 (APN 025-697-02-04) "Morse" | $829,600.00<br><br>Less $29,047.32 tax liens equals:<br>$800,552.68 | $1,899,476.42 Private Mortgage Fund, LLC (est.)<br><br>$773,500.00 Jacol (est.) | $0.00 |
| 29th Avenue, Oakland, CA 94601 (APN 25-697-3-6) "Tuffy" | $656,200.00<br><br>Less $28,711.33 tax liens equals:<br>$627,488.67 | | $0.00 |
| 2783 E 12th Street, Oakland, CA 94601 (APN 25-697-7-14) | $214,200.00<br><br>Less $11,468.22 tax liens equals:<br>$202,731.78 | | $0.00 |
| Petty cash. | $0.00 | $0.00 | $0.00 |
| Est. Funds in DIP Accounts (incl. Pre-Petition Bank Acct. Balances) | $150,000.00 | $0.00 | $150,000.00 |
| 1091 Calcot | $0.00 | $0.00 | $0.00 |
| Regulars | $0.00 | $0.00 | $0.00 |
| Leon & Leon OHA Trust | $0.00 | $0.00 | $0.00 |
| Security/Deposits | $42,893.00 | $0.00 | $42,893.00 |
| Other | $0.00 | $0.00 | $0.00 |
| Loans to Shareholders | $41,515.00 | $0.00 | $8,303.00 |

Case: 12-46534   Doc# 449   Filed: 12/31/13   Entered: 12/31/13 13:12:53   Page 74 of 85

| | | | |
|---|---|---|---|
| Note receivable from China Sci-Tech | $0.00 | $0.00 | $0.00 |
| Note receivable from Pacific Trading Ventures | $66,000 | $0.00 | $13,200.00 |
| Note receivable Edwin Nova Thomas RLT | $0.00 | $0.00 | $0.00 |
| Note receivable Nova Group | $350,000.00 | $0.00 | $70,000.00 |
| Note receivable Terry Hepler | $0.00 | $0.00 | $0.00 |
| Note receivable Thomas California Investments | $0.00 | $0.00 | $0.00 |
| Note receivable Thomas Capital Investments | $0.00 | $0.00 | $0.00 |
| Note receivable Jose Coronado | $0.00 | $0.00 | $0.00 |
| Note receivable Ken Blunt | $0.00 | $0.00 | $0.00 |
| Note receivable Buhla R. Darrow | $0.00 | $0.00 | $0.00 |
| Accounts Receivable | $2,000.00 | $0.00 | $2,000.00 |
| Prepaid Insurance | $0.00 | $0.00 | $0.00 |
| Machinery & Equipment | $6,000 | $0.00 | $6,000.00 |
| TOTAL: | | | $1,645,506.78 |

## Liquidation Analysis

| | | |
|---|---|---|
| Personal Property at Liquidation Value | $292,366.00 | |
| Pacific Thomas Properties at Liquidation Value Less Tax Liens | $10,488,697.82 | |
| Total Assets At Liquidation Value: | $10,781,063.82 | |

| LESS LIABILITIES IN CHAPTER 7 CASE: | | |
|---|---|---|
| Less Secured Creditor Recovery[21] | $14,301,486.42 | |
| Less: Chapter 7 trustee's fees and expenses | $346,681.91 | |
| Matlock Law Group, P.C., Debtor's Counsel | $175,000.00(est.) | |
| Chapter 11 Trustee | $150,000.00 (est.) | |
| Chapter 11 Trustee Counsel | $350,000,000 (est.) | |
| Chapter 11 Trustee Accountant / Other | $25,000 (est.) | |
| Clerk's Office Fees | $0.00 | |
| Office of the U.S. Trustee Fees | $650 (1st qtr 2014) | |
| **% OF THEIR CLAIMS WHICH UNSECURED CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:** | **-0-** | |

Below is a demonstration, in tabular format, that all Creditors and interest holders will receive at least as much under the Plan as such Creditor or holder would receive under a Chapter 7 liquidation.

//

//

//

//

[21]

| Est. Classes 1 through 4 | $14,301,486.42 |
|---|---|
| Summit Bank (est.) | $8,350,000.00 |
| Bank of the West (est.) | $3,278,510.00 |
| Private Mortgage Fund, LLC (est.) | $1,899,476.42 |
| Jacol (est.) | $773,500.00 |

Debtor's Fourth Amended Disclosure Statement - 76

| CLAIMS AND CLASSES | PAYOUT PERCENTAGE UNDER THE PLAN | PAYOUT PERCENTAGE IN CHAPTER 7 LIQUIDATION |
|---|---|---|
| Administrative Claims | 100.00% | Estimated funds available for Administrative Claims sufficient to pay Administrative Fees and Costs are estimated at $346,681.91 and Chapter 11 Administrative Fees and Costs are estimated at $700,650.00[22]) |
| Classes 1 – 4 | 100.00% | 77.00% on average |
| Class 5(i) – 5(ix) | 100.00% | 100.00% |
| Class 6A Unsecured Trade and Business Creditors | 50.00% | 0% |
| Class 6B – Insiders Unsecured | 0% est. | 0% |
| Class 7– Interest Holders | To have their existing shares cancelled and be issued new shares in the Reorganized Debtor subject to a share repurchase agreement for new value investors. | 0% |

### 4.03    Feasibility

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date of the Plan to pay all the

---

[22] Based on the statements made by the Chapter 11 trustee's counsel, the administrative claims could be up to $1,000,000 or possibly even more.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 77 of 85

claims and expenses which are entitled to be paid on such date. The Plan Proponent maintains that this aspect of feasibility is satisfied as illustrated here:

Estimated Cash that the Debtor will have on hand

| | |
|---|---|
| by Effective Date: | $850,000 - $1,350,000,00.00 |
| **To Pay:** Est. Administrative claims[23] | $700,650.00 - $1,000,000.00 |
| **To Pay:** Statutory costs & charges | $0.00 |

Balance after paying these amounts.....................$149,350.00 -  $350,000.00

Proceeds of the Thorofare refinance that the Debtor will  have on hand

| | |
|---|---|
| by Effective Date: | 6,525,359.00 |
| **To Pay:** Classes 2 and 3 | $5,133,510.00 |
| **To Pay Pay-Down of** Class 4: | $200,000.00 |
| **To Pay:** Class 5's post-petition arrearages | $159,262.87 |
| **To Pay:** Classes 5(ii), (iii), (iv), (viii) | $100,149.16 |

Balance after paying these amounts................................... $932,436.97[24]

The sources of the cash Debtor will have on hand by the Effective Date, as shown above are:

| | |
|---|---|
| $150,000.00 | Cash in DIP Accounts (est. based on Chapter 11 Trustee's Monthly Operating Reports), |
| $600,000 -   $950,000.00 | Third party funding from insiders (new value; investment in return for shares in the Reorganized Debtor (est.); see **Exhibit O, R, S, T, V, W, X** |
| up to $250,000.00 | Cash from Thorofare previously earmarked for PPMM Tenant Improvements (see Exhibit F, Holdback for Tuffy's Building CapEx), subject to lender approval |
| $750,000 - $1,350,000.00 | **Total** |

---

[23] See section 3.02.1 of this Disclosure Statement.
[24] For further uses of the refinance funds, including but not limited to placement fees and costs, please refer to **Exhibit F**, the Thorofare Commitment document(s).

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 78 of 85

Insiders will supply new value, the cash necessary to raise sufficient proceeds to pay Administrative Claims. See **Exhibit R**. In particular, Debtor proposes that Thomas Land Investments, an insider of the Debtor, will sell real property in Hawaii that is currently owned by such insider(s) to raise sufficient funds to pay Administrative claims. Attached hereto as **Exhibit T** is a true and correct copy of a preliminary title report for the different parcels that the Molokai property is comprised of. Attached as **Exhibit O** is a true and correct copy of the fully executed listing agreement. Attached as **Exhibit S** are true and correct copies of the real property's 2013 tax assessments for the different parcels and a map showing said parcels, all of which were obtained from the Hawaii Information Service. Debtor anticipates that it will obtain $650,000 - 750,000 net proceeds from said sale. See **Exhibit V, R, and X.** If the insiders should not be able to liquidate the Hawaii real estate prior to plan confirmation, they will transfer title to the Hawaii real property into the name of the Reorganized Debtor at Confirmation, conditioned on Debtor's Plan, as amended, being confirmed. Moreover, Randall Whitney and/or Jill Worsley will obtain loans up to $500,000 using excess equity of additional real property they own if needed so that sufficient funds to pay administrative claims are available on the effective date of the plan. See **Exhibit X, ¶**8.

Debtor and proposed lender Thorofare Capital, pursuant to Debtor's Motion to Approve Post-Petition Financing and confirmation of Debtor's Fourth Amended Plan, intend to finalize loan documents and close a transaction under the Plan proposed hereunder to use the proceeds of such a refinance loan along with the new value investment of the insiders, to fund a new entity, the Reorganized Debtor, that implements the Plan outlined herein.

The second aspect considers whether the Proponent will have enough cash over the life of the Plan to make the required Plan payments. Debtor has consulted with several financial professionals regarding aspects of the Fourth Amended Plan. Capital Restructuring Group of Irvine, CA, has assisted in preparing pro forma income statements and balance sheets over five years based on current demand level for commercial leasing space near the BART station in the Fruitvale District of Oakland. In preparing the projected financials, Debtor consulted with

numerous real estate professionals that know the local Fruitvale District commercial leasing market and also the self-storage industry. Based on the input from these financials, Debtor worked with financial professionals to prepare the income statements and balance sheets. The financial statements are based on a number of assumptions, including the successful reorganization of the Debtor's business in a timely manner, continued strength in local market conditions, and the achievements of the projections reflected in the Fourth Amended Plan of Reorganization, such as equivalent leases being closed to those previously being contemplated with Debtor at the time of filing, increased rent revenues to reflect the currently strong leasing conditions in the local market, a stabilization of the vacancy rates in the self-storage business upon confirmation of Debtor's proposed Fourth Amended Plan, and availability of debt and equity capital throughout Debtor's Plan.

Based on the current projected financials, Financial Modeling Specialists of Walnut Creek, CA prepared a valuation of the Reorganized Debtor utilizing a discounted cash flow and weighted average cost of capital methodology to estimate a range of enterprise value. Mr. Bill Crisick of Financial Modeling Specialists prepared a Net Present Value analysis considering relevant discount rates related to Debtor's industry, business size, marketability, and specific company risks to assist with the WACC calculation. According to the valuation analysis, the Enterprise Value of the Reorganized Debtor is estimated to be approximately $20MM-$24MM, when considering a terminal value with a 5% growth rate, an overall weighted average cost of capital of 11.46% - 14.6%, and the current dollar amount levels of proposed new equity and debt.

Debtor Pacific Thomas Corporation ("Debtor") holds a unique relationship with the several properties located on East 12th Street and 29th Avenue. In addition to the self-storage asset under the brand name SAFE STORAGE, the property consists of two (2) commercial buildings and hosts three (3) parking lots located next door to the Fruitvale BART station.

Revenues have been increasing at the Pacific Thomas Properties for past 10 years on a year over year basis. The revenue increases are primarily due to the expansion of the Safe Storage self-storage operation, being increased from 56,000 leasable square feet to over 100,000 square

---

Debtor's Fourth Amended Disclosure Statement - 80

feet as currently situated. As of June 2013, the Safe Storage operation is operating at 76%
occupancy and has a composite lease rate of approximately $1.56 per square foot.

The Safe Storage business used to be operated by Pacific Trading Ventures, who leased
the self-storage property for $70,000 per month[25]. See **Exhibit G**. Additionally, the Safe Storage
Management Company leased parking areas and commercial spaces for the operation of their
business of Budget Truck Rental and Safe Parking program. See **Exhibit G**.

Projections for the Pacific Thomas properties from July 2013 going forward for the next 5
years show very positive potential due to both internal and external factors. See **Exhibit C**. The
most significant internal factor is the expiration of the 2005/2010 lease with Safe Storage
Management Company, which the Chapter 11 Trustee terminated. By either a takeover of the
leased space or through a newly negotiated lease with an increased rental amount commensurate
to market rental rates, Pacific Thomas anticipates that it will be able to recognize a robust 15-20%
increase in net profit. At current rents and expenses, the difference between re-entering into leases
with Safe Storage Management Company and Pacific Trading Ventures versus handling said
affairs directly through the Debtor amount to essentially a revenue neutral outcome. In other
words, if the leases are not renewed, then the Debtor, pursuant to its Fourth Amended Plan of
Reorganization, will assume both the rental revenues and the expenses, including those costs to
manage the storage units. Debtor believes that the market for rental property itself, both
commercial and self-storage, in the Fruitvale area of Oakland can deliver revenue increases in the
coming years compared to the depressed revenue obtained during the 2008-2013 time period. The
reasons for such increase are described below. In a takeover scenario, Pacific Thomas would
assume the approximate $115,000 gross revenues that were projected for the Safe Storage facility
as of October 2013. Rents for the self-storage operations should see a year over year increase in
rental rates by approximately 6-8 % consistent with the rental rate increases showing throughout

---

[25] Approximately $2,500 of this rental payment is for an office space located in the Morse Building, which
was leased by Pacific Trading Ventures. See **Exhibit G**.

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 81 of
85

the Oakland metro multi-family rental market. As of last year, Oakland achieved a 12% increase in rental rates, and was ranked #2 nationwide fastest growing rental market. Additionally, Safe Storage operations have been improving and occupancy continues to gain approximately 1% per month.

By January 2015, Pacific Thomas would be able to demonstrate the approximate 15 - 18% occupancy increase coupled with the rental rate increases to bring its gross revenue per month closer to $145,000.

Additional to the self-storage asset increasing over time, the commercial property activities continue to thrive and improve. Most importantly, the impacts felt from the local ACMC Highland Hospital $1.0Billion renovation and new Acute Tower being built have been a positive result for Pacific Thomas. Primarily, the general contractor, Clark Construction, has been a primary tenant for Pacific Thomas properties by utilizing parking spaces for employees, employing shuttle buses for transportation, and using the commercial space for both logistical off-sites but also as a showroom for their "mock" hospital rooms being built at the Highland campus. Clark now occupies the commercial space and pays an additional $3,700 per month for space, along with their parking use.

With stipulated termination of Planned Parenthood's lease of a commercial space located at Debtor's1111 29th Ave building, Debtor anticipates that it will be able to sign a new lease that will bring a triple net (NNN) lease rent of at least $12,000 per month to the Pacific Thomas financials within 2-3 months after the Effective Date. See **Exhibit C**.

Additionally, Performance Contracting Inc. has taken more commercial parking space and also utilizes storage space for their contracting needs. However, to account for Debtor probably not being able to continue to collect the full rent amount per the lease agreement for too much longer due to Summit Bank's efforts to foreclose the real property owned by Nova Group, which is utilized by Performance Contracting Inc., Debtor reduced its projected income stream from Performance Contracting Inc. in its income and expense projections accordingly. See **Exhibit C**.

---

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 82 of 85

As Debtor's financial income and expense projections demonstrate, Debtor projects the Pacific Thomas Properties will generate sufficient income to service all of the creditor's debts under the plan. See **Exhibit C**. The final payment under the Plan is expected to be paid on or before the 60th month after Plan confirmation.

The Proponent has provided the financial projections discussed above. Please refer to **Exhibit C** for a complete set of the detailed, relevant financial projections. YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL PROJECTIONS.

In summary, the Plan proposes to pay the Class 1 through 6A creditors through revenue generated by the rent proceeds and the sale or refinance of the Pacific Thomas Properties, per the treatments listed above. Class 6B creditors shall not receive anything for their claims but shall make a new equity investment and receive shares in the newly reorganized Debtor entity.

The Plan Proponent contends that Debtor's financial projections are reasonable in light of the current economic conditions in the Fruitvale district of Oakland. Therefore, Debtor's Fourth Amended Plan is workable and has a reasonable likelihood of success pursuant to §1129(a)(11) subject to this Court's approval of its Motion for Post-Petition Financing and subsequent execution of loan documents and closing of the Refinancing Transaction. As a result, the Plan Proponent believes that its Fourth Amended Disclosure Statement adequately describes a feasible Fourth Amended Plan of Reorganization.

**ARTICLE V.**

**EFFECT OF CONFIRMATION OF PLAN**

**5.01**      **Discharge**

This Plan provides that upon <u>confirmation of the plan</u>, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan to the extent specified in 11 U.S.C. § 1141. However, the discharge will not discharge any liability imposed by the Plan. Confirmation of the Plan does not discharge any debt provided for in the Plan until the Court grants a discharge on completion of all payments under the Plan, or as otherwise provided in

Case: 12-46534    Doc# 449    Filed: 12/31/13    Entered: 12/31/13 13:12:53    Page 83 of 85

§1141(d)(5) of the Bankruptcy Code. The Debtor will not be discharged from any debt excepted from discharge under §523 of the Bankruptcy Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

**5.02**     **Injunction and Stay.**

The entry of the Confirmation Order shall constitute an injunction applicable to all Persons, staying and enjoining the enforcement or attempted enforcement, by any means, against the Debtor, or property of the Estate, of all liens, Claims and debts to be treated under the Plan or discharged as set forth below and in Section 3.13.3.10 of the Plan.

**5.03**     **Revesting of Property in the Debtor**

Except as provided herein and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**5.04**     **Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation. However, the Court may require a new disclosure statement and/or re-voting on the Plan.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**5.05**     **Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

**5.06**     **Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan. If the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been

property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate. The automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances. The Court may revoke the order if the order of confirmation was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

### 5.07    Final Decree

Upon substantial consummation of the Plan and once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or such other party as the Court shall designate in the Plan Confirmation Order, shall file a motion and final account with the Court to obtain a final decree to close the case. The Debtor shall have the continuing obligation to pay the quarterly fees required by 28 U.S.C. §1930 until the case is closed, converted or dismissed.


Dated:  December 31, 2013                    Respectfully submitted,

By Plan Proponent,

/s/ Randall Whitney
Pacific Thomas Corporation, Debtor
Randall Whitney



Matlock Law Group, P.C.

By: /s/Anne-Leith Matlock
Anne-Leith Matlock, Esq.
Attorneys for Debtor

---